Zia Shaikh, in propria persona
200 Village Ctr Dr
Unit 7381
Freehold, New Jersey 07728

## DISTRICT COURT FOR THE UNITED STATES
## DISTRICT OF NEW JERSEY

_____

Zia Shaikh,                                    Civil Action No.

            Plaintiff,

    vs.

Laura L. Germadnig,
Siegfried Germadnig
Patricia Germadnig
Melissa Reeves
Kenneth Reeves
Mark Germadnig
Stacy GERMADNIG
Siegfried GERMADNIG Jr
Barus Germadnig
Crystal Germadnig
Skye Germadnig Jr
David Tarnowski
Nicole Tarnowski
Slava Kleyman
Nancy Cavanaugh
Louis Elwell
Janice Elwell
Christine Gilfillen
Sandra Seaman
Jack M
Nada Pityinger
Brett Pityinger
Daniel SCHASTNY
Kathleen SCHASTNY
Bradely Mckee
Rene Mckee
Robert Mckee
Carol Mckee
Stanley O'Brian
Lori O' Brian
Candy Mckee

Steven A. Zabarsky, Esq.,
Kimberly Zabarsky, Law firm
of Citta, Holzapfel & Zabarsky,
Legal Malpractice Insurance Carrier
for Citta, Holzapfel & Zabarsky,
Cathleen Christie-Coneeny, Esq.,
Legal Malpractice Insurance Carrier
For Cathleen Christie-Coneeny, Esq.,
Joseph Gunteski CPA
Cowan Gunteski & Co
John R. Wiley Jr, CPA,ABV,CGMA
AICPA (Association of International CPA's)
Seth Arkush, Integrated Care Concepts LLC
Jackson School District
Principal of Jackson Liberty HS
Principal of Christa Mcaulifee Middle School
Principal of Crawford Rodriguez elementary School
Stephanie J. Brown Esq
August J. Landi Esq
Margie McMahon Esq
David Schlendorf Esq
Jackson Twsp. Police Chief Matthew KUNZ
Jackson Township Police Officer Christopher Parise
Ocean Cty NJ Prosecutor Bradley Bilheimer
John Foti Jr
Madeline F. Einbinder J.S.C
Marlene L. Ford A.J.S.C
John S. Doran J.S.C.
Deborah H. Schron J.S.C.
John Does 1-10,
John Does 1-10, XYZ Corporations,

                          Defendants
_____    :

        Plaintiff, Zia Shaikh, plaintiff in the above captioned matter, states as follows:

**PARTIES**

**Plaintiff Zia Shaikh ("Plaintiff")** is an individual currently domiciled in the State of New Jersey, and resides at 200 Village Ctr Dr Unit 7381, Freehold,  07728, in Monmouth County, New Jersey at all times relevant to this Complaint.

**Defendant Laura Germadnig** ("Defendant Laura Germadnig") is an individual currently domiciled in the State of New Jersey, and resides at 172 Roosevelt Ave Howell, NJ 07731, at all times relevant to this Complaint.

**Defendant Siegfried Germadnig** ("Defendant Siegfried Germadnig") is an individual currently domiciled in the State of New Jersey, and resides at 172 Roosevelt Avenue, Howell, New Jersey 07731, at all times relevant to this Complaint.

**Defendant Patricia Germadnig** ("Defendant Patricia Germadnig") is an individual currently domiciled in the State of New Jersey, and resides at 172 Roosevelt Avenue, Howell, New Jersey 07731, at all times relevant to this Complaint.

**Defendant Melissa Reeves** ("Defendant M. Reeves") is an individual currently domiciled in the State of New Jersey, and resides at 39 Dawn Cypress Lane, Jackson, New Jersey 08527, at all times relevant to this Complaint.

**Defendant Kenneth Reeves** ("Defendant K.Reeves") is an individual currently domiciled in the State of New Jersey, and resides at 39 Dawn Cypress Lane, Jackson, New Jersey 08527, at all times relevant to this Complaint.

**Defendant Mark Germadnig** ("Defendant M. Germadnig") is an individual currently domiciled in the State of New Jersey, and resides at 172 Roosevelt Avenue, Howell, New Jersey 07731, at all times relevant to this Complaint.

**Defendant Stacy Germadnig** ("Defendant S.Germadnig") is an individual currently domiciled in the State of New Jersey,  and resides at 172 Roosevelt Avenue, Howell, New Jersey 07731, at all times relevant to this Complaint.

**Defendant Siegfried Germadnig Jr** ("Defendant Siegfried Jr") is an individual currently domiciled in the State of New Jersey, and resides at 172 Roosevelt Avenue, Howell, New Jersey 07731, at all times relevant to this Complaint.

**Defendant Barus Germadnig** ("Defendant B.Germadnig") is an individual currently domiciled in the State of New Jersey, and resides at 172 Roosevelt Avenue, Howell, New Jersey 07731, at all times relevant to this Complaint.

**Defendant Skyler Germadnig** ("Defendant S.Germadnig") is an individual currently domiciled in the State of New Jersey, and resides at 172 Roosevelt Avenue, Howell, New Jersey 07731, at all times relevant to this Complaint.

**Defendant David Tarnowski** ("Defendant D.Tarnowski ") is an individual currently domiciled in the State of New Jersey, and resides at 42 E. 4th St, Howell, New Jersey 07731, at all times relevant to this Complaint.

**Defendant Nicole Tarnowski** ("Defendant N.Tarnowski ") is an individual currently domiciled in the State of New Jersey, and resides at 42 E. 4th St, Howell, New Jersey 07731, at all times relevant to this Complaint.

**Defendant Slava Kleyman** ("Defendant Kleyman ") is an individual currently domiciled in the State of New Jersey, and resides at 1187 Marissa Dr Tomsriver, NJ 08724 , at all times relevant to this Complaint.

**Defendant Nancy Cavanaugh** ("Defendant Cavanaugh ") is an individual currently domiciled in the State of New Jersey, and resides at 1187 Marissa Dr Tomsriver, NJ 08724

**Defendant Louis Elwell** ("Defendant L.Elwell") is an individual currently domiciled in the State of New Jersey, and resides at 17 Raintree Ct Holmdel, NJ 07733 at all times relevant to this Complaint.

**Defendant Janice Elwell** ("Defendant J.Elwell") is an individual currently domiciled in the State of New Jersey, and resides at 17 Raintree Ct Holmdel, NJ 07733 at all times relevant to this Complaint.

**Defendant Christine Gilfillen** ("Defendant Gilfillen") is an individual currently domiciled in the State of New Jersey, and resides at 19 Rustic Ln Howell, NJ 07731, at all times relevant to this Complaint.

**Defendant Sandra Seaman** ("Defendant Seaman") is an individual currently domiciled in the State of New Jersey, and resides at 315 Elberon Ave Allenhurst, NJ 07711, at all times relevant to this Complaint.

**Defendant Jack M** ("Defendant Jack ") is an individual currently domiciled in the State of New Jersey, with an as yet known address, at all times relevant to this Complaint.

**Defendant Nada Pityinger** ("Defendant N.Pityinger") is an individual currently domiciled in the State of New Jersey, and resides at 482 Jamaica Blvd Tomsriver, NJ 08755, at all times relevant to this Complaint.

**Defendant Brett Pityinger** ("Defendant B.Pityinger") is an individual currently domiciled in the State of New Jersey, and resides at 482 Jamaica Blvd Tomsriver, NJ 08755, at all times relevant to this Complaint.

**Defendant Daniel Schastny** ("Defendant D.Schastny ") is an individual currently domiciled in the State of New Jersey, and resides at 174 Windeler Rd Howell, NJ 07731, at all times relevant to this Complaint.

**Defendant Kathleen Schastny** ("Defendant K.Schastny") is an individual currently domiciled in the State of New Jersey, and resides at 174 Windeler Rd Howell, NJ 07731, at all times relevant to this Complaint.

**Defendant Bradely Mckee** ("Defendant B.Mckee") is an individual currently domiciled in the State of New Jersey, and resides at 14 Lexington Rd Howell, NJ 07731,  at all times relevant to this Complaint.

**Defendant Rene Mckee** ("Defendant R.Mckee") is an individual currently domiciled in the State of New Jersey, and resides at 14 Lexington Rd Howell, NJ 07731, at all times relevant to this Complaint.

**Defendant Robert I. Mckee** ("Defendant R.I.Mckee") is an individual currently domiciled in the State of New Jersey, and resides at 99 Steiner Ave Unit 22, Neptune, NJ 07753, at all times relevant to this Complaint.

**Defendant Carol L. Mckee** ("Defendant C.Mckee") is an individual currently domiciled in the State of New Jersey, and resides at 99 Steiner Ave Unit 22, Neptune, NJ 07753, at all times relevant to this Complaint.

**Defendant Stanley O' Brian** ("Defendant S.O'Brian") is an individual currently domiciled in the State of New Jersey, and resides at 450 Cook Rd Jackson, NJ 08527, at all times relevant to this Complaint.

**Defendant Lori O' Brian** ("Defendant L.O'Brian") is an individual currently domiciled in the State of New Jersey, and resides at 450 Cook Rd Jackson, NJ 08527, at all times relevant to this Complaint.

**Defendant Candy Mckee** ("Defendant McKee") is an individual currently domiciled in the State of New York, with an as yet known address, at all times relevant to this Complaint.

**Defendant Steven A. Zabarsky, Esq.,** ("S.Zabarsky") is an individual and attorney with offices located at Citta, Holzapfel & Zabarsky, located at 248 Washington Street, Toms River, New Jersey 08753, and also resides at 712 Woodchuck Lane, Toms River, New Jersey, 08755.

**Defendant Kimberly Zabarsky,** ("K.Zabarsky") is an individual and spouse of Defendant Steven A. Zabarsky, Esq. domiciled in the State of New Jersey, and resides at 712 Woodchuck Lane, Toms River, New Jersey, 08755.

**Defendant Law firm of Citta, Holzapfel & Zabarsky,** ("Zabarsky Law firm") is a professional corporation located at 248 Washington Street, Toms River, New Jersey 08753.

**Defendant Legal Malpractice Insurance Carrier for Citta**, Holzapfel & Zabarsky is a  professional corporation with an as yet unknown address.

**Defendant Cathleen J. Coneeny, Esq.,** ("Defendant Coneeny") is an individual and licensed officer of the courts/attorney and owner of A & S Title Insurance Agency, with offices located at A & S Title Insurance Agency, 3215 Danskin Road, Wall, New Jersey 07719, at all times relevant to this Complaint.

**Defendant Legal Malpractice Insurance Carrier for Cathleen Christie-Coneeny, Esq.**,  is a professional corporation with an as yet unknown address.

**Defendant Joseph Gunteski CPA** ("Defendant Gunteski") is an individual and a licensed CPA with office address at 40 Bey Lea Rd Ste A101 Toms River, NJ 08753 at all times relevant to this complaint.

**Defendant Cowan Gunteski & Co, CPA**. (Defendant "Cowan Gunteski & Co") is a professional corporation doing business in the State of New Jersey, has the main office located at 40 Bey Lea Road Toms River, New Jersey 08753, at all times relevant to this Complaint.

**Defendant John R.Wiley CPA, ABV,CGMA**  ("Defendant Wiley") is an individual and a licensed CPA with office address at 200 Leigh Farm Rd Durham, NC 27707-8110 at all times relevant to this complaint.

**Defendant AICPA-CIMA (Association of International Certified Public Accountants)**. (Defendant "AICPA") is a professional corporation doing business in the State of New Jersey, has the main office located at 200 Leigh Farm Rd Durham, NC 27707-8110, at all times relevant to this Complaint.

**Defendant Seth Arkush, Integrated Care Concepts LLC (**"Defendant Arkush**)** is an individual and owner of said professional corporation domiciled in the State of New Jersey, with an address at 19 N.County Line Rd Jackson, NJ 08527, at all times relevant to this Complaint.

**Defendant Camille Eluzzi,** ("Defendant Eluzzi') is an Assistant Deputy Court Administrator for Jackson Township and is an individual currently domiciled in the State of New Jersey, and resides at 53 Newbury Road, Howell, New Jersey, 07731, at all times relevant to this Complaint.

**Defendant Jackson Township Police Chief Matthew Kunz ("**Defendant Kunz") is the chief of the Police Department of the New Jersey municipality of Jackson Township at all times relevant to this Complaint.

**Defendant Jackson Township Police Officer Christopher Parise** ("Defendant Parise") is the Police officer in the Police Department of the New Jersey municipality of Jackson Township at all times relevant to this Complaint.

**Defendant Geoffrey Brignola, Principal of Jackson Liberty High School** ("Defendant Brignola") is the principal of Jackson Liberty High School in the New Jersey municipality of Jackson Township at all times relevant to this Complaint.

**Defendant Debra Phillips, Principal of Christa McAulife Middle School.** ("Defendant Phillips")  is the principal of Christa Mcaulifee Middle School in the New Jersey municipality of Jackson Township  at all times relevant to this Complaint.

**Defendant Adrien Jean Denis, Principal of Crawford Rodriguez Elementary School** ("Defendant Jean Denis") is the principal of Crawford Rodriguez Elementary School in the New Jersey municipality of Jackson Township at all times relevant to this Complaint.

**Defendant Ocean County, New Jersey Prosecutor Bradley Bilheimer** ("Defendant Bradley" ) is the Ocean Cty New Jersey Prosecutor of Jackson Township at all times relevant to this Complaint.

**Defendant John Foti Jr** ("Defendant Foti Jr") is a former Prosecutor in the Ocean County, New Jersey Prosecutors office at all times relevant to this Complaint.

**Defendant Stephanie J. Brown Esq** ("Defendant Brown") was a formerly Licensed Attorney in New Jersey and have previously represented the Plaintiff at all times relevant to this Complaint.

**Defendant August J. Landi Esq** ("Defendant Landi Esq" ) is a Licensed Attorney in New Jersey and have previously represented the Plaintiff at all times relevant to this Complaint.

**Defendant Margie McMahon Esq** (" Defendant McMahon Esq" ) is a Licensed Attorney in New Jersey and have previously represented the Plaintiff at all times relevant to this Complaint.

**Defendant Judge Madelin F. Einbinder J.S.C** ("Defendant Einbinder J.S.C.") is the Superior Court, Family Part Judge, New Jersey at all times relevant to this Complaint.

**Defendant Marlene L. Ford A.J.S.C** ("Defendant Ford A.J.S.C.") is the Superior Court, Family Judge, New Jersey at all times relevant to this Complaint.

**John Does 1-10** are the Individual whose names are unknown to the Plaintiff at present and who may be added to this suit later at appropriate times.

**John Does 1-10, XYZ Corporation** are Corporate Companies whose names are unknown to the Plaintiff at present and who may be added to this suit later at appropriate times.

**JURISDICTION AND VENUE**

The jurisdiction of this Court is invoked by Plaintiff pursuant to Federal Tort Claims Act, Common Law Tort Claims, 28 U.S.C. §§1331 and 1343 which confer original jurisdiction upon the Court on the grounds that the instant action arises under the Constitution of the United States, the Civil Rights Acts of 1866 and 1871, as amended, 42 U.S.C. §§1981, 1983, 1985, 1986, and 1988.

This Court also has jurisdiction pursuant to the following statutes:

Federal Regulation of Commerce Jurisdiction:  Title 28 U.S.C. §1337;
Federal Supplemental Jurisdiction:  Title 28 U.S.C. §1367(a)-(b);
Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), Title 18 U.S.C. §§1961, 1962, 1964(a)-(d), 1965 (a), (b), and (d);
Federal Tort Claims Act;
Common Law Tort Claims;
Restatement of Torts;
The general legal and equitable powers of this Court.

Venue is proper under 28 U.S.C. §1391(b) as one or more Defendants are located or reside in this District and Vicinage, and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District.


**FACTUAL BACKGROUND**


**FACT NO:1**

On or about January 18, 2014, Plaintiff was falsely arrested and falsely imprisoned based on a false domestic violence temporary restraining order ("TRO") brought under the New Jersey Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 et seq., specifically an Harassment charge pursuant to N.J.S.A. 2C:33-4, entitled "*Laura L. Germadnig v. Zia H. Shaikh, Docket No. FV-15-001088-14*", filed by Defendant Laura Germadnig under false pretenses to obtain unfair advantage in the divorce matter entitled "*Zia H.Shaikh v. Laura L. Germadnig-Shaikh, Docket No. FM-15-500-14-W*".

Defendant Laura Germadnig filed the TRO upon advice of counsel, Defendant Coneeny, Esq.  Laura Germadnig dated Defendant Coneeny's brother in high school.  Defendant Coneeny is the landlady to Defendant Laura Germadnig's sister, Nicole Germadnig Tarnowski.

On or about September 2013, Defendant Coneeny was hired as divorce counsel by Defendant Laura Germadnig.  Defendant Laura Germadnig confirmed on multiple occasions to me directly that Coneeny bragged to Ms.Germadnig, that she knows how to make ***"Middle Eastern men cry".***

Plaintiff was falsely arrested by Jackson Township Police Department Officers Tristan Bennett and David Watson, and Sergeant Wayne Olejarz, on a domestic violence harassment charge *(N.J.S.A. 2C:33-4(c)).* Defendant Bennett is a friend of the Germadnig family.

Defendant Laura Germadnig falsely accused Plaintiff of domestic violence, specifically Harassment, by falsely alleging the couple got into a verbal argument, when Plaintiff grabbed her from behind in a "bear hug".  Defendant Laura Germadnig further falsely alleged that Plaintiff attempted to grab her purse from her hands, ripping out a chunk of hair, allegedly calling his daughter a "nigger".  Defendant Laura Germadnig never sought out any medical help, never went to a hospital, nor are there any medical records.  She never went to a domestic violence counselor when offered by the police that same date (1/18/2014).

Defendant Laura Germadnig made the false allegation to the police department claiming that the incident occurred in the marital residence on January 18, 2014, even though the January 30, 2014, Transcript of the domestic violence TRO hearing evidence that Laura Germadnig was not at the marital residence on the day of the alleged incident.

Plaintiff was arrested without probable cause, even though probable cause finding  determination box was checked off.  The person checking off the probable cause finding box was Defendant Camille Eluzzi, Assistant Deputy Court Administrator of the Municipal Court of Jackson Township; not possessing the power of a judicial officer.  On the signature line where the name "Judge Daniel F. Sahin" is written, not signed, the handwriting is of a female, not Judge Sahin. On closer inspection, Judge Sahin's handwritten name is identical to Defendant Eluzzi's handwriting.

Defendant Eluzzi has therefore impersonated a judicial officer in violation of *New Jersey Criminal Code, N.J.S.A. 2C:21-17* (impersonation).  The January 18, 2014, Complaint-Warrant was fraudulent because there was no probable cause to issue any warrant.  No affidavit of the probable cause was attached to the warrant.  Plaintiff was arrested on $5,000.00 bail, 10% cash.


## FACT NO:2

On January 30, 2014, the hearing for the TRO was commenced. As part of the hearing, Plaintiff testified that Defendant Laura Germadnig told Plaintiff that Defendant Coneeny bragged to Ms.Germadnig that she knows how to make "Middle Eastern men cry", indicating that Defendant Coneeny has done this to other Middle Eastern men in divorce matters before.  These comments were then further exacerbated by Defendant Laura Germadnig's divorce counsel, Defendant Zabarsky.  Since the April 23, 2014, hearing and in June 2014 motion filings, Defendant Zabarsky has repeatedly asked the Family Court Judge to confiscate Plaintiff's passport.  Defendant Zabarsky has stated in oral argument that he has reported that Department of Homeland Security, TSA  as well as other law enforcement authorities have been informed that Plaintiff is NOT allowed to travel outside of the United States and Plaintiff's movements will be watched and limited within the United States. All of these allegations are preceded by comments such as Plaintiff  "is a Pakistani national" and a "Muslim", and that Plaintiff "can take his children and relocate them to Pakistan".  Defendant Zabarsky further stated to the Family Court this has also been reported to the State Department which has already put a block on Plaintiff's children's names from any kind of travel with him; without ever providing any evidence to the court or the Plaintiff from any law enforcement agency for any legal reason by any party to take such action in violation of the Plaintiff's constitutionally protected rights.

Plaintiff's former attorney, August J. Landi, Esq., in his October 2014 motion filing brought this to the Family Court's attention about racial, religious, and nationality discrimination issues and Family Court Judge Madelin F. Einbinder ignored it.  Plaintiff has since tried to reapply for his passport twice but the

applications were rejected due to Judge Einbinder's order precluding Plaintiff from obtaining a replacement passport since Plaintiff's passport was stolen by Defendant Nada Pityinger who is a friend of Defendant Laura Germadnig and given to Ms. Germadnig for use against Plaintiff in the divorce and child custody matter.  These comments are indicative of the racial discrimination against Plaintiff in the family court matter. As a result of the TRO hearing, the trial judge could not find any element of domestic violence to grant a Final Restraining Order ("FRO") and dismissed the TRO in favor of the Plaintiff.


**FACT NO: 3**


On or about February 2014, Defendant Coneeny withdrew her representation of Defendant Laura Germadnig. On or about March 2014 Defendant Zabarsky entered the case as counsel for Defendant Laura Germadnig. As a result of the filing of the false domestic violence allegation, Plaintiff has been subjected by Defendant Zabarsky to false allegations and false representations to the Court that have resulted in unjust, unfair and unconscionable court orders by  County Superior Court Family Part Judge Madelin F. Einbinder, J.S.C. who is a friend and protégé of Defendant Zabarsky.

Plaintiff has learned that Defendant Zabarsky has personal and professional relationships with Family Part Judge Madelin F. Einbinder.  Plaintiff had hired attorney August J. Landi, Esq., in August 2014, to represent Plaintiff.  Landi told Plaintiff directly that Defendant Zabarsky had mentored Judge Einbinder before she became a judge and helped her with her law practice.  Plaintiff was told directly that Zabarsky was a prime mover to get Judge Einbinder on the bench in Ocean Coungty.  Plaintiff also personally spoke with Ian Goldman, Esq., who was an ex-partner of Madelin F. Einbinder, before she became a judge.  Goldman told Plaintiff directly that Judge Einbinder and Defendant Zabarsky have a very close professional and personal relationship.

Plaintiff's first attorney, Stephanie Brown, Esq.,  abruptly stopped representing him Since May 2, 2014, and Plaintiff began shopping for a new attorney.  In over a dozen conversations with lawyers, each time Plaintiff mentioned the opposing counsel is Steven A. Zabarsky, Esq., he was personally and directly told that Defendant Zabarsky is a notorious "THUG" in  Ocean county and has a reputation for dragging out the most minute issues to run up his legal bills and does not communicate with opposing counsel for a resolution. Defendant Citta, Holzapfel & Zabarsky is profiteering off of this extortion racket of destroying families through divorce actions in which Defendant Steven A. Zabarsky is part of.  Zabarsky is using the firm's political connection of having New Jersey State Senator James Holzapfel.  Defendant Kimberly Zabarsky, Steven A. Zabarsky's spouse, has also profited off of her husband's profiteering and extortion and is living comfortably from it.  With high probability, Defendant Kimberly Zabarsky is also a holder of the family finances and is complicit in her husband's profiteering and extortion racket.

Defendant Holzapfel and other  County politicians routinely ignore their constituents' complaints of judicial misfeasance and a malfeasance in the Family Courts and other courts. Legislators have an obligation to ensure that their constituents are served by an honest judiciary, and the ignoring by legislators of tangible evidence of judicial corruption is a betrayal of trust at least and is evidence of their (the legislators') corruption at most.  Holzapfel protects the judges in the  County. Given what happened to the deleterious actions and orders against Plaintiff in his current divorce action, Superior Court Judge Madelin F. Einbinder was mentored as an attorney, groomed for judgeship and promoted by Defendants Zabarsky and  Holzapfel.  Because of this there was an unconstitutional and conflict of interest quid pro quo with Judge Einbinder  and Defendant Zabarsky and members of Zabarsky's Defendant Law firm.

Due to this financial fraud and extortion by Defendants Zabarsky, the Law firm, and Cowan and Gunteski, causing financial devastation, Plaintiff has been financially and familiarly destroyed as part of a campaign to deprive him of his children and all his life savings as a first generation immigrant from Pakistan. Also due to the malicious, unlawful and unconstitutional actions against Plaintiff to deprive him of his property through falsifying and fabricating the amount of money he makes and the amount of assets he has, and then threatening to deprive Plaintiff of liberties if he doesn't make payments on fraudulent, fictitious orders that have no bearing in reality, Plaintiff has no ability to pay and is being subjected to impossibility of performance.

**FACT NO: 4**

During the Ex-parte April 23, 2014 hearing, without notice or presence of the Plaintiff or his attorney Stephanie J. Brown, Defendant Zabarsky colluded with his friend and presiding Judge Einbinder to fast-track his Pendente Lite financial and custody motion from its return date on May 2, 2014, to April 23, 2014. Plaintiff's attorney, Stephanie Brown, Esq., was never noticed about the changed date to April 23, 2014. Plaintiff was never served notice that the hearing was moved up from May 2, 2014, to April 23, 2014. As a result of this ex parte hearing before Judge Einbinder, in violation of the *New Jersey Code of Judicial Conduct, Canon 3(A)(6)*, prohibiting ex parte hearings or communications, Judge Einbinder committed judicial misconduct and issued the Pendente Lite Order on April 23, 2014 granting Defendant Laura Germadnig sole possession of the marital residence at 5 Lons Lane, Jackson, New Jersey, which was valued at approximately $650,000 ($220,000 equity) on that date and Plaintiff was ordered to remove himself from the premises on April 23, 2014, granting Defendant Laura Germadnig sole custody of all three (3) minor children without conducting a plenary hearing.

During the part 2 of the Pendente Lite hearing brought on motion by Defendant Laura Germadnig, returnable June 13, 2014, Defendant Laura Germadnig was further granted $800.00 per week of unallocated support without Plaintiff having any pre-deprivation/ability-to-pay hearing. Plaintiff was further ordered to issue a check in the amount of $50,000 (FIFTY thousand dollars) to the trust account of Defendant Law firm Citta, Holzapfel & Zabarsky, plus an additional $15,000 (FIFTEEN thousand) to the Defendant Law firm for fees, plus an additional $10,000 (TEN thousand) to Defendant Cowen & Gunteski, for forensic accounting fees to try and uncover the fictitious, fabricated millions of dollars that Plaintiff purportedly was alleged to be hiding, according to Defendant Zabarsky's repeated mantra.

Defendant Zabarsky regularly uses forensic accounting firm Defendant Cowen & Gunteski for matrimonial financial forensic work. Defendant Cowen & Gunteski are the most expensive CPA firm in the county. Defendant Laura Germadnig was granted all other relief requested. Plaintiff was forced to represent himself because he could not afford counsel because he was paying all of his money and assets for Defendant Laura Germanig's counsel. Plaintiff was also forced to represent himself because no self-respecting attorney would take on his case when they heard that Defendant Zabarsky was representing Plaintiff's wife. Since these Pendente Lite orders, Plaintiff has suffered excessive financial and emotional damage. Plaintiff was a self-employed financial advisor who never made more than $120,000 per year of income. Plaintiff's income was received via check on commissions earned. Plaintiff's credit has been severely damaged by the excessive Pendente Lite orders which materialized as same in the FJOD of Dec

2016. The former marital residence was finally sold at a Sheriff sale on Sep 09,2019 with a market value of over $1,000,000.

Due to these fraudulent and fictitious Pendente Lite orders obtained unfairly by Defendant Zabarsky, Plaintiff has been severely financially damaged to the point that it is affecting his ability to earn income. Def. Zabarsky continually used his position as a well-known municipal prosecutor in Ocean County and his well-connected political connections through Defendant Law firm Citta, Holzapfel & Zabarsky, to maliciously abuse the family court process in  County by making false representations against Plaintiff, where Zabarsky knows he will face no repercussions.

Due to  these malicious, fraudulent, and unconstitutional acts by Defendants Zabarsky, Laura Germadnig, and other named Defendants, Plaintiff is continually suffering financial devastation and threat of deprivations of his constitutionally protected Liberties by civil coercive contempt of court and forced labor.


**FACT NO: 5**

Plaintiff states that Defendant Melissa Reeves attacked him physically on March 10, 2014.  Plaintiff filed a complaint, Complaint No. 1511 S 2014 000229, against Reeves for assault and filing a false police report with law enforcement of assault against Plaintiff on March 28, 2014.  Plaintiff also filed a Complaint, Complaint No. 1511 S 2014 000230, against Reeves for Harassment on March 28, 2014, for calling Plaintiff an *"asshole", "jerk", "piece of shit", "fuck head"* in front of Plaintiff's two (2) minor children while Plaintiff and the children were in his own home.  Probable cause was found on the Harassment charge.  However, again, probable cause on Complaint No. 1511 S 2014 000230 was signed off on by the Jackson Township Assistant Deputy Court Administrator Camille Eluzzi who impersonated a sitting Judge and signed her name as a Judicial Officer.

On March 10, 2015, the Complaints against both sides were mutually dismissed.  Plaintiff contends that the only reason Defendant Melissa Reeves filed charges against him were to help her best friend, Defendant Laura Germadnig, by maliciously abusing the court process with a case of malicious prosecution.

Defendant Kenneth Reeves, husband to Defendant Melissa Reeves, was pretending to be Plaintiff's friend and passing along information that Plaintiff would tell Kenneth Reeves about the divorce situation, to Defendant Laura Germadnig.  This information that was passed along to Defendant Kenneth Reeves resulted in Defendant Melissa Reeves to commit malicious abuse of process and malicious prosecution against Plaintiff, in order to help their friend, Defendant Laura Germadnig.

**FACT NO: 6**

Defendants Siegfried Germadnig and Patricia Germadnig are the parents of Defendant Laura Germadnig. They financially are funding unnecessary and frivolous litigation by continually funding their daughter Defendant Laura Germadnig's divorce case against Plaintiff.  They paid the initial $5,000.00 retainer for their daughter to hire Defendant Zabarsky in March 2014.  They instigated the false and malicious allegations of domestic violence against Plaintiff for purposes of stealing the marital residence by getting Plaintiff out of the residence and ultimately off the deed.  Defendants Siegfried and Patricia Germadnig

have had a history of deceiving and manipulating others through swindling others out of real estate and personal property; as they are known grifters.

In a separate case in Monmouth county Richard and Eileen Lapinski, the family of the late millionaire nurse Pauline Zawistowski filed a criminal theft complaint for abuse of the elderly and confiscation of her realestate and personal assets worth high seven figures. Defendants Siegfried and Patricia Germadnig swindled well over $500,000 in cash and jewelry from this elderly Pauline Zawistowski, whose address was 814 Hulses Corner Road, Howell, New Jersey. The Germadnig's moved into Pauline's house in Howell, New Jersey, since she was elderly and sick. The Germadnig's continued living in Pauline's house for free after Pauline died. The Germadnig's used the $500,000 for buying houses in their name, new cars, and European vacations with the entire family for a month. The law firm of Stark & Stark were able to avoid prison terms for these defendants upon the condition of vacating the senior victim's property.

In yet another separate incident Defendants Siegfried and Patricia Germadnig also stole $150,000 from a dentist in Sea Girt, Monmouth County. Siegfried was a contractor and promised to put an addition on the dentist's home for $150,000 and never put on the addition but stole the money. There was a big criminal investigation and charges were filed. Disposition of the matter is not known. In the instant case Defendants Siegfried and Patricia Germadnig are currently involved in interfering with the Plaintiff's fundamentally secured parental rights by secreting the children from the inception of this divorce case and in violation of court-ordered parenting time and refuse to allow Plaintiff to have the children. From June 6, 2015-June 14, 2015, Defendant Laura Germadnig went on vacation to Europe without the children and left the children to be watched by her parents, Defendants Siegfried Germadnig and Patricia Germadnig. They interfered with my parental rights by preventing me from seeing my own children and disallowing the children to contact me. This constitutes emotional and physical child abuse.


**FACT NO: 7**

In early 2014, Defendant Laura Germadnig had spy software installed on Plaintiff's cell phone. In a Notice of Cross-Motion To Enforce Litigant's Rights Pursuant to Rule 1:10-3 and For Other Relief, returnable August 1, 2014, filed by Defendant Laura Germadnig and Defendant Zabarsky, they provided evidence that they had received documentation of my texts without my knowledge. At pp. 6-8, paragraphs 9-11 citing EXHIBIT "D", Defendants Laura Germadnig and Zabarsky admit they had accessed Plaintiff's cell phone through the parties' 11-year-old daughter's cell phone being used to access Plaintiff's search mode for his telephone.

Defendant Laura Germadnig and her attorney, Defendant Zabarsky without much effort had his friend Judge Einbinder accept a childish explanation in his pg. 6, paragraph 9 of the July 16, 2014, certification, that; "The Plaintiff has a Familyware cellular telephone plan through T-Mobile. The family plan allows him to monitor our daughters', Sonya and Milana's use of their cellular telephones. Because this is a "Familyware plan", not only can the Plaintiff monitor their cellular telephone use, but our daughters can also see whatever the Plaintiff searches or transacts on his cellular telephone".

There is no such thing as a "Familyware" cellular telephone plan by T-Mobile. The app is called "Familywhere". On or about July 20, 2014, Plaintiff personally contacted T-Mobile, and spoke to a technology representative named Sandy, who confirmed that there is no such technology of mirroring of another person's cell phone—except for a spy software installation.

On February 28, 2015, Plaintiff had a vehicle bug sweep inspection done because Defendant Laura Germadnig has been texting and contacting Plaintiff about all of his movements of where he has been. On April 21, 2015, USA bug sweeps, Inc., TSCM "Debugging" Experts gave Plaintiff a report that they conducted a Level 1 Physical and Basic RF Inspection on Plaintiff's gray 2004 Ford Taurus vehicle, New Jersey Registration P82-ECN.  The Level 1 Basic Physical & RF Inspection revealed that even though there were no signs of a GPS tracker installed on the OUTSIDE of the vehicle, the multi-frequency RF detector that was used did detect an unidentified intermittent radio signal that registered a distinct signal in the area inside of the Plaintiff's vehicle.   This signal is similar to that of a hardwired GPS tracker.  Such hardwired devices can be buried under the dash or in the side panels of the vehicle.  Because of financial constraints, Plaintiff was unable to perform a more advanced Level 3 Electronic Inspection.

Besides the bugging of Plaintiff's vehicle, the phone tapping of Plaintiff's cell phone are violations of Federal Wiretapping Laws, 18 U.S.C. §2510 et seq.  They are also violation of *New Jersey Wiretapping Laws, N.J.S.A. 2A:156A-4(c).*


**FACT NO: 8**

Defendants LAURA L. GERMADNIG, SIEGFRIED & PATRICIA GERMADNIG, MELISSA & KENNETH REEVES, MARK & STACY GERMADNIG, SIEGFRIED. JR & BARUS GERMADNIG, CRYSTAL GERMADNIG, SKYE GERMADNIG, DAVID & NICOLE TARNOWSKI, SLAVA KLEYMAN, NANCY CAVANAUGH, LOUIS & JANICE ELWELL, CHRISTINE GILFILLEN, SANDRA SEAMAN, JACK M, NADA PITYINGER, BRETT PITYINGER, DANIEL & KATHLEEN SCHASTNY, BRADELY & RENE MCKEE, ROBERT & CAROL MCKEE, STANLEY & LORI O' BRIAN CANDY MCKEE, STEVEN A. ZABARSKY, ESQ., JACKSON TWP. POLICE CHIEF MATTHEW KUNZ, JACKSON TWP. POLICE OFFICER CHRISTOPHER PARISE, OCEAN CTY, NJ PROSECUTOR BRADLEY BILHEIMER, JOHN FOTI JR, MADELINE F. EINBINDER J.S.C., MARLENE L. FORD A.J.S.C, JOHN S. DORAN J.S.C., DEBORAH H. SCHRON J.S.C., JOHN DOES 1-10, JOHN DOES 1-10, XYZ CORPORATIONS, have made a Contempt of a judicial order, a fourth-degree crime in violation of *N.J.S.A. 2c:29-9(a) (Four hundred fifty-nine counts);* and Interference with custody of a minor child in violation of 2c:13-4a (Four hundred fifty-nine counts)

LAURA L. GERMADNIG et al is guilty of 459 counts of 2C:13-4 *and* 459 counts of 2C:29-9: Regarding violations of parenting time orders:  There have been a series of parenting time orders in this case of the Plaintiff.

(a) In the last sentence of paragraph #3 of an order entered June 13, 2014, Plaintiff was granted "Pending the parenting time mediation, the parenting time for Harrison & Sonya will be one (1) night during the week and one day during the weekend, with no overnights until further Order of the Court."  Parenting time mediation did take place, but the defendant would not agree to anything so parenting time mediation was unsuccessful.

(b) The next Order was entered on December 18, 2015, so the above parenting time schedule was in effect from Friday June 13, 2014, through Friday December 18, 2015, a total of 79 weeks.  Since parenting time was to be twice per week, that means that there would have been *158 days of parenting time during that period*.  In actuality, during the period from Friday June 13, 2014, through Friday December 18, 2015, because the defendant would *never* provide the children to me, Sonya and Harrison and I were together for ZERO DAYS OF PARENTING TIME.  Presuming that the "one (1) night during the week" would have averaged about four hours, and the "one day during the weekend" would have averaged about eight

hours, that resulted in twelve hours of parenting time each week. Multiplying twelve hours by 79 weeks, we find that Sonya, Harrison and I were deprived of 1,896 hours of parenting time during the period from June 13, 2014, through Friday December 18, 2015.

The next order pertaining to parenting time was entered on December 18, 2015. Paragraph #3 of that order reads "3) Parenting Time; Effective 12/13/15 the first phase of the Parties transitional parenting time schedule shall commence with the Plaintiff / Father having parenting time with the minor children every Thursday from 4:00pm until 7:30pm and every Sunday from 12 noon until 6 :00pm." The next Order was entered on June 10, 2016, so this parenting time schedule was in effect from Sunday December 13, 2015, through Friday June 10, 2016, a total of 183 days, including 26 Thursdays and 26 Sundays. During that period, the defendant brought Sonya and Harrison *only* on Sunday, December 20, 2015, for the full six-hour period, and on Thursday December 24, 2015. On December 24 defendant only allowed the children to stay for 30 minutes because, she said, she had to go home and bake cookies. (Reading the order, I do not find a "cookie-baking" exemption.) Thus, Defendant deprived Plaintiff of 25 Thursdays @ 3.5 hours each, 25 Sundays @ 6 hours each, and an additional 3 hours on Thursday December 24, for a total of 50 days or 153 hours.

(d) The next order pertaining to parenting time was entered on June 10, 2016 . Paragraph #11 of that order reads (in part) "Plaintiff shall continue to be required to have supervised parenting time with the two minor children, Sonya Shaikh and Harrison Shaikh, but supervision shall be in the future supervised by the Ocean County Family Probation Department or by a third party or entity acceptable to both parties. Both parties shall submit the name or names of potential third party supervisors of parenting time, but until such time as the third party is mutually agreed to, the Plaintiff shall have parenting time supervised through the Court program." Needless to say, no person that plaintiff proposed was acceptable to defendant, and no subsequent order has changed this.

( e) When the Plaintiff left the courtroom on June 10, 2016, Plaintiff immediately went to the Ocean County Probation's supervised parenting time program office, where I met parenting time coordinator Lynn Gawlick. She told Plaintiff there was a four-month backlog to get into the parenting time program in the courthouse, or rather than using their program, I could use either Catholic Charities on Long Beach Island, or Preferred Children's Services in Lakewood. Either of them, she told, would charge $45 per hour. Plaintiff didn't want to wait four months until I again saw my children, and Long Beach Island was too far, so I elected to temporarily use Preferred Children's Services until space became available in Ocean County Probation's supervised parenting time program.

(f) Plaintiff hereto has a report dated December 22, 2016, from Pauline M. Chiocchi, Visitation Counselor at Preferred Children's Services. In it she reports that each parenting time is for one hour, from 5:30 PM to 6:30 PM, and are scheduled for every Tuesday beginning August 9, 2016. The report is dated December 22, 2016, 19 weeks after we began in Preferred Children's Services' supervised parenting time program. In it, Ms. Chiocchi reports that 24 visits were scheduled, but only 8 took place. If parenting time is every Tuesday beginning August 9, 2016, and this report is dated 19 weeks later, how could there have been 24 visits scheduled' That is because the defendant continually canceled visits. In her report, Ms. Chiocchi reports the defendant's excuses for canceling 13 of the visits. Thus, defendant demonstrates that even if parenting time is only *one hour per week*, it is her intention to *not* cooperate with or promote *any* parenting time between the children and their father. Of the parenting times that were scheduled on 13 separate dates at Preferred Children's Services, 13 never occurred.

(g) Plaintiff had run out of money to pay for Preferred Children's Services' supervision services, so Plaintiff returned to Ocean County Probation's supervised parenting time program. They were able to accommodate us beginning Tuesday, March 21, 2017. Immediately following the one-hour parenting time, Plaintiff was arrested on a child support warrant. The next time Plaintiff was able to use Probation's supervised parenting time program was on Tuesday, June 20, 2017, and parenting time was scheduled for every Tuesday thereafter from 6:30 PM to 7:30 PM. In the twelve weeks since then, defendant did not show up with the children on NINE more days … June 27, July 4, July 18, or JULY 27, 2017, August 15, 22, 29, September 5, 12.

(h) As demonstrated in the preceding paragraphs, the total court-ordered parenting time missed because of defendant's willful contempt of court orders was 158 days or 1,896 hours from June 13, 2014, through Friday December 18, 2015, 50 days or 153 hours from December 18, 2015, to June 10, 2016, 13 days or 13 hours from June 1, 2016, to December 22, 2016, and One hundred seventy days or 170 hours from December 22, 2016, to June 25,2020. The grand total time from June 13, 2014, through June 25,2020 that the children were deprived of court-ordered parenting time with their father was 378 days or 2,427 hours.

(i) Defendant is guilty of depriving father and children of 378 days of parenting time. *Per N.J.S.A. 2C:13-4,* Interference with Custody is a crime. "A person, including a parent, guardian, or other lawful custodian, is guilty of interference with custody if he: (1) Takes or detains a minor child with the purpose of concealing the minor child and thereby depriving the child's other parent of custody or parenting time with the minor child;" That is exactly what the defendant did … take or detains a minor child with the purpose of concealing the minor child and thereby depriving the child's other parent of parenting time … and she did it 378 times.

(j) Further, since all listed defendants collaborated, in depriving the children and me of <u>court ordered</u> parenting time, they are all in violation of N.J.S.A. 2C:29-9, Contempt. "A person is guilty of a crime of the fourth degree if he purposely or knowingly disobeys a judicial order or protective order," … "or hinders, obstructs or impedes the effectuation of a judicial order or the exercise of jurisdiction over any person, thing or controversy by a court, administrative body or investigative entity." Defendant committed this crime, too, 378 times.

<u>Defendant is guilty of 459 counts of 2C:13-4 *and* 459 counts of 2C:29-9.</u> 2C:13-4: "Interference with custody is a crime of the second degree if the child is taken, detained, enticed, or concealed … (ii) for more than 24 hours." Every time defendant withheld parenting time, she detained and concealed the children for more than 24 hours, so each of her violations is a crime of the second degree with *no presumption of non-incarceration*. Further, since there were *two* children withheld each time, Sonya and Harrison, defendant is guilty of 459 counts of 2C:13-4 *and* 459 counts of 2C:29-9.

(a) There are not, and never were, any order(s) preventing Plaintiff's children and Plaintiff from communicating with each other by phone. Plaintiff used to provide cell phones for his children, and we would talk with or text each other whenever we felt like it. But, the defendant mother Laura Germadnig in her insane paranoia, also felt that the children's *phones* contained tracking devices, and, on December 20, 2016, during our last parenting time at Preferred Children's Services, defendant had the children return their phones to Plaintiff and purchased new cell phones for all the children while refusing to provide their phone number, precluding any contact with any of the children for over EIGHT years now.

(b) Paragraph #5 of the order entered December 18, 2015 (Exhibit "B") reads "<u>Telephonic Contact with the Children</u>: Both Parents are entitled to daily telephonic contact with the children when they are in the

care and control of the other Parent. Both Parents shall be respectful though of bedtimes for the children In each Parents domiciles when calling, texting or utilizing a webcam, Both Parents shall maintain a working telephone number at all times and communicate the same to the other Parent to effectuate this provision. If the Children are not available at the time that the initiating Parent calls then the Parent calling shall have the reasonable expectation of a return call on the same day. The children shall also not be unreasonably prevented from calling and/or texting either Parent on a daily basis, Both Parents shall provide reasonable assistance for the children if they wish to communicate with the other Parent also as prescribed herein." Further, the last sentence of paragraph #7 of an order entered February 17, 2017 (copy attached hereto as Exhibit "F") reads "The children are in possession of cell phones, and the Plaintiff[ ] should encourage and permit the children to communicate with their father, the Plaintiff, on a regular and frequent basis." These defendants to this day are willfully participating in the alienation of the parent-child relationship.

**FACT NO: 9**

In a report produced by Cowan Gunteski & Co, dated June 09,2015 on page 2 pp 3 it was claimed *"During the course of our discovery, **we have found** that the Shaikh's have over $650,000 in assets as shown .."*; Then in pp 4 it was further claimed *"Mr. Shaikh has withdrawn and/or closed bank account in the amount of $419,222"*. The Gunteski defendants repeatedly failed to inform the court that their report was not final, but preliminary in nature and could not be relied upon. Plaintiff has made several requests to the Gunteski defendants to correct their error and inform the court but they refuse to set the record straight. Defendants Zabarsky and the Law firm were involved in mail fraud and wire fraud by regularly sending threatening letters and faxes about arranging for Plaintiff's incarceration if he did not pay additional $20,000 in fees to these defendants. These demands were made directly to Plaintiff and his counsel in order to extort monies out of Plaintiff they could not find, despite several years of forensic accounting. Def.'s Zabarsky, Cowan Gunteski & Co and Joseph Gunteski CPA himself testified in court about their claims without ever any evidence of same. These threatening letters and faxes lead to Plaintiff being under threat of contempt, arrest and incarceration. This mail fraud and wire fraud included mailings and faxes of unjust, inequitable and unconstitutional orders against Plaintiff that were issued and filed by Def. Judge Einbinder and Def. Judge Marlene L. Ford leading to erroneous orders of the FJOD in December of 2016. Till this day the FJOD in-equitable distribution haunts Plaintiff based on the fraudulent preliminary report submitted to the court. Plaintiff then filed a complaint with the AICPA-CIMA on or about Nov 5, 2018, about the fraud being committed by the Gunteski defendants. AICPA-CIMA is the regulatory body over all licensed CPA's across the country; all correspondence was led by John R. Wiley Jr. CPA, ABV, CGMA, manager of the ethics committee. After much correspondence and submission of evidence Def. Wiley chose to dismiss the complaint on Sep' 23,2019 stating on a recorded phone call with Plaintiff that "since the Gunteski report was a preliminary report, he is denying an investigation into the complaint"; the letter of dismissal fails to assert his verbal claims. This demonstrates the continuation of collusion and fraud by the AICPA-CIMA thru it's agent Def. Wiley to protect the Gunteski defendants who are in blatant violation of the NJ Rules of evidence and professional conduct rules of the AICPA-CIMA.

Additionally, Plaintiff and his counsel were denied any defense or ability-to-pay hearings against the financial fabrications by these Defendants since Def. Judge Einbinder is beholden to Defendant Zabarsky and Defendant Law firm.

Defendant Cowan and Gunteski are also committing mail fraud and wire fraud by submitting fraudulent extortion letters to the Court, Plaintiff and Defendant Zabarsky claiming that they don't know what happened to monies that they "believe" Plaintiff may be hiding. Cowan and Gunteski are purportedly a

top New Jersey matrimonial forensic accounting firm, that were hired in April 2014 to investigate Plaintiff. Plaintiff was ordered to pay them at $15,000 retainer extortion in January 2015.  They have been investigating Plaintiff in what can only be described as a "fishing expedition" for over EIGHT years now and have found nothing. They want additional fees of $ 20,000 to concoct a scam accounting procedure to show that they "may" have found something to justify their fees.  This is part of the extortion scam/scheme and quid pro quo between Defendants Zabarsky, the Law firm, Cowan and Gunteski and Laura Germadnig. This is all part of the extortion and fraud agenda by Cowan and Gunteski against Plaintiff because of their close associations with Defendants Zabarsky and the Law firm, who use Cowan and Gunteski in almost all of their matrimonial forensic cases.

**FACT NO: 10**

Defendants, Jackson School District and respective Principals of Jackson Liberty HS, Christa McAuliffe Middle school, Crawford Rodriguez elementary school- Refused to provide any physical or telephonic access to Plaintiff's three children despite court orders, refused to accept the JURY VERDIT ORDER of Sep 06,2019 and challenged Plaintiff to sue them. All principals regularly harassed Plaintiff when seeking report cards and seeking help for Plaintiff's children who all had POOR struggling grades; threatened to call police if Plaintiff attempted to attend kids' graduation ceremonies from these public institutions.

Defendants four Previous LAWYERS:  Stephanie J. Brown, August J. Landi, Margie McMahon, David Schlendorf- NONE of them ever cited Plaintiff's constitutional rights or filed anything in the courts etc. to assert Plaintiff's INALIENABLE constitutionally protected parental rights and thus have committed these TORTS under constitutionally protected rights.

Defendants, Jackson Twsp. Police chief Matthew Kunz and Jackson Township Police officer Christopher Parise - Deliberately interfered and refused to take in police reports on Plaintiff's complaints. - Harassed Plaintiff when he called in to request wellness checks on his children since the beginning of the divorce case starting in 2014.

Defendants, Ocean cty NJ prosecutor Bradley Bilheimer, John Foti Jr, under direct supervision of Bradley Bilheimer's command refused prosecution of Laura Germadnig for willfully violating Plaintiff's parental rights and provided her protection by abuse of power and process- Bilheimer is a former criminal defense attorney for Laura Germadnig from an earlier case, causing exceptional conflict of interest.

Defendant Madeline F. Einbinder J.S.C. Ocean county family court judge -Without any testimony from Laura or any evidence from Zabarsky Esq, removed me from home and took away my custody at the Ex-parte April 23,2014 hearing in violation of court rules and Judicial canons. Defendant Marlene L. Ford A.J.S.C. Ocean county Assignment judge -DESPITE receiving over TWENTY motions for parenting time REFUSED to even get Plaintiff, his kids phone numbers from Defendant mother Laura Germadnig and continued to JAIL Plaintiff for non-payment of alleged "Child support" without demonstrating subject matter or inpersonam jurisdiction while being challenged to demonstrate rule of law. Same actions were continued for several years by Defendants John S. Doran J.S.C., Deborah H. Schron J.S.C., under the guidance of Marlene L. Ford A.J.S.C.

Defendants, Joseph Gunteski CPA, COWAN GUNTESKI & CO forensic accountants- Submitted preliminary reports as final Forensic accounting reports leading to erroneous FJOD. Defendants, Seth Arkush MBA,MSW,LCSW, Integrated Care Concepts LLC- Submitted false personality report without ever meeting Plaintiff in violation of HIPPA rules and colluded to violate parent child relationship with co-defendants.

**LEGAL ARGUMENT**

**I. DEFENDANTS COMMITTED COMMON LAW TORT OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ( IIED) AGAINST THE PLAINTIFF.**

**II. DEFENDANTS COMMITTED COMMON LAW TORT OF PARENTAL ALIENATION SYNDROME ( PAS) AGAINST THE PLAINTIFF.**

**III. DEFENDANTS COMMITTED COMMON LAW TORT OF PARENTAL ALINATION OF AFFECTIONS AGAINST THE PLAINTIFF.**

**IV. DEFENDANTS COMMITTED COMMON LAW TORT OF PARENTAL ALEINATION AND INTERFERENCE WITH CUSTODY AGAINST THE PLAINTIFF.**

**V. DEFENDANTS COMMITED  COMMON LAW TORT OF PARENTAL ALEINATION AND CAUSED A CIVIL CONTEMPT**

**VI. DEFENDANTS COMMITTED COMMON LAW TORT OF PARENTAL ALEINATION AND CONTRIBUTED  A CAUSE FOR NON-PAYMENT OF CHILD SUPPORT BY THE PLAINTIFF**

**VII. DEFENDANTS HAVE COMMITTED A TORT VIOLATION OF THE RIGHT TO PRIVACY AGAINST THE PLAINTIFF.**

**VIII. DEFENDANTS HAVE COMMITTED MALACIOUS PROSECUTION AND HAVE MADE MALACIOUS ABUSE OF PROCESS.**

**IX. DEFENDANTS HAVE MADE FALSE ARREST AND FALSE IMPRISONMENT BY ABUSING THE PROCESS OF LAW AGAINST THE PLAINTIFF.**

**X. DEFENDANTS HAVE COMMITTED INTENTIONAL INFLICTION OF EMOTIONAL INJURY/DISTRESS TO PLAINITFF AND LIABLE FOR COMPENSATORY AND PUNITIVE DAMAGES**

**XI. FEDERAL US CONSTITUTIONAL PROTECTION OF CHILD-PARENT RELATIONSHIPS:**

**XII. FEDERAL PREJURY UNDER OATH OR ITS EQUIVALENT- 18 U.S.C.  § 1623(a)- VIOLATIONS BY DEFENDANTS**

**XIII. JUDICIAL BIAS- A US CONSTITUTIONAL VIOLATION FOR EQUAL AND FAIR JUSTICE**

**XIV. RICO CLAIMS VIOLATIONS**

**LEGAL ARGUMENT**

**I. DEFENDANTS COMMITTED COMMON LAW TORT OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ( IIED) AGAINST THE PLAINTIFF.**

The emotional distress tort recently has been used successfully as a remedy for victims of child snatching in a significant number of jurisdictions. This tort has been used against child-snatching parents, and also against those who aid the abducting parent. A tort-based suit potentially affords the victimized plaintiff the most complete compensation for his or her dam-ages-costs incurred in attempting to recover the child and damages for mental distress. And a tort suit may be more effective in prompting the return of the child than other remedies. In fact, the significance of the tort remedy grows when compared with other available remedies. Although most states have felony kidnapping statutes condemning parental kidnapping, even if a felony conviction results in the return of the child, no costs or mental distress damages are recoverable.

As held in **Cole v. Cole, 633 F.2d 1083, 1087 (4th Cir. 1980):** A district court may not simply avoid all diversity cases having intrafamily aspects. Rather it must consider the exact nature of the rights asserted or of the breaches alleged.

In **Wasserman v. Wasserman, 671 F.2d 832, 834-35 (4th Cir. 1982),** we held: [H]owever, the torts of child enticement and intentional infiction of emotional distress are in no way dependent on a present or prior family relationship. Most importantly, appellant is not seeking a determination of entitlement to custody or any other adjustment of family status. A decision by a federal court not requiring the adjustment of family status or establishing familial duties or determining the existence of a breach of such duties, does not contravene the domestic relations exception to federal diversity jurisdiction. **Kelser v. Anne Arundel County Dept. of Social Services, 679 F.2d 1092 (4th Cir. 1982)** (the action claimed deprivation by the husband of the plaintiff's right to the custody and society of her three minor children, a matter over which the district court did have jurisdiction, exercisable once state custody proceedings were concluded).

In **RAFTERY Vs. SCOTT  756. F.2d 335** it was held that, the Intentional Infliction of emotional distress and alienation of affection are two distinct causes of action. Under the former, a plaintiff must establish that the tort is intentional or reckless, the tortfeasor's conduct is outrageous and intolerable, the wrongful conduct and the emotional distress are causally connected and the emotional distress is severe. **Womack v. Eldridge, 215 Va. 338, 210 S.E.2d 145 (1974).** To recover for the tort of alienation of affection, at least as it existed prior to the 1968 statutory abolition, outrageous and intolerable conduct or a showing of severe emotional distress were not prerequisites for recovery. Instead, a plaintiff need only show a "malicious" (meaning unjustifiable) interference or an intention that such interference result in the loss of affection. Annotation, Right of Child or Parent to Recover for Alienation of Other's Affections, 60 A.L.R.3d 931, 939 (1974), citing **Strode v . Gleason, 9 Wn. App. 13, 510 P.2d 250 (1973**) (allowing compensatory damages against a third party who maliciously alienated the affections of a minor child).

Unlike the tort of intentional infliction of emotional distress, alienation of affection also has required an existing family relationship. See generally, 9B Michie's Jurisprudence of Virginia and West Virginia § 101 (1984); 60 A.L.R.3d 931, 935. Hence, not only are the elements of the two causes of action different, but intentional infliction of emotional distress implies a higher burden of proof than alienation of affection. We have here, therefore, not merely a solitary rose (alienation of affection) but rather a bouquet containing, in addition, the tulip of intentional infiction of emotional distress.

To put things somewhat differently there might in the case have been no diminution in the son's affection for the father. Yet, realizing that the father was not in a position to provide him a home, and appreciating that custody had been awarded to the mother, the son might have concluded that his best interests dictated a display by him of an assumed indifference towards, even dislike for, his father to make life more tolerable at home. The unwarranted breach in the physical relationship and its resulting adverse impact on the father would have entitled Raftery to some damages, even if the affection of his son for him remained unabated.

"The harm of deliberate frustration of a close and affectionate relationship between parent and child, which the evidence permitted the jury to find in the instant case, were there no remedy available to a parent who as a result was psychologically damaged strikes us as more potentially a danger to society." Majority Opinion, p. 340. 11. If such a result of narrowing the domestic relations exception is to be brought about, it should be done by the action of Congress, rather than by this whittling away process. It is signifcant that Congress has accepted the domestic relations exception for over 100 years, without undertaking to reduce it or to change it in any way.

In *__Kajtazi v. Kayiazi, 488 F. Supp. 15 (E.D.N.Y. 1978)__* the mother awarded custody pending divorce sued her husband and his relatives for their role in her husband's abduction of her child to Yugoslavia. The mother, on her own behalf and as guardian ad litem for the child, alleged defendants false imprison-ment, intentional infliction of mental suffering, prima facie tort and civil conspiracy. The district court dismissed the latter two causes of action respectively, as duplicative and not recognized in New York. It awarded plaintiffs general and punitive damages of $176,430 and $5,000 legal expenses on the other counts, noting that: It is difficult to conceive of intentional conduct more calculated to cause severe emotional distress than the outrageous conduct of the defendant, Fabian, in surreptitiously abducting the infant from his mother, who had legal custody, and falsely imprisoning him in Yugoslavia. This outrageous conduct constitutes the distinct tort of intentional infliction of mental suffering under New York decisional law.

The court in *__Wasserman v. Wasserman 671 F.2d 832 (4th Cir. 1982)__* reversed a trial court's dismissal of plaintiffs' claims of child enticement, intentional infliction of emotional distress, and civil conspiracy based on the father's abduction of his three children. Although the court concluded the allegations were not within the domestic relations exception to federal diversity jurisdiction, *( Id. at 834-35. The federal courts have long considered the granting of divorces and the determination of custody to be outside diversity jurisdiction. This doctrine, the domestic relations exception, arose from interpretations of dicta in Barber v. Barber, 62 U.S. (21 How.) 582,584 (1858) and Ex Porte Burrus, 136 U.S. 586 (1890). While many family questions are thus excluded from the federal courts, some issues are considered sufficiently removed from the marital relationship so as to fall outside the exception. Cole v. Cole, 633 F.2d 1083, 1087-89 (4th Cir.1980) (claims of malicious prosecution, arson, conspiracy and conversion)* it found that the complaint stated generally cognizable common law torts. Similarly, the Vermont Supreme Court found in Sheltra v. Smith, 392 A.2d 431 (Vt. 1978) a cause of action for intentional infliction of emotional distress where a mother alleged, she had been denied communication with her daughter for three weeks.

*In Lloyd v. Loefter, 694 F.2d 489 (7th Cir. 1982)* a Wisconsin district court concluded plaintiff had stated a cause of action for civil conspiracy under Wisconsin law against his ex-wife and certain of her family members for abduction and concealment of his child. The court decided defendants owed a duty to plaintiff, citing Section 700 and state criminal statutes against custodial interference. The compensatory damages of $95,000 later awarded by the court to plaintiff included $30,000 for emotional distress, and plaintiff also was to receive$2000 per month until his child was returned.

In *Fenslage v. Dawkn'ts, 629 F.2d 1107 (5th Cir. 1980)* a father refused to return his children to the custodial mother after summer visitation and fled to Canada. The mother alleged civil conspiracy and the intentional infliction of mental anguish through custodial interference. The jury, awarding her $65,000 in compensatory damages, concluded the defendant father and his relatives had con-spired to remove the children from the state in violation of a custody decree, had actively concealed their whereabouts, and intentionally caused the mother to suffer mental distress. The District of Columbia also has recognized the cause of action for custodial interference (*Bennett v. Bennett, 682 F.2d 1039 (D.C. Cir. 1982).* Moreover, a Louisiana Court in *Spencer v. Terebelo, 373 So. 2d 200 (La. Ct. App. 1979)* not only affirmed a judgment for plaintiff, reasoning that the abducting wife had violated the state's kidnapping statute and breached a duty owed to the father, but also increased the damages.

In *Johannes v. Sloan, No. 79-L-169 (Kankakee County Cir. Ct., Mar 25, 1981)* plaintiff father, the non-custodial spouse, was awarded $150,000 for the severe emotional distress he suffered after being deprived of his visitation rights. The Family Law Reporter also cites a jury verdict for a father based on his wife's interference with his visitation rights and her malicious alienation of his children( **6 FAM. L. REP. (BNA) 2764 (1980))** . Similarly, in *Rodgers v. Rodgers, No. 82-L-10593 (Cook County Cir. Ct., July 18, 1983)* plaintiff's allegations of emotional distress suffered because of his wife's interference with visitation survived a motion to dismiss.

The intentional infliction of emotional distress tort has developed from "new tort" to a well-accepted cause of action in a relatively short time span. Its elements are fairly well articulated but suffer from a lack of precision in application. As the mental distress tort developed, intrafamily immunities were abolished. Such developments naturally raise questions concerning the application of the emotional distress tort in the newly available field of family liability.

There is no inherent reason why emotional distress among family members should not be compensable. What is needed, however, is a clearer analysis of the facts of the case and in those situations truly involving the family relationship, a more specific inquiry into what constitutes outrageous behavior. A balancing of the parties' interests would, it is suggested, lend more certainty to that determination and present a more acceptable standard for liability. Family members do inflict emotional distress on one an-other, and where that distress is intended and results, the defendant who has acted without justification should be liable.

*PRESENT CASE: In the Present case the Defendants as detailed in the pleading and more specifically Defendant Laura and her Paramour, Defendant have violated NJ 2C: 29-9 Parent Child Relationship and Multiple Court Orders allowing daily telephonic contact, have conspired with other Defendants to secret the Plaintiff's Children and block all access to the Plaintiff. Similarly, Defendant Siegfried and Defendant Patricia who are the Parents of Defendant Laura, willfully participated to secret the children, colluded with Defendant Laura to violate courts orders, blocking access to children and provided financial funding to support the illegal and bad behavior of their daughter Defendant Laura. Similarly, Defendant Mark, Defendant Stacy, Defendant Siegfried Jr, Defendant Barus, Defendant Crystal, Defendant Skye, Defendant David, Defendant Nicole who are the siblings and spouses of Defendant Laura actively colluded to violate court orders and conspired to block parent child relationship by secreting Plaintiff's children and also did provide financial support to combat the Plaintiff for his parental rights. Similarly, Defendant Slava, Defendant Nancy, Defendant Louis, Defendant Janice, Defendant Melissa, Defendant Kenneth , Defendant Christine, Defendant Jack, Defendant Nada, Defendant Bradley, being the friends of Defendant Laura also actively participated by giving advice to Defendant Laura on how to block Plaintiff's access to his children.*

*Hence all the above said Defendants have jointly and severely committed the tort of Intentional Inflicting of Emotional Distress by their intentional or reckless acts , and by their outrageous and intolerable conduct. The Defendants outrageous, intolerable and wrongful conduct had caused the severe emotional distress to the Plaintiff to which the said Defendants are liable for the maximum Compensatory Damages and the Punitive Damages.*

## II. DEFENDANTS COMMITTED COMMON LAW TORT OF PARENTAL ALIENATION SYNDROME ( PAS) AGAINST THE PLAINTIFF.

Parental alienation is when one parent intentionally disrupts the child's relationship with the other parent ( *See Amy J.L. Baker & Jaclyn Chambers, Adult Recall of Childhood Exposure to Parental Conflict: Unpacking the Black Box of Parental Alienation, 52 J. DIVORCE & REMARRIAGE 55, 56 (2011). Hereinafter "alienating parent" will be used to describe the parent who intentionally acts to damage the relationship between the child and the other parent, and "alienated parent" will be used to describe the parent targeted by this behavior. See id. at 57 (using the terms "alienating parent" and "targeted parent" to distinguish the parents' roles in the alienation).*

Parental alienation generally involves behaviors that denigrate the alienated parent, reduces contact between the child and the alienated parent, and ultimately causes the child to reject the alienated parent. ( *See Edward Kruk, The Impact of Parental Alienation on Children, PSYCHOL. TODAY (Apr. 25, 2013) Hatred of a parent is not a natural emotion for a child; hatred is taught by the parent. See id. "[W]hen the child is alienated the child is saying I am so weak I need to kind of terminate one parent and align myself completely with the other." Mary E. v. Usher E., 967 N.Y.S.2d 868, 880 (Sup. Ct. 2013) (quoting testimony by a forensic evaluator*).

These behaviors have become a serious problem for children of divorce or unhappy relationships (*see also Richard A. Gardner, Parental Alienation Syndrome vs. Parental Alienation: Which Diagnosis Should Evaluators Use in Child-Custody Disputes, 30 AM. J. FAM. THERAPY 93, 95 (2002) (noting that parental alienation syndrome occurs almost exclusively in child-custody disputes).* In 2010, in Noland-Vance v. Vance, the Missouri Court of Appeals affirmed the trial court's finding of parental alienation and awarded custody of the minor children to the father. Following the mother's allegations of the father's abuse of the children, the court ordered a clinical psychologist to conduct a psychological evaluation of the family. *( Noland-Vance v. Vance, 321 S.W.3d 398, 409 (Mo. Ct. App. 2010).* The psychologist found no credible evidence that the father had abused the children. The mother, however, admitted that she never said anything positive about the father to the children. She would berate him in front of the children and incite in them a fear of him. The psychologist concluded that the mother caused severe trauma to the children by alienating them from their father. In fact, the psychologist noted that this was the worst case of parental alienation he had ever seen.

In several jurisdictions, in addition to family law remedies, parents can pursue civil tort action to compensate for the loss of their relationship with their child. (*See C. David Bargamian, Note, Intentional Infliction of Emotional Distress in the Child Custody Context: Proposed Guidelines, 36 WAYNE L. REV. 125, 126–27 (1989) (explaining that parents can pursue civil remedies when their custodial rights are infringed upon).* Whereas family law focuses primarily on the child's best interest, tort law focuses on the injury to the alienated parent *( See Varnado, supra note 20, at 118 (noting that family law remedies do not offer relief for the damages suffered by the alienated parent nor*

*does it adequately deter the alienating behaviors).*Tort actions provide monetary relief for the alienated parent's emotional pain and loss of relationship with the child. Relevant tort actions involving parental alienation **include alienation of affections, intentional infliction of emotional distress ("IIED"), interference with custody, and interference with visitation. ( *See Varnado,*** supra note 20, at 139, 142, 145. Some argue for a separate tort action that specifically addresses parental alienation. See id. at 119, 150) .

In an IIED action, the alienating parent, by "extreme and outrageous conduct," causes the alienated parent severe emotional distress ( ***See Varnado, supra note 20, at 145–46, 146 n.202 (explaining that "extreme and outrageous conduct" is considered behavior that is intolerable and atrocious).*** The tort involves four elements: extreme and outrageous conduct, intent or recklessness, causation, and severe emotional distress ( ***See Bargamian,*** *supra note 129, at 128 (noting the four elements of IIED); Varnado, supra note 20, at 145 (defining someone who creates an IIED claim as "one who by extreme and outrageous conduct intentionally or recklessly causes severe and emotional distress").* Courts are reluctant to find IIED due to parental alienation, however, unless the alienating parent has abducted or hidden the child. Nonetheless, in 1985, in **Raftery v. Scott, the U.S. Court of Appeals for the Fourth Circuit held** that the facts supported a father's claim for IIED. ( ***See Raftery, 756 F.2d at 339; see also Bhama v. Bhama, 425 N.W.2d 733, 735–36 (Mich. Ct. App. 1988)*** *(finding that the creation of a negative relationship between the child and his or her other parent constitutes outrageous conduct). In Raftery, a jury had awarded the father punitive damages in the amount of $10,000 and compensatory damages in the amount of $40,000. Raftery, 756 F.2d at 336).*

The court found that the mother continuously and successfully destroyed the father's relationship with the child and prevented any rehabilitation ( ***See Raftery, 756 F.2d at 337.** In that case, the mother convinced the son that he should not see his father. Id. A clinician could not get the son to accept any positive ideas about the father because of the negative information he received from his mother. Id. At one court hearing, the son would not even speak to his father. Id.)* Consequently, the court reasoned that a cause of action should exist for the psychological damage that resulted from the mother's forced separation of the father from the child.

Jurisdictions have also allowed a tort action for interference with the parental relationship based on the Restatement (Second) of Torts ( *See RESTATEMENT (SECOND) OF TORTS § 700 (1977); Hill, supra note 86, at 658 & n.6 (explaining that this section of the Restatement (Second) of Torts addresses when a parent compels a child to leave the custody of the other parent); see also **Wyatt v. McDermott, 725 S.E.2d 555, 559–60 (Va. 2012)** (citing to the Restatement as the origin and persuasive authority for a tort for interference with parental rights); Beth Rosenberg, Note, **Khalifa v. Shannon:** How Much Interference Is Too Much When It Comes to a Tort for Interfering with the Parent-Child Relationship, 68 MD. L. REV. ENDNOTES 124, 129 & n.52 (2009).* In particular, the Restatement that provides "[o]ne who, with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent . . . is subject to liability." For example, in 2012, in ***Wyatt v. McDermott, the Supreme Court of Virginia*** formally recognized a tort for interference with parental rights. The court reasoned that when a parent has been separated from his or her child without due process of law, the parent should be able to recover in tort for the loss and anguish ( *See id. at 559 (acknowledging that when a parent is separated from their child by a third party without due process, the parent should be able to recover through tort for the*

loss of companionship, anguish, and expenses). Elements of this tort include (1) the parent bringing the complaint has a right to establish a relationship with the child; (2) a party intentionally interferes with that parent's right by removing or detaining the child without consent or prevents the parent from exercising their rights; (3) the interference caused harm to the relationship with the child; and (4) damage resulted. Id. at 562 (**quoting Kessel v. Leavitt, 511 S.E.2d 720, 765–66 (W. Va. 1998))**

PRESENT CASE: In the Present case the Defendants as detailed in the pleading and more specifically Defendant Laura and her Paramour, Defendant have violated NJ 2C: 29-9 Parent Child Relationship and Multiple Court Orders allowing daily telephonic contact, have conspired with other Defendants to secret the Plaintiff's Children and block all access to the Plaintiff. Similarly, Defendant Siegfried and Defendant Patricia who are the Parents of Defendant Laura, willfully participated to secret the children, colluded with Defendant Laura to violate courts orders, blocking access to children and provided financial funding to support the illegal and bad behavior of their daughter Defendant Laura. Similarly, Defendant Mark, Defendant Stacy, Defendant Siegfried Jr, Defendant Barus, Defendant Crystal, Defendant Skye, Defendant David, Defendant Nicole who are the siblings and spouses of Defendant Laura actively colluded to violate court orders and conspired to block parent child relationship by secreting Plaintiff's children and also did provide financial support to combat the Plaintiff for his parental rights. Similarly, Defendant Slava, Defendant Nancy, Defendant Louis, Defendant Janice, Defendant Melissa, Defendant Kenneth , Defendant Christine, Defendant Jack, Defendant Nada, Defendant Brett, Defendant Gilfillen, Defendant Seaman being the friends of Defendant Laura also actively participated by giving advice to Defendant Laura on how to block Plaintiff's access to his children.

Hence all the above said Defendants have jointly and severely committed the tort of Parental Alienation syndrome by their intentional or reckless acts, and by their outrageous and intolerable conduct. Here the Defendant Laura is the "Targeted Parent" and the Plaintiff is the "Alienated Parent" and all the above-mentioned Defendants have conspired, colluded, willfully participated in the Parental Alienation Tort with the Targeted Parent, Defendant Laura. The above-mentioned defendants have intentionally disrupted the Plaintiff's Children's relationship with the Plaintiff and have reduced the contact between the Plaintiff's children and the Plaintiff and have intimately induced and brainwashed the Children and have created hatred feelings to the Children as against the Plaintiff. The Defendants outrageous, intolerable and wrongful conduct in interfering with the Plaintiff's parental rights has prevented the Plaintiff from exercising his parental rights by causing harm to the relationship with the children. It has also caused severe emotional distress to the Plaintiff to which the said Defendants are liable for the maximum Compensatory Damages and the Punitive Damages.

### III. DEFENDANTS COMMITTED COMMON LAW TORT OF PARENTAL ALINATION OF AFFECTIONS AGAINST THE PLAINTIFF.

In an alienation of affections claim, the alienated parent can sue the alienating parent to remedy the loss of the child's affection as a result of the damage to his or her relationship with the child (See McGlynn, supra note 132, at 539. Traditionally, alienation of affection was used against a third party who stole the affection of a spouse. See Varnado, supra note 20, at 142. Because women were regarded as property of their husbands, any attempt to have relations with someone's wife was a property-based tort. See id., at 142 & n.182.) For example, in 1991 in **Hershey v. Hershey**, the

South Dakota Supreme Court held that the father stated a cause of action against the mother for alienation of affection regarding their son. ( *See 467 N.W.2d 484, 489 (S.D. 1991) (noting that policy considerations regarding recognition of this tort included the best interest of the child, availability of other remedies, and exacerbating custody and visitation battles). Alienation of affection has three elements: (1) wrongful conduct of the defendant; (2) loss of affection or consortium; and (3) a causal connection between such conduct and the loss.* **Jones v. Swanson, 341 F.3d 723, 732 (8th Cir. 2003).** The court reasoned that there was alienation of affection because the mother kept the child's location a secret from the father for fourteen years. ( **See Hershey, 467 N.W.2d at 489**). With the abolishment of alienation of affection for spouses, however, courts have been reluctant to continue recognizing an alienation of affection tort for parent-child relationships. **( See Raftery v. Scott, 756 F.2d 335, 338–39 (4th Cir. 1985)** *(explaining that the father's alienation of affection claim could not be a basis for recovery because the tort had been abolished);* **Zamstein v. Marvasti, 692 A.2d 781, 790 (Conn. 1997)** *(concluding that because the state legislature abolished alienation of affections, the father could not bring a claim of alienation of affections of his children).*


Although similar in many ways to parental alienation syndrome, parental alienation of affections is a more respected and less controversial categorization of the behaviors. Parental alienation focuses on the alienating parent's behavior and is defined as any parental behavior that disturbs the child's relationship with the other parent. ( **See Varnado, supra** *note 20, at 116–17, 117 n.12; see also Darnall, supra note 20, at 325 (explaining that one of the main differences between parental alienation and parental alienation syndrome is that parental alienation syndrome requires that the child participate in the degradation of the alienated parent).*

Parental alienation syndrome focuses on the reactions, behaviors, and contributions of the child, and diagnoses it as a disorder. Techniques employed by the alienating parent may include the following: restricting the other parent's access to information about the child, refusing telephone contact or visitation with the other parent, criticizing the other parent in front of the child, destroying pictures of the other parent, changing the child's last name to disassociate the child from the other parent, encouraging conflict between the child and the other parent, using the child to deliver messages to the other parent, or blaming the other parent for financial or emotional problems. ( **See Varnado, supra** *note 20, at 120–22 (explaining the techniques employed by alienating parents).*

Parental alienation of affections can have severe effects on children, including emotional distress and adjustment difficulties. *( See Fidler & Bala, supra note 44, at 20 (explaining that the literature reports that alienated children are at a greater risk for emotional distress and adjustment difficulties than children who are not alienated). Alienated children exhibit illogical cognitive operations, distorted interpersonal perceptions, self-hatred, aggression, and poor impulse control. See id. at 20–21)*. A child affected by parental alienation might experience guilt, confusion, fear, powerlessness, anger, anxiety, hopelessness, depression, or diminished self-esteem. ( *Children may also experience adjustment problems, such as issues at school, sadness, low self-esteem, anxiety, drug abuse in adolescence, hyperactivity, and resistance to authority. See Elisabeth Godbout & Claudine Parent, The Life Paths and Lived Experiences of Adults Who Have Experienced Parental Alienation: A Retrospective Study, 53 J. DIVORCE & REMARRIAGE 34, 46 (2012).*

Specifically, the alienation can damage the child's self-esteem because the child receives the message that the alienating parent's love is contingent on the child's rejection of the other parent and may perceive that the alienating parent hates the other parent more than they love the child. *( See Baker & Ben-Ami, supra note 47, at 474–75 (observing that this is one way that alienation can affect a child's self-esteem); see also In re Matthew M., No. F-04-CP-11009363A, 2013 WL 4734892, at *4 (Conn. Super. Ct. Aug. 12, 2013) (noting expert testimony that parental alienation affects a child's sense of security, inter-personal relationships, regulation of emotions, and the ability to accept positive experiences).*

The child's self-esteem and self-efficacy are also affected by conceptualizing one parent as all "good" and one as all "bad." ( *See Janet R. Johnston et al., Therapeutic Work with Alienated Children and Their Families, 39 FAM. CT. REV. 316, 318 (2001) (explaining that a child's self-esteem is undermined by the belief that one parent is all "bad").* The child concludes that if his or her parent is all "bad," the child is "bad" too. ( *See id.* This leads a child to conceptualize himself or herself as either all "good' or all "bad," making it hard for the child to cope with any failure ).

Parental alienation of affections may also cause a child to engage in self-destructive behaviors because it affects his or her sense of agency and control and can lead to anxiety and depression. *( **See In re Matthew M., 2013 WL 4734892, at *4** (explaining through expert testimony that parental alienation puts the child in conflict and requires them to engage in self-destructive behaviors that destroy their agency); see also Baker & Ben-Ami, supra note 47, at 485 (discussing the results of a study that looked at the effect of parental alienation on children, and noting specifically that these children demonstrated reduced self-sufficiency, insecure attachments, and depression).*

Researchers have likened parental alienation of affections to psychological violence.( ***See GOTTLIEB, supra note 24, at 209** (discussing how researchers have labeled children effected by parental alienation as "psychologically battered" and that parental alienation is among the most serious kinds of emotional abuse); Baker & Ben-Ami, supra note 47, at 473 (explaining that parents who engage in parental alienation are considered to be psychologically maltreating the child because alienation can result in the child feeling worthless, unloved, and endangered).* The techniques employed by the alienating parent, such as lying, blackmail, and manipulation can be described as psychologically abusive. ( *See Godbout & Parent, supra note 47, at 38 (describing lying, blackmailing, and manipulating as brainwashing techniques, which are psychologically abusive).*

Parental alienation can have lasting effects on adults who were alienated as children. A child models his or her future relationships based on their relationship with his or her parents. ( *See Proof of Facts, supra note 47, § 3 at 250–51 (describing those children base their expectations and model relationships on those they had with their parents); see also Wyndol Furman et al., Adolescents' Working Models and Styles for Relationships with Parents, Friends, and Romantic Partners, 73 CHILD DEV. 241, 241 (2002) (explaining that a child's understanding of their relationship with their parents shape their relationships with friends and romantic partners).*

Adults alienated as children can suffer from low self-esteem, self-hatred, self-blame, guilt, depression, alienation of their own children, marital problems, and identity issues. *( Godbout & Parent, supra note 47, at 38 (noting the qualitative retrospective study that found that the effects of parental alienation can continue into adulthood and manifest as depression, substance abuse, and issues with their own families).* Additionally, when the child becomes an adult, they may realize that the alienating parent

caused the destruction of his or her relationship with the other parent, and this can then cause tension between the child and the alienating parent ( *Jennifer Gerber Moné et al., Family Members' Narratives of Divorce and Interparental Conflict: Implications for Parental Alienation, 52 J. DIVORCE & REMARRIAGE 642, 644 (2011) (noting that when the adult child realizes what the alienating parent did, there may be a "backfiring effect" on their relationship with that parent and may cause distance between them).*

Alienation is also traumatic for the alienated parent. A parent's loss of contact or relationship with his or her child can even perpetuate the alienation. ( *See Finzi-Dottan et al., supra note 63, at 317 (noting that a study of parental alienation cases asserted that an alienated parent's loss of contact with their child can perpetuate the alienation).* Alienated parents typically respond to the child's rejection passively and become withdrawn. Although the parent may be trying to cope with the rejection or give the child space, the child might interpret this withdrawn behavior as disinterestedness. In other instances, the alienated parent may become overly aggressive, self-centered, and immature in his or her attempt to deal with the child's rejection. *( Fidler & Bala, supra note 44, at 20 (explaining that parents might react with passivity or withdrawn behaviors in order to cope. Articulating that, although the parent may think they are giving the child "space," withdrawn behaviors may reinforce allegations by the alienating parent that they have abandoned the child or are a bad parent); Godbout & Parent, supra note 47, at 43 (noting that adults alienated as children later understood their parent's withdrawn behavior as a result of their feelings of helplessness; at the time it reinforced the alienating parent's assertions that the parent was bad or did not love the child).*

*PRESENT CASE:  In the Present case the Defendants as detailed in the pleading and more specifically Defendant Laura and her Paramour, Defendant have violated NJ 2C: 29-9 Parent Child Relationship and Multiple Court Orders allowing daily telephonic contact, have conspired with other Defendants to secret the Plaintiff's Children and block all access to the Plaintiff. Similarly, Defendant Siegfried and Defendant Patricia who are the Parents of Defendant Laura, willfully participated to secret the children, colluded with Defendant Laura to violate courts orders, blocking access to children and provided financial funding to support the illegal and bad behavior of their daughter Defendant Laura. Similarly, Defendant Mark, Defendant Stacy, Defendant Siegfried Jr, Defendant Barus, Defendant Crystal, Defendant Skye, Defendant David, Defendant Nicole who are the siblings and spouses of Defendant Laura actively colluded to violate court orders and conspired to block parent child relationship by secreting Plaintiff's children and also did provide financial support to combat the Plaintiff for his parental rights. Similarly, Defendant Slava, Defendant Nancy, Defendant Louis, Defendant Janice, Defendant Melissa, Defendant Kenneth , Defendant Christine, Defendant Jack, Defendant Nada, Defendant Brett, being the friends of Defendant Laura also actively participated by giving advice to Defendant Laura on how to block Plaintiff's access to his children.*

*Hence all the above said Defendants have jointly and severely committed the tort of Parental Alienation of Affections by their intentional or reckless acts, and by their outrageous and intolerable conduct.  Here the Defendant Laura is the "Alienating Parent" and the Plaintiff is the "Alienated Parent" and all the above-mentioned Defendants have conspired, colluded, willfully participated in the Parental Alienation of Affections Tort with the Alienating Parent, Defendant Laura. The above-mentioned defendants have intentionally disrupted the Plaintiff's Children's relationship with the Plaintiff and have reduced the contact between the Plaintiff's children and the Plaintiff and have intimately induced and brainwashed the Children*

*and have created hatred feelings to the Children as against the Plaintiff. The above said Defendants are psychologically maltreating the Plaintiff's Children and have caused the children worthless, unloved and endangered. The Defendant's have been continuously lying, blackmailing, manipulating the Children and have caused a psychological abuse to the Children. The Plaintiff states that his Children as Adults in future, because of the above said Alienation of Affections can suffer from low self-esteem, self-hatred, self-blame, guilt, depression, alienation of their own children, marital problems and identity issues. The Defendants outrageous, intolerable and wrongful conduct in interfering with the Plaintiff's parental rights has prevented the Plaintiff from exercising his parental rights by causing harm to the relationship with the children. It has also caused severe emotional distress to the Plaintiff to which the said Defendants are liable for the maximum Compensatory Damages and the Punitive Damages.*

## IV. DEFENDANTS COMMITTED COMMON LAW TORT OF PARENTAL ALEINATION AND INTERFERENCE WITH CUSTODY AGAINST THE PLAINTIFF.

A Material Change in Circumstances Changes Custody Due to the complications it can create, the presence of parental alienation may qualify as a material change in circumstances and result in a change in custody to the alienated parent. *( See Wade v. Hirschman, 903 So. 2d 928, 935 (Fla. 2005) (affirming the trial court's consideration of parental alienation as a reason to change the custodial arrangement); Proof of Facts, supra note 47, § 8 at 257–58 (listing best interest factors that relate to parental alienation when changing custody). In extreme situations, judges might threaten to remove the child from either parent's custody or place the child in foster care. See Noland-Vance v. Vance, 321 S.W.3d 398, 404 (Mo. Ct. App. 2010) (noting that the trial court warned the mother that if she did not cooperate to facilitate the father's visitation that the three youngest children would be placed in foster care so that the father could exercise visitation)*

To establish a prima facie case for a modification of custody, a parent must first show a material change in circumstances and then show that the change in custody is in the child's best interest. *(In 2005, in Wade v. Hirschman, the Florida Supreme Court directed the lower court to enter an order affirming the father as the primary custodial parent. See 903 So. 2d at 935. The court found that the mother's alienation of the children against their father was a material change in circumstances and that it was in the children's best interest to reside with the father).*

To make the custody determination, a court holds an evidentiary hearing to consider the child's best interest and the allegations of alienating behaviors. Evidence of the alienation is often presented to the court in the form of a child custody evaluation or a guardian ad litem report. These experts are tasked with investigating the family and drafting a report for the court to make a recommendation as to a custody arrangement that will be in the child's best interest. Courts have found parental alienation to constitute a material change of circumstances. For example, *in 2011, in Grove v. Grove 386 S.W.3d at 609* , the Court of Appeals of Arkansas affirmed transferring custody of the children to the father after a finding of parental alienation. The court gave deference to the trial court's findings that the mother failed to comply with the custody agreement, failed to cooperate in counseling as ordered, alienated the children from the father, sought to limit or terminate contact between the father and the children, and made false accusations against the father in front of the children. (*See id. at 607. The court noted that the trial court found that the mother was alienating the children from the father, making them think he was an evil*

*person by coaching and pressuring them to lie about their father*). In that case, the court found that mother's efforts to alienate the children from the father constituted a material change in circumstances. Changing custody due to parental alienation has also been determined to be in the child's best interest. (***see also Leistner v. Leistner, 524 N.Y.S.2d 243, 244 (App. Div. 1988)*** *(noting that a parent's interference with the relationship between the child and the other parent is "so inconsistent with the best interests of the child as to per se raise a strong probability that the offending party is unfit to act as a custodial parent")*.

In particular, the court may look to best interest factors such as the willingness to facilitate and encourage a relationship between the child and the other parent, and the relationship and amount of contact between the child and the parent. For example, ***in 2012, in Hibbard v. Hibbard 55 A.3d at 308, 310***, the Appellate Court of Connecticut affirmed a transfer of custody to the father because of the mother's alienating behaviors. The court found that the mother attempted to eliminate the father from the daughter's life and was unwilling to facilitate a relationship between the child and her father, so a transfer of custody was in the child's best interest. Similarly, ***in 2013, in Bennett v. Schultz***, the New York Supreme Court, Appellate Division noted that parental alienation offends the child's best interest to the point where the parent may be unfit to have custody. (***See 973 N.Y.S.2d 244, 245 (App. Div. 2013)***) *("Parental alienation of a child from the other parent . . . is 'an act so inconsistent with the best interests of the children as to, per se, raise a strong probability that the [offending party] is unfit to act as custodial parent.'" (quoting **Entwistle v. Entwistle, 402 N.Y.S.2d 213, 216 (App. Div. 1978)**)*

A jury in ***Cramler v. Donahue 9 FAM. L. REP. (BNA) 2452 (D. Colo. May 13, 1983)*** returned a verdict against defendants for $5,900,000 based on claims of tortious interference with custody, civil conspiracy and outrageous conduct. A number of other cases have relied on the tort of custodial interference, citing Restatement (Second)of Torts Section 700, instead of the infliction of mental distress tort. While the tort of custodial interference had its origins in the loss of service suffered by the deprived parent,102 such loss of service is no longer a necessary element of the cause of action: "The deprivation to the parent of the society of the child is itself an injury that the law redresses." Although the custodial interference cause of action provides damages for loss of service if such has occurred, the more significant damages aspect appears to be for emotional distress and expenses incurred in regaining custody.  Thus, the overlap with the emotional distress cause of action is obvious. ( *RESTATEMENT (SECOND) OF TORTS § 700, comment g (1977).The parent can recover for the loss of society of his child and for his emotional distress resulting from its abduction or enticement. If there has been a loss of service or if the child, though actually not performing service, was old enough to do so, the parent can recover for the loss of the service that he could have required of the child during the period of its absence. While section 46, outlining the emotional distress tort, supra note 12, is broader in the conduct it condemns, section 700 theoretically would allow recovery for an interference of short duration where section 46 may not. See Note, Abduction of Child by Noncustodial Parent: Damages for Custodial Parent's Mental Distress, 46 Mo. L. REV. 829, 834 (1981). On the other hand, the tort of custodial interference may not be applicable until a custody decree has been entered, but the emotional distress tort would cover pre-decree situations*.)

***In Lloyd v. Loefter, 694 F.2d 489 (7th Cir. 1982)*** a Wisconsin district court concluded plaintiff had stated a cause of action for civil conspiracy under Wisconsin law against his ex-wife and certain of her family members for abduction and concealment of his child. The court decided defendants owed a duty to plaintiff, citing Section 700 and state criminal statutes against custodial interference. The compensatory damages of $95,000 later awarded by the court to plaintiff included $30,000 for emotional distress, and plaintiff also was to receive$2000 per month until his child was returned.

In *Fenslage v. Dawkn'ts, 629 F.2d 1107 (5th Cir. 1980)* a father refused to return his children to the custodial mother after summer visitation and fled to Canada. The mother alleged civil conspiracy and the intentional infliction of mental anguish through custodial interference. The jury, awarding her $65,000 in compensatory damages, concluded the defendant father and his relatives had con-spired to remove the children from the state in violation of a custody decree, had actively concealed their whereabouts, and intentionally caused the mother to suffer mental distress. The District of Columbia also has recognized the cause of action for custodial interference (*Bennett v. Bennett, 682 F.2d 1039 (D.C. Cir. 1982)*. Moreover, a Louisiana Court  in *Spencer v. Terebelo, 373 So. 2d 200 (La. Ct. App. 1979)* not only affirmed a judgment for plaintiff, reasoning that the abducting wife had violated the state's kidnapping statute and breached a duty owed to the father, but also increased the damages.

In *Johannes v. Sloan, No. 79-L-169 (Kankakee County Cir. Ct., Mar 25, 1981)* plaintiff father, the non-custodial spouse, was awarded $150,000 for the severe emotional distress he suffered after being deprived of his visitation rights. The Family Law Reporter also cites a jury verdict for a father based on his wife's interference with his visitation rights and her malicious alienation of his children( **6 FAM. L. REP. (BNA) 2764 (1980))** .  Similarly, in *Rodgers v. Rodgers, No. 82-L-10593 (Cook County Cir. Ct., July 18, 1983)* plaintiff's allegations of emotional distress suffered because of his wife's interference with visitation survived a motion to dismiss.

*PRESENT CASE:  In the Present case the Defendants as detailed in the pleading and more specifically Defendant Laura and her Paramour, Defendant have violated NJ 2C: 29-9 Parent Child Relationship and Multiple Court Orders allowing daily telephonic contact, have conspired with other Defendants to secret the Plaintiff's Children and block all access to the Plaintiff. Similarly, Defendant Siegfried and Defendant Patricia who are the Parents of Defendant Laura, willfully participated to secret the children, colluded with Defendant Laura to violate courts orders, blocking access to children and provided financial funding to support the illegal and bad behavior of their daughter Defendant Laura. Similarly, Defendant Mark, Defendant Stacy, Defendant Siegfried Jr, Defendant Barus, Defendant Crystal, Defendant Skye, Defendant David, Defendant Nicole who are the siblings and spouses of Defendant Laura actively colluded to violate court orders and conspired to block parent child relationship by secreting Plaintiff's children and also provide financial support to combat the Plaintiff for his parental rights. Similarly, Defendant Slava, Defendant Nancy, Defendant Louis, Defendant Janice, Defendant Melissa, Defendant Kenneth , Defendant Christine, Defendant Jack, Defendant Nada, Defendant Bradley, being the friends of Defendant Laura also actively participated by giving advice to Defendant Laura on how to block Plaintiff's access to his children.*

*Hence all the above said Defendants have jointly and severely committed the tort of Parental Alienation causing Interference with Custody and Visitations of Plaintiff's children by their intentional or reckless acts, and by their outrageous and intolerable conduct.  Here the Defendant Laura is the "Alienating and Custody Parent" and the Plaintiff is the "Alienated and Non-Custody Parent" and all the above-mentioned Defendants have conspired, colluded, willfully participated in the Parental Alienation causing interference with custody and visitations of the Alienated and Non-Custody Parent. The above-mentioned defendants have intentionally disrupted the Plaintiff's Children's relationship with the Plaintiff and have reduced the contact between the Plaintiff's children and the Plaintiff and have intimately induced and brainwashed the Children and have created hatred feelings to the Children as against the Plaintiff. The above said Defendants are psychologically maltreating the Plaintiff's Children and have caused the children worthless, unloved and endangered. The Defendants have been continuously lying, blackmailing, manipulating the Children and have caused a psychological abuse to the Children, which has caused a material change of circumstances entitling Plaintiff to regain custody of his children from the Alienating and Custodial*

*Defendant Laura. The Plaintiff states because of the continues psychological abuse the children are undergoing in the hand of the custodial Defendant Laura; the material change of circumstances have made the custodial parent totally unfit for the upbringing of the children and has  warranted a change of custody of the children to the Plaintiff in the best interests of the Plaintiff's children.   The Plaintiff states that his Children as Adults in future, because of the above said Alienation of Affections can suffer from low self-esteem, self-hatred, self-blame, guilt, depression, alienation of their own children, marital problems and identity issues if the Custody continues with Defendant Laura. The Defendants outrageous, intolerable and wrongful conduct in interfering with the Plaintiff's parental rights has prevented the Plaintiff from exercising his parental rights of Visitation and Custody by causing harm to the relationship with the children. Apart from the requirement of the Custodial change of the children from Defendant Laura to the Plaintiff, the continuing Psychological Alienation Abuses which the Children have been suffering in the hands of Defendants Laura have caused  severe emotional distress to the Plaintiff to which the said Defendants are liable for the maximum Compensatory Damages and the Punitive Damages.*

### V. DEFENDANTS COMMITED COMMON LAW TORT OF PARENTAL ALEINATION WHICH IS A

### CIVIL CONTEMPT

In addition to modifying custody orders, courts have found a parent in civil contempt of court when the parent withholds or violates a court order. ( *See **Woodward v. Woodward, 776 N.W.2d 567, 570 (N.D. 2009)** (defining civil contempt as a willful intent to violate a court order).* To find the parent in contempt, there must be a custody order currently in place, and the parent must demonstrate a willful intent to violate the order. ( ***See id.; Proof of Facts, supra note 47, § 20 at 280–82*** *(explaining that a parent can file contempt if there is a valid child custody order and there is a willful intent to violate it).* For example, in ***2009, in Woodward v. Woodward, the North Dakota Supreme Court*** affirmed the trial court's finding that a mother was in contempt. The trial court did so because they denied the father visitation and failed to undergo an evaluation for parental alienation after an allegation that the mother constantly berated him in front of their children.  (*See id. The father stated that the mother minimized his role as a parent and restricted his access to the children in person and on the phone. See id. at 570*)


Child custody and visitation determinations (since visitation is a limited form of custody) involve a judicial intervention and restructuring of family life of the parties before the court.  That such determinations involve a fundamental liberty interest of the parties, protected by the U.S. Constitution and afforded "strict scrutiny" standard, cannot be tenably disputed.  It must be recognized that a domestic relation proceeding in and of itself can constitute state intervention that is so disruptive of the parent-child relationship that the constitutional right of a custodial (or non-custodial) parent to make certain basic determinations for the child's welfare becomes implicated.  Troxel v. Granville, 530 U.S. 57, 101, 120 S.Ct. 2054, 2079 (2000).   If a parent adequately cares for his or her children, (i.e., "is fit"), there is no reason for the State to inject itself into the realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.   530 U.S. at 68-69, 120 S.Ct. at 2061.

A parent's right to the preservation of his relationship with his child derives form the fact that the parent's achievement of a rich and rewarding life is likely to depend significantly on his ability to participate in the

rearing of his children. A child's corresponding right to protection from interference in the relationship derives from the psychic importance to him of being raised by a loving, responsible, reliable adult'. Franz V. United States, 707 F. 2d 582, 595-599 ( D.C.Cir.1983)

The statist notion that government may supersede parental authority in order to ensure bureaucratically or judicially determined "best interests" of children has been rejected as repugnant to American traditions. Judges and state officials are ill-equipped to second guess parents and are precluded from intervening in absence of powerful countervailing interests. Zummo v. Zummo, 574 A.2d 1130, 1138, citing Lehr v. Robertson, 463 U.S. 248, 257-61, 103 S.Ct. 2985, 2991-93, 77 L.Ed. 2d 614, 623-29 (1982).

'It seems obvious to us that since custody and visitation encompass practically all of what we call 'parental rights', a total denial of both would be equivalent of termination of parental rights.' Matter of Baby M, 109 N.J. 396, 451 (1988); Franz v. United States, 707 F.2d 582, 602 (D.C.Cir. 1983).

The admonition to function in a 'parental' relationship of standing **is not an invitation to procedural arbitrariness**. *Kent v. United States*, 383 U.S. 541, 555 (1965). **States may not exercise such power in a manner that has 'all-encompassing scope and . . . sweeping potential for broad and unforeseeable application**.' *Wisconsin v. Yoder*, 406 U.S. 205, 234 (1972). With respect to school teachers, they have only such portion of parental authority as a parent may choose to temporarily commit to the teacher's charge, in order to answer the purposes for which the parent has initiated the employment. *Vernonia School District 47J v. Action*, 515 U.S. 646, 654-55 (1995)(quoting 1 W. Blackstone, *Commentaries on the Laws of England* 441(1769)).

**State governments may not properly override** parental decisions or terminate custody, unless 1) parents delegate their authority to the state voluntarily and knowingly, or 2) the state demonstrates through appropriate due process that there is **clear and convincing evidence that the parents have triggered state parens patriae interests by placing their children in clear and present danger.** C.f. *Croft v. Westmoreland County Children & Youth Serv., 103 F.3d 1123 (3d. Cir. 1997)*

In this case, the liberty of both parents is an issue. **They both have a liberty interest to direct the upbringing and education of their child(ren)** under their control **and without State interference. Therefore, the Court may not exercise Parens Patriae Power to resolve a private custody dispute or contributions. The Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a better decision could be made.** See *Troxel v. Granville,* 530 *U.S.* 57, 120 *S.Ct.* 2054, 147 *L.Ed.*2d 49 (2000). It is true that a disagreement between the Parties exists. However, s*imply because the decision of a parent is not agreeable to a child or other parent or, because it involves risks* **does not automatically transfer the power to make that decision from the parents to some agency or officer of the state. Parham v. J. R.**, 442 U.S. 584 (1987)

The statist notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition." *Parham,* 442 U.S. at 603 (emphasis in original). Parents and children do not have competing interests, and it is not correct to *presume* or *assume* that parents and children are "adversaries." *Santosky,* 455 U.S. at 760 ("until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship"). Our Constitution treats parents as natural allies of their children. Parham, 442 U.S at 602.

Our jurisprudence holds a high regard for the family into which a child has been born. *Santosky,* 455 U.S. at 759, 765-66 (**rejecting "balanc[ing]" of the "child's interest** in a normal family home against the parents' interest in raising the child," or consideration of "whether the child would have a better home elsewhere"). Our Constitution assumes that children want to remain with their natural family. *Id.* at 766. The Court has never recognized a separate interest or right that is child-specific, *per se;* the only recognized right for children in this context is the child's reciprocal right to maintain his natural family relationship. *Parham,* 442 U.S. at 603 (**not all choices will be "agreeable to a child," but that "does not automatically transfer the power to make that decision from parents to some agency or officer of the State"); Santosky, 455 U.S. at 765.**

To suggest government's "special interest" in protecting children, or invoking the altruistic language of "best interest," or simply saying that "children have a right to be free from harm" are <u>legally insufficient criteria</u> for "children's rights" and elevating the role of the state into the lives of families. *See* Martin Guggenheim, *What's Wrong with Children's Rights*, *passim* (Harvard University Press 2005). *All* human beings have dignity and the right to be free from harm--it is not uniquely a children's right. The *Santosky* Court's "refusal to consider the rights of the children [was] analytically correct, since such consideration would involve the assumption of unproven facts.  The refusal demonstrates the Court's commitment, as a policy matter, **to the autonomy of the family unit.**" Barbara Shulman, *The Supreme Court's Mandate for Proof Beyond a Preponderance of the Evidence in Terminating Parental Rights,* 73 J. Crim. & Criminology 1595, 1606 ( Winter 1982)

Our jurisprudence does not see the child in isolation, but as an extension and ward of his parents, <u>**not the state**</u>. *Parham,* 442 U.S. at 602-03 (**parents are** *presumed* **to "act in their child's best interest")**; *Pierce,* 268 U.S. at 535; *Meyer,* 262 U.S. at 401. Children are *not* merely autonomous individuals needing the cacophony of alternate voices (*e.g.,* state social services, guardian ad litems, educators, etc.) contending to speak on their behalf. *Yoder,* 406 U.S. at 213; *Parham,* 442 U.S. at 606 (rejecting childhood by committee approach); Guggenheim, *What's Wrong with Children's Rights* 95 (*e.g.,* assigning independent counsel for a toddler to advance the child's so-called interest is a legal fiction, as that grown-up lawyer assigned is merely advancing what that grown-up envisions as best for the child). **Our Constitution rejects the notion that children receive independent consideration "absent a finding of neglect or abuse" by their parents. Parham, 442 U.S. at 604.**

**The State and the parent do not stand in equipoise, or have an equal interest in the child.** Vivek S. Sankaran, *Parens Patriae Run Amuck: The Child Welfare System's Disregard for the Rights of Non-Offending Parents,* 82 Temple Law Review 55 (Spring 2009) (**showing a historical rejection of broad *parens patriae* doctrine** as case law on parental liberty interest was developed in *Meyer, Pierce, Prince, Yader).*

"**The State's interest in caring for children is de minimis if [the parent] is shown to be fit."** *Stanley,* 405 U.S. at 657-58 (the State "spites its own articulated goals" of child protection when it presumptively and arbitrarily removes children without a due process hearing). The State's ***parens patriae* interest in promoting the welfare of the child is <u>secondary and triggered only where parents have been determined unfit</u>.** New Jersey Family Court Judges violate this principal every day.  *Santosky,* 455 U.S. at 767 n.17; *cf. In re Gault,* 387 U.S. 1, 16, 30 (1967) (pejoratively describing latin term *parens patriae* as a rationalization "to exclude juveniles from the constitutional schemes" and invite "procedural

arbitrariness"). **The State has no viable interest in children who are with fit parents.** The State only has an interest in children who are genuinely abused and need protection, and even then, that interest arises Only after a judicial adjudication of parental unfitness.

*In Pierce v. Society of Sisters, supra,* the Court again upheld the wide scope of the liberty interest provided to parents by the Fourteenth Amendment when it overturned an Oregon statute that prohibited parents from enrolling their children in private school. *Pierce,* 268 U.S. at 530. Relying on *Meyer,* this Court held that the Statute: Unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control. ... **The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the state to standardize its children by forcing them to accept instruction from public teachers only.** The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high Duty to recognize and prepare him for additional obligations.

The Court reaffirmed its commitment to the **rights of natural parents** in *Wisconsin v. Yoder,* 406 U.S. 205, 207 (1972), overturning convictions of Amish parents for removing their children from school before age sixteen. **The state's interest in providing universal education had to "yield to ... the interest of parents in directing the rearing of their off-spring."** *Yoder,* 406 U.S. at 213-14. **The same is true about the Law of Necessary Education in New Jersey.**

The *Yoder* Court noted that the state can override parents only where "it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens." *Id.* at 233-34. "The primary role of parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Id.* at 232. **The New Jersey Family Court Judges violate principal.**

Around the same time, the Court also took up the issue of parental rights as applied to an unwed father in *Stanley v. Illinois,* 405 U.S. 645 (1972). Following the death of the mother, Stanley, the natural father, directed that his children move into his friend's home, much to the chagrin of the state, which sought to Make another choice for the children. Stanley, 405 U.S. at 658.

The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection. It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children "come[s] to this Court with a momentum for respect lacking when appeal is made to the liberties which derive merely from shifting economic arrangements at 651. The Court concluded "that all parents are constitutionally entitled to a hearing on their fitness before their children are removed from their custody" and laid the groundwork for the presumption of parental fitness.

In *Moore v. City of East Cleveland, supra,* this Court struck down a housing ordinance that restricted categories of relatives who could live together as "intrud[ing] on choices concerning family living arrangements." *Moore,* 431 U.S. at 499 (plurality opinion). The *Moore* court employed the principles elucidated in *"Yoder, Meyer* and *Pierce"* in a school setting, and extended them to "households" where "decisions concerning child rearing" were "shared with ... other relatives" who take on major responsibilities for the child.

In *Parham v. J.R., supra,* the Court **considered the ability of the state to second guess the decisions of natural parents to commit their own child to a mental institution without state approval.** The Court recognized that parents made such difficult choices based on their own observations and independent professional recommendations, and that "[n]either state officials nor federal courts are equipped to review such parental decisions. "Parham, 442 U.S. at 604.

[H]istorically [the law] has recognized that natural bonds of affection lead parents to act in the best interest of their children. ... **The statist notion that governmental power should supersede parental authority in** *all* **cases because** *some* **parents abuse and neglect children is repugnant to the American tradition**. *Id.* at 602-03 (emphasis in original); *see also Smith v. Organization of Foster Families,* 431 U.S. 816, 847, 860 (1977) (differentiating foster families as "squatters" to the rights enjoyed by natural parents, who would have a "liberty interest" in the "survival" or an "expectancy" of "continuation" of their family That is protected under the Fourteenth Amendment.

In *Santosky v. Kramer,* 455 U.S. 745 (1982), the Court squarely addressed parental rights in the context of a state proceeding seeking to extinguish both a family's natural and legal relationship. The *Santosky* Court held that before a state could completely and irrevocably sever the rights of a parent in their natural child, due process required that the state support its allegations by at least clear and convincing evidence. New York's statutory scheme providing for a **"fair preponderance of the evidence" standard was "inconsistent with due process" owed to parents and children.** *Santosky,* 455 U.S. at 758. The Court held that the private interest affected in maintaining family association was a "commanding" one, and that the "risk of error" from employing the lower standard of proof was "substantial" since it distributed a near equal allocation of risk of error as shared between the parents and the State. *Id.* at 761 ("we have no difficulty finding that the balance of private interests strongly favors heightened procedural protections").

Though the children had been in the state's care for three years, and the parents were not ideal, this Court held that the "fundamental liberty interest of natural parents in the care, custody and management of their child" did not "evaporate." *Id.* at 753. The Court again reiterated that a natural parent's "interest [is] Far more precious than any property right.

In the present case Defendants LAURA L. GERMADNIG, SIEGFRIED & PATRICIA GERMADNIG, MELISSA & KENNETH REEVES, MARK & STACY GERMADNIG, SIEGFRIED. JR & BARUS GERMADNIG, CRYSTAL GERMADNIG, SKYE GERMADNIG, DAVID & NICOLE TARNOWSKI, SLAVA KLEYMAN, NANCY CAVANAUGH, LOUIS & JANICE ELWELL, CHRISTINE GILFILLEN, SANDRA SEAMAN, JACK M, NADA PITYINGER, BRETT PITYINGER, DANIEL & KATHLEEN SCHASTNY, BRADELY & RENE MCKEE, ROBERT & CAROL MCKEE, STANLEY & LORI O' BRIAN, CANDY MCKEE,  STEVEN A. ZABARSKY, ESQ., JACKSON TWP. POLICE CHIEF MATTHEW KUNZ, JACKSON TWP. POLICE OFFICER CHRISTOPHER PARISE, OCEAN CTY, NJ PROSECUTOR BRADLEY BILHEIMER, JOHN FOTI JR, MADELINE F. EINBINDER J.S.C., MARLENE L. FORD A.J.S.C, JOHN S. DORAN J.S.C., DEBORAH H. SCHRON J.S.C., JOHN DOES 1-10, JOHN DOES 1-10, XYZ CORPORATIONS have made a Contempt of a judicial order, a fourth-degree crime in violation of *N.J.S.A. 2c:29-9(a) (Four hundred fifty-nine counts);*  and Interference with custody of a minor child in violation of 2c:13-4a (Four hundred fifty-nine counts)

*Also in the Present case, due to the fraudulent and fictitious Pendente Lite and FJOD orders of  $3,500 per month unallocated support ordered paid to Defendant Laura Germadnig and being forced to pay household carrying charges of $7,857 per month, plus the approximate $4,100 per month, it costs Plaintiff*

*to survive in New Jersey, leaves Plaintiff with nothing to survive on.  It is to the point of destroying Plaintiff's financial ability to maintain his financial planning business and destroying Plaintiff's financial ability to survive.  Due to these malicious, fraudulent, and unconstitutional acts by Defendants Zabarsky, Laura Germadnig, and other named Defendants, Plaintiff has been economically devastated and is under continuing threat of deprivations of his constitutionally protected Liberties by civil coercive contempt of court and forced labor.*

*The Plaintiff states that his Children as Adults in future, because of the above said Alienation of Affections can suffer from low self-esteem, self-hatred, self-blame, guilt, depression, alienation of their own children, marital problems and identity issues if the Custody continues with Defendant Laura. The Defendants outrageous, intolerable and wrongful conduct in interfering with the Plaintiff's parental rights by continuously violating all the court orders of Visitation for the Plaintiff has prevented the Plaintiff from exercising his parental rights of Visitation and Custody by causing harm to the relationship with the children. Apart from continuing Psychological Alienation Abuses which the Children have been suffering in the hands of Defendants, the Defendants have caused Contempt of Court Orders, by violating the several court orders including visitation right orders for the Plaintiff which has caused  severe emotional distress to the Plaintiff to which the said Defendants are liable for the maximum Compensatory Damages and the Punitive Damages.*

## VI. DEFENDANTS COMMITTED COMMON LAW TORT OF PARENTAL ALEINATION AND CONTRIBUTED  A CAUSE FOR NON-PAYMENT OF CHILD SUPPORT BY THE PLAINTIFF

Parental alienation may also be treated as an affirmative defense for not paying child support.  *( See F.S.-P. v. A.H.R., 844 N.Y.S.2d 644, 646 (Fam. Ct. 2007) (articulating that parental alienation can be an affirmative defense to child support). For example, **in 2007, in F.S.-P. v. A.H.R., a New York Family Court** found that the father could raise parental alienation as an affirmative defense to paying child support. (See id. (deciding that parental alienation may be an affirmative defense to child support even when an order is not yet in place); **see also Roe v. Doe, 272 N.E.2d 567, 570 (N.Y. 1971)** (explaining that, although the duty to support a child is continuous, the child's right to support and the parent's right to custody are reciprocal). The court reasoned that it could suspend the noncustodial parent's duty to pay child support in some instances when the custodial parent has intentionally alienated or brainwashed the child against the non-custodial parent. **See F.S.-P, 844 N.Y.S.2d at 645** (stating that child support payments can be suspended when the parent has frustrated visitation by alienating the child*).

The Plaintiff despite filing over TWENTY motions for parenting time, Defendant Marlene L. Ford AJSC, Ocean County Assignment Judge refused to even get Plaintiff, his Children's phone numbers from Defendant Laura and continued to JAIL Plaintiff for non-payment of Child Support without any jurisdiction.

Monmouth County v. G.D.M., 308 N.J.Super. 83,88 (Ch.Div. 1997): Some courts have gone so far as to ground the parental duty of support in our federal Constitution. See, e.g., *Pamela P. v. Frank S*., 443 N.Y.S.2d 343, 110 Misc.2d 978 (Fam.Ct.1981). That court stated, "clearly, the duty of support fits into the legal framework *as a reciprocal* of the fundamental Constitutional right to beget and raise children ... Accordingly, this court views enforcement of the parental support duty as a compelling State interest ..." Id. at 347, 110 Misc.2d at 984-85, 443 N.Y.S.2d 343, citing U.S.C.A. Const., amend. 14.

The United States Supreme Court has visited the issue, and noted that "[w]hen parents make a commitment to meet those responsibilities [of parenthood], the child has [705 A.2d 411] a right to rely on the unique contribution of each parent to material and emotional support. The child therefore has a fundamental interest in the continuation of parental care and support." <u>Bowen v. Gilliard, 483 U.S. 587, 612-13, 107 S.Ct. 3008, 3023, 97 L.Ed.2d 485 (1987)</u>. This fundamental interest, ***and the corresponding*** parental duty, is an inherent part of the "best interests of the child" rubric which underlies Our family courts. (Note:  According to the terms "reciprocal" and "corresponding" , it is unequivocal that child support and parenting time are linked.  If you don't have parenting time then you don't have child support obligations). ***<u>It seems obvious to us that since custody and visitation encompass practically all of what we call 'parental rights', a total denial of both would be equivalent of termination of parental rights.' Matter of Baby M, 109 N.J. 396, 451 (1988); Franz v. United States, 707 F.2d 582, 602 (D.C.Cir. 1983).</u>***

Thus, if the defendant prosecutes an innocent plaintiff for a crime without reasonable grounds to believe him  guilty, it is malicious prosecution; if he prosecutes him  with such grounds  to extort payment of a debt, it is abuse of process.  *Prosser on Torts, Chap. 22, sec. 121 at 856-857 (4th ed. 1971). See also  Earl v. Winne, 14  N.J. 119, 135 (1953); 34  N.J.  Super. 605, 616 (Cty. Ct. 1955), and  Gambocz v. Apel,  et al., 102  N.J.  Super. 123, 128-130 (App. Div. 1968),  certif. denied, 52  N.J. 485 (1968).*

*Defendant Laura Germadnig, upon advice from Defendant Coneeny, Esq., and under false and fraudulent probable cause committed by Defendant Eluzzi, filed a domestic violence complaint, with underlying criminal harassment charge, against the Plaintiff falsely, maliciously and without probable cause. Plaintiff was falsely arrested and falsely imprisoned without probable cause as a direct result of a fraudulent warrant signed by Defendant Eluzzi, and without legal justification, maliciously, without probable cause, these Defendants confined Plaintiff within set boundaries—a jail cell.  Plaintiff was aware of the confinement and was therefore damaged and suffered special grievance. The matter was terminated in Plaintiff's favor. As a result of these Defendant's actions Plaintiff sustained harm and was damaged.*

*Defendants were Alienating the Children from the Plaintiff but by all illegal means got Plaintiff arrested without any probable cause to do so just because the Child Support payments have not been made. Defendants* LAURA L. GERMADNIG, SIEGFRIED & PATRICIA GERMADNIG, MELISSA & KENNETH REEVES, MARK & STACY GERMADNIG, SIEGFRIED. JR & BARUS GERMADNIG, CRYSTAL GERMADNIG, SKYE GERMADNIG, DAVID & NICOLE TARNOWSKI, SLAVA KLEYMAN, NANCY CAVANAUGH, LOUIS & JANICE ELWELL, CHRISTINE GILFILLEN, SANDRA SEAMAN, JACK M, NADA PITYINGER, BRETT PITYINGER, DANIEL & KATHLEEN SCHASTNY, BRADELY & RENE MCKEE, ROBERT & CAROL MCKEE, STANLEY & LORI O' BRIAN CANDY MCKEE,  STEVEN A. ZABARSKY, ESQ., JACKSON TWP. POLICE CHIEF MATTHEW KUNZ, JACKSON TWP. POLICE OFFICER CHRISTOPHER PARISE, OCEAN CTY, NJ PROSECUTOR BRADLEY BILHEIMER, JOHN FOTI JR, MADELINE F. EINBINDER J.S.C., MARLENE L. FORD A.J.S.C, JOHN S. DORAN J.S.C., DEBORAH H. SCHRON J.S.C., JOHN DOES 1-10, JOHN DOES 1-10, XYZ CORPORATIONS *have all used the state court process for their own wrongful ends, inspite of the fact that they were all actively guiding, supporting and participating in the Alienation of the Children from the plaintiff to the Defendant Laura  . As a result of his wrongful arrest, .Plaintiff suffered damages and a special grievance hence entitled for maximum Compensatory and Punitive Damages.*

## VII. DEFENDANTS HAVE COMMITTED A TORT VIOLATION OF THE RIGHT TO PRIVACY AGAINST THE PLAINTIFF:

Invasion of privacy is the considered the intrusion upon, or revelation of, something private. *Huskey v. National Broadcasting Co.*, 632 F. Supp. 1282 (N.D. Ill. 1986). One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his/her private affairs or concerns, is subject to liability to the other for invasion of privacy. *Jackson v. Playboy Enterprises, Inc.*, 574 F. Supp. 10 (S.D. Ohio 1983). The law of privacy consists of four distinct types of invasion. The right of privacy is invaded when there is: (1) unreasonable intrusion upon the seclusion of another (2) appropriation of the other's name or likeness, (3) unreasonable publicity given to the other's private life, and (4) publicity which unreasonably places the other in a false light before the public. See *Klipa v. Board of Education*, 54 Md. App. 644 (Md. Ct. Spec. App. 1983).

An invasion of the right of privacy by any of the above four courses of conduct may give rise to a cause of action and, on occasion, there may be an overlapping or concurrent invasion by any or all of the above means working toward the injury of the plaintiff. Liability for a claim of invasion of privacy by intrusion must be based upon an *intentional interference* with the plaintiff's interest in solitude or seclusion, either as to his/her person or as to his/her private affairs or concerns. *Uranga v. Federated Publs., Inc.*, 138 Idaho 550 (Idaho 2003).

Invasion of privacy by intrusion does not depend upon just any publicity given to the person whose interest is invaded or to his/her affairs. To be actionable, the prying or intrusion into the plaintiff's private affairs must be of a type which is offensive to a reasonable person. The Restatement of Torts clearly provides that the acts constituting the invasion of privacy must be highly offensive to a reasonable person. However, in the case of wrongful appropriation of one's name or likeness restatement provisions provides that the act need not be highly offensive to constitute invasion of privacy. The unwarranted publication of a person's name or likeness may constitute the most common means of invasion of the right of privacy. The protection of name and likeness from unwarranted intrusion or exploitation is the heart of the law of privacy. *Lugosi v. Universal Pictures*, 25 Cal. 3d 813 (Cal. 1979).

Damages Available: A cause of action for invasion of privacy entitles the plaintiff to recover damages for the harm to the particular element of his or her privacy that is invaded. Thus, one who suffers an intrusion upon his or her solitude or seclusion, may recover damages for the deprivation of his or her seclusion. One whose name, likeness or identity is appropriated to the use of another, may recover for the loss of the exclusive use of the value so appropriated. One to whose private life publicity is given, may recover for the harm resulting to his or her reputation from the publicity. One who is publicly placed in a false light, may recover damages for the harm to his or her reputation from the position in which he or she is placed. See *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 572 (U.S. 1977).

A plaintiff may also recover damages for emotional distress or personal humiliation that he or she proves to have actually suffered. *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562. The element of emotional distress includes anxiety, embarrassment, humiliation, shame, depression, feelings of powerlessness, and anguish. These are subjects of determination by a jury in an action for invasion of privacy by intrusion, taking into account all of the consequences and events which flow from an actionable wrong.

In this respect, the action for invasion of privacy closely resembles that for defamation. Unlike defamation, where compensation is confined to actual injury, damages for invasion of privacy are extended to

presumed or even punitive damages, at least when liability is based on a showing of knowledge of falsity or reckless disregard for the truth. Invasion of privacy is a willful tort which constitutes a legal injury, and damages for mental suffering are recoverable without the necessity of showing actual physical injury in a case of a willful invasion of the right of privacy. *Trevino v. Southwestern Bell Tel. Co*., 582 S.W.2d 582 (Tex. Civ. App. Corpus Christi 1979).

*In early 2014, Defendant Laura Germadnig had spy software installed on Plaintiff's cell phone.  In a Notice of Cross-Motion To Enforce Litigant's Rights Pursuant to Rule 1:10-3 and For Other Relief, returnable August 1, 2014, filed by Defendant Laura Germadnig and Defendant Zabarsky, they provided evidence that they had received documentation of my texts without my knowledge.  At pp. 6-8, paragraphs 9-11 citing EXHIBIT "D", Defendants Laura Germadnig and Zabarsky admit they had accessed Plaintiff's cell phone through the parties' 11-year-old daughter's cell phone being used to access Plaintiff's search mode for his telephone.*

*Defendant Laura Germadnig and her attorney, Defendant Zabarsky's attempt to bamboozle the Family Court Judge by stating at pg. 6, paragraph 9 of the July 16, 2014, certification, the following: "The Plaintiff has a Familyware cellular telephone plan through T-Mobile.  The family plan allows him to monitor our daughters', Sonya and Milana's use of their cellular telephones.  Because this is a "Familyware plan", not only can the Plaintiff monitor their cellular telephone use, but our daughters can also see whatever the Plaintiff searches or transacts on his cellular telephone". There is no such thing as a "Familyware" cellular telephone plan by T-Mobile. The app is called "Familywhere".  On or about July 20, 2014, Plaintiff personally contacted T-Mobile, and spoke to a technology representative named Sandy, who confirmed that there is no such technology of mirroring of another person's cell phone—except for a spy software installation.*

*On February 28, 2015, Plaintiff had a vehicle bug sweep inspection done because Defendant Laura Germadnig has been texting and contacting Plaintiff about all of his movements of where he has been.  On April 21, 2015, USA bug sweeps, Inc., TSCM "Debugging" Experts gave Plaintiff a report that they conducted a Level 1 Physical and Basic RF Inspection on Plaintiff's gray 2004 Ford Taurus vehicle, New Jersey Registration P82-ECN.  The Level 1 Basic Physical & RF Inspection revealed that even though there were no signs of a GPS tracker installed on the OUTSIDE of the vehicle, the multi-frequency RF detector that was used did detect an unidentified intermittent radio signal that registered a distinct signal in the area inside of the Plaintiff's vehicle.   This signal is similar to that of a hardwired GPS tracker.   Such hardwired devices can be buried under the dash or in the side panels of the vehicle.  Because of financial constraints, Plaintiff was unable to perform a more advanced Level 3 Electronic Inspection.  Besides the bugging of Plaintiff's vehicle, the phone tapping of Plaintiff's cell phone are violations of Federal Wiretapping Laws, 18 U.S.C. §2510 et seq.  They are also violation of New Jersey Wiretapping Laws, N.J.S.A. 2A:156A-4(c).*

*Apart from the continuing Psychological Alienation Abuses which the Children have been suffering in the hands of Defendants, all the Defendants have caused  severe emotional distress to the Plaintiff by way of their acts and conducts of Intrusion to privacy against the Plaintiff to which the said Defendants are liable for the maximum Compensatory Damages and the Punitive Damages.*

## VIII. DEFENDANTS HAVE COMMITTED MALICIOUS PROSECUTION AND HAVE MADE MALICIOUS

## ABUSE OF PROCESS:

The Plaintiff in this action allege that these Defendant are liable for abuse of process.  There are two basic elements necessary to sustain the cause of action of abuse of process. They are (1) that the defendant made an  improper, illegal and perverted use of the legal procedure, that  is to say, his/her resort to the legal process was neither warranted nor authorized by law and (2) that the defendant had an ulterior motive in initiating the legal process.  In other words, abuse of process is the misuse or misapplication  of the legal procedure in a manner not contemplated by law. Specifically, the plaintiff contends  that the defendant utilized the legal process to intimidate, harass and coerce the  plaintiff in order to obtain a collateral advantage.  In other words, the plaintiff contends that the defendant invoked the legal process to accomplish some unlawful end, namely, to compel  the plaintiff to do some  collateral thing which he/she could not legally be compelled to do. In short, in order for the plaintiff to  prevail in this action, he/she must prove by a preponderance of the evidence that the defendant made an improper, illegal, and perverted use of the process and that  there existed an ulterior motive or purpose on part of the defendant.

In the case of  *Ash v. Cohn, 119  N.J.L. 54 (E. & A. 1937)* in which the court distinguishes malicious abuse of process from  an action for malicious use of process: An action for malicious abuse  of process is distinguished from  an action for malicious use of process in that the action for abuse of process lies for the improper, unwarranted and perverted use of process after it has been issued while that for the malicious use of it lies for causing process to issue maliciously and without reasonable or probable cause. *Grainger v. Hill, 4  Bing. N.C. 212*.  Thus, it is said, is substance, that the distinction between malicious  use and malicious abuse of process is that the malicious use is the employment of process for its ostensible purpose, although without reasonable or probable cause, whereas the malicious abuse is the employment of a process in a manner not contemplated by law. Another fundamental distinction is that in the case of malicious use it is necessary to allege that the action in which the process was used has terminated favorably to the  plaintiff whereas in the case of the malicious abuse no such  allegation is necessary. *Saliem v. Glovsky  (1942), 132  Me. 402; 172  Atl.  Rep. 4; 50  C.J. 612, sec. 373."  119  N.J.L. at p. 58.*

Prosser comments on the distinction  between these causes of action in his treatise as follows: Abuse of process differs from  malicious prosecution in that the gist of the tort is  not commencing an action or causing process to issue without justification, but misusing, or misapplying process justified in itself for an end other than that which  it was designed to accomplish. The purpose for which the process is used, once it is issued, is the only thing of importance.  Consequently, in an action for abuse of process it is unnecessary for the plaintiff to prove that the  proceeding has terminated in his favor, or that the process was obtained without probable cause or in the course of a proceeding begun without probable cause.  It is often said that proof of 'malice' is required; but it  seems well settled that, except on the issue of punitive damages, this does not mean spite or ill will, or anything other than the improper purpose itself for which the process is used, and that even a pure spite motive is  not sufficient where process is used only to accomplish the result for which it was created.  Thus, if the defendant prosecutes an innocent plaintiff for a crime without reasonable grounds to believe him  guilty, it is malicious prosecution; if he prosecutes him  with such grounds  to extort payment of a debt, it is abuse of process.  *Prosser on Torts, Chap. 22, sec. 121 at 856-857 (4th ed. 1971). See also  Earl v. Winne, 14  N.J. 119, 135 (1953); 34  N.J.  Super. 605,*

*616 (Cty. Ct. 1955), and  Gambocz v. Apel,  et al., 102  N.J.  Super. 123, 128-130 (App. Div. 1968),  certif. denied, 52  N.J. 485 (1968).*

*Defendant Laura Germadnig, upon advice from Defendant Coneeny, Esq., and under false and fraudulent probable cause committed by Defendant Eluzzi, filed a domestic violence complaint, with underlying criminal harassment charge, against the Plaintiff falsely, maliciously and without probable cause. Plaintiff was falsely arrested and falsely imprisoned without probable cause by Jackson Township Police Department, Officers Bennett, Watson, Prosniewski, and Sergeant Olejarz, as a direct result of malicious actions caused by Defendant Eluzzi, and without legal justification, maliciously, without probable cause, these Defendants confined Plaintiff within set boundaries—a jail cell.   Plaintiff was aware of the confinement and was therefore damaged and suffered special grievance. The matter was terminated in Plaintiff's favor. As a result of these Defendant's actions Plaintiff sustained harm and was damaged.*

*Defendants, Jackson School District and respective Principals of Jackson Liberty HS, Christa McAuliffe Middle school, Crawford Rodriguez elementary school, refused to provide access to Plaintiff's three children in collusion with illegal orders hampering parental rights and repeatedly refused to accept the JURY VERDIT ORDER of Sep 06,2019 and challenged Plaintiff to sue them. All principals harassed Plaintiff when seeking report cards and seeking help for Plaintiff's children who all had POOR struggling grades; threatened to call police if Plaintiff attempted to attend kids' graduation ceremonies from these public institutions.*

*Plaintiff's Four Previous Lawyers, Stephanie J. Brown, August J. Landi, Margie McMahon, David Schlendorf, intentionally or incompetently never cited Plaintiff's constitutional rights or filed anything in the courts asserting INALIENABLE constitutionally protected parental rights and thus have committed the TORTS. Defendants, Jackson Twsp. Police chief Matthew Kunz and Jackson Township Police officer Christopher Parise deliberately interfered and refused to take in police reports on Plaintiff's complaints and harassed Plaintiff when he called in to request wellness checks on his children since the beginning starting in 2014.*

*By having Plaintiff arrested without any probable cause to do so, Defendants Coneeny, Laura Germadnig, Steven A. Zabarsky, Esq., the Law firm, Cowan & Gunteski, Melissa Reeves, Kenneth Reeves, Siegfried Germadnig, and Patricia Germadnig, Plaintiff's previous Lawyers Stephanie, August, Margie and David and Plaintiff's Children's School principals of Christa Mcaulifee Middle School, Jackson Liberty High School, Crawford Rodriguez Elementary School, including Jackson Township Police Chief Matthew Kunz and Police Officer  have all used the state court process for their own wrongful ends. As a result of his arrest, Plaintiff suffered damages and a special grievance. The domestic violence matter and underlying criminal matter were terminated favorably to Plaintiff. As a result of  the above acts of the Defendants the Plaintiff suffered damages and a special grievance hence entitled for maximum Compensatory and Punitive Damages.*

## IX. DEFENDANTS HAVE MADE FALSE ARREST AND FALSE IMPRISONMENT BY ABUSING THE PROCESS OF LAW AGAINST THE PLAINTIFF.

### False Arrest

The restraint or detention by one person of another without lawful justification (probable cause, a valid arrest warrant, or consent) under an asserted legal authority to enforce the process of the law. False arrest is also referred to as false imprisonment and is generally considered a misdemeanor offense. Some

jurisdictions distinguish between false arrest and false imprisonment, maintaining that a charge for false arrest requires the arresting party to have asserted the legal authority to make arrests. Such jurisdictions consider false imprisonment to consist of any unlawful restraint made, with or without claim of authority.

The word 'false' in the phrase refers to the illegality of the restraint. It is not a measure of whether the individual was actually restrained to the extent which they perceived. False arrest refers to private as well as governmental detentions and does not require any malice or bad faith on the offender's part to make them guilty of the offense. An individual may honestly believe they have the authority to make an arrest and still be found guilty. Police officers, however, are generally immune to false arrest claims.

### False Imprisonment

False imprisonment is an act punishable under criminal law as well as under tort law. Under tort law, it is classified as an intentional tort. A person commits false imprisonment when he commits an act of restraint on another person which confines that person in a bounded area. For a Prima Facie Case: The defendant should willfully act, intending to confine the plaintiff without the plaintiff's consent and without authority of law the defendant's act causes the plaintiff's confinement the plaintiff is aware of his/her own confinement. An act of restraint can be a physical barrier (such as a locked door), the use of physical force to restrain, a failure to release, or an invalid use of legal authority. An area is only bounded if freedom of movement is limited in all directions. If there is a reasonable means of escape from the area, the area is not bounded. However, if the means of escaping will result in the risk of physical harm to the detainee, then the area is bounded. Further, threatening to harm the detainee's family if the detainee leaves would also result in the area being bounded. Threats of immediate physical force may also be sufficient to be acts of restraint. A mere threat to imprison will not qualify for false imprisonment. Typically, when determining whether a threat counts as false imprisonment, the court will look at whether the plaintiff had a just fear of injury.

Invalid Use of Legal Authority:  An invalid use of legal authority is the detainment or arrest of a person without a warrant, with an illegal warrant, or with a warrant illegally executed. So long as the person is deprived of his personal liberty, the amount of time actually detained is inconsequential. *See, e.g., Schenck v. Pro Choice Network, 519 U.S. 357 (1997)*

*The fraudulent Enterprise known as the Township of Jackson, Jackson Township Police Department, the named Jackson Township police officers and officials, and Defendant Zabarsky (who is municipal prosecutor for Jackson Township and 18 other County municipalities) unlawfully uses police power to harass, abuse, threaten, intimidate, assault, and kidnap persons, like Plaintiff, through false arrest and false imprisonment, to obtain unfair advantage in a civil matter, namely a divorce, child custody and support dispute, in order to extract and extort through unlawful coercion as much as they can from Plaintiff, including presenting false and fraudulent testimony and evidence that Plaintiff and others similarly situated have more money than what is in reality, along with others similarly situated, no matter what their circumstances, financially or otherwise, may be.*

*By having Plaintiff arrested without any probable cause to do so, Defendants Coneeny, Laura Germadnig, Steven A. Zabarsky, Esq., the Law firm, Cowan & Gunteski, Melissa Reeves, Kenneth Reeves, Siegfried Germadnig, and Patricia Germadnig, Plaintiff's previous Lawyers Stephanie, August, Margie and David and Plaintiff's Children's School principals of Christa Mcaulifee Middle School, Jackson Liberty High School, Crawford Rodriguez Elementary School, including Jackson Township Police Chief Matthew Kunz and Police*

*Officer have all used the state court process for their own wrongful ends. As a result of his arrest, Plaintiff suffered damages and a special grievance. The domestic violence matter and underlying criminal matter were terminated favorably to Plaintiff.*

*Plaintiff was falsely arrested and falsely imprisoned without probable cause by Defendants Jackson Township, Jackson Township Police Department, Officers Bennett, Watson, Prosniewski, and Sergeant Olejarz, caused by Defendant Eluzzi, Laura Germadnig, Cathleen Coneeny, Esq., and without legal justification, maliciously, without probable cause. Plaintiff was detained against his will. The detention was without proper legal authority, legal justification, and/or without probable cause. The matter was terminated in Plaintiff's favor. As a proximate result, Plaintiff suffered damages.*

In Sevigny v. Dicksey, 846 F.2d 953 (4th Circuit U.S. Court of Appeals-1988) --Woman falsely arrested and detained for 3 hours. Won $121,000 from jury. That's $40,000 per hour for deprivation of liberty. In a similar case of Trezevant v. City of Tampa, 741 F.2d 336 (11th Circuit U.S. Court of Appeals-1984) --Falsely arrested and jailed. Held for 23 minutes in a holding cell. Won $25,000 from jury. That's about $67,000 per hour for deprivation of liberty. In yet another case a woman falsely arrested and imprisoned for 23 minutes. Awarded $120,000. That translates into $1,000,000.00 PER DAY.

N.J.S.A. § 2A:20-1 to § 2A:20-11: New Jersey Revised Statutes Title 2A - ADMINISTRATION OF CIVIL AND CRIMINAL JUSTICE- Section 2A:20-10 - Discharge as immunity from imprisonment Universal Citation: NJ Rev Stat Section 2A:20-10 (2013)

**2A:20-10. Discharge as immunity from imprisonment -** Every insolvent debtor, who has given up all his estate and conformed in all things to the directions of this subtitle, shall, so far as regards the imprisonment of his person, forever thereafter be discharged from all debts due at the time of the assignment, or contracted for before that time, though payable afterwards.

Title 2A - ADMINISTRATION OF CIVIL AND CRIMINAL JUSTICE-**Section 2A:20-8 - Discharge of debtor from confinement on assignment of property-**Universal Citation: NJ Rev Stat § 2A:20-8 (2013)

**2A:20-8. Discharge of debtor from confinement on assignment of property-** Upon making the assignment required by section 2A:20-6 of this title, the court may, by order, direct the sheriff to discharge the debtor from confinement on account of any debts previously contracted by him.

In New Jersey and New York it's called Intentional Infliction of Emotional Distress ("IIED"), Negligent Infliction of Emotional Distress ("NIED"),  Fraudulent Representation and Deceit, Fraud in the Inducement, Outrageous Conduct, Invasion of Privacy (by another), could be possible complaint by parent for emotional distress for psychic injury to a child(ren), complaint for interference with custody and visitation.

NJ Dissipation of assets in divorce is Fraud on marital rights. Kothari v. Kothari, 255 N.J. Super. 500, 510 (App. Div. 1992) ("Where property has been dissipated during the marriage the asset subject to distribution may take the form of a cash indebtedness to be imposed by the court upon one spouse in favor of the other."); N.J.S.A. 2A:34-23.1(i) ("[i]n making an equitable distribution of property, the court shall consider the contribution of each party to the dissipation in the amount or value of the marital property"); Monte v. Monte, 212 N.J. Super. 557, 567-68 (App. Div. 1986) ("intentional dissipation" of marital assets is a "fraud on marital rights" (quotation omitted)

Family Court Bias - The bias against fathers in family court is the most damaging of these issues, fathers not being the only victims. Children must also face the consequences of custody rulings that rule in favor of the mother unfairly. The reason is largely traced to the preference Judges and Attorneys indicate to have for mothers. The data shows overwhelming bias from attorneys towards mothers in custody cases, with over half of judges indicating the same. This not only impacts a judge's ruling, but the performance of the attorney. This can mean an increase or decrease in quality depending on who they are representing.

The effects of this bias are most definitely seen, as sole legal custody is an unlikelihood for Fathers and the chances of joint legal custody only correlate with an increase of income. What causes this disparity is a number of factors. The way America has organized the family court system is a promotion of gender roles in parenting. As men associate with the fatherly role, a less nurturing role, the courts perceive it this way. The fact is though that this is a narrow and ultimately costly way of seeing the big picture of child custody that children and fathers see the consequences of, while mothers overwhelmingly benefit.

*Without legal justification, maliciously, and without probable cause, Defendants Jackson Township, Jackson Township Police Department, Officers Bennett, Watson, Prosniewski, and Sergeant Olejarz, caused by Defendant Eluzzi, Laura Germadnig, Cathleen Coneeny, Esq., intentionally confined Plaintiff within set boundaries—a jail cell. Plaintiff was aware of his confinement and was damaged.*

## X DEFENDANTS HAVE COMMITTED NEGLIGENT INJURY AND DISTRESS TO PLAINITFF AND LIABLE FOR COMPENSATORY AND PUNITIVE DAMAGES

Intentional Infliction of Emotional Injury/Distress: The history of claims for intentional infliction of emotional distress reflects a gradual growth in the State of New Jersey. In a non-matrimonial case, the Law Division has recognized that extreme or outrageous conduct could give rise to such cause of action. *Hume v. Bayer, 178 N.J.Super 310, 428 A2d. 966 (Law Div. 1981).* Both Hafner and Hume refer to the Restatement (Second) of Torts, Sec. 46D (1965) contained the quote "outrageous conduct as causing severe emotional distress".

Section 46 provides: *"(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm. (2) When such conduct is directed at a third person, the actor is subject to liability is he intentionally or recklessly causes severe emotional distress (a) to a member of such person's immediate family who was present at the time, whether or not such distress results in bodily harm or (b) to any other person who is present at the time, if such distress results in bodily harm."*

To establish a claim for intentional infliction of emotional distress, the plaintiff must establish intentional outrageous conduct by the defendant, proximate cause, and distress that is severe. Initially, the plaintiff must prove that the defendant acted intentionally or recklessly. For an intentional act to result in liability, the defendant must **first,** intend to do the act. Liability will also attach when a defendant acts recklessly in deliberate disregard of a high degree of probability that emotional distress will follow. *Hume, supra 178 N.J.Super 319.* **Second**, the defendant's conduct must be extreme and outrageous. *Hume, supra 178 N.J.Super at 315.* The conduct must be "so outrageous in character, and so extreme in degree, as to

go beyond all possible bounds of decency, and be regarded as atrocious and utterly intolerable in a civilized community." Restatement, supra, Sec.46D. **Third,** the defendant's action must have been the proximate cause of the plaintiff's emotional distress. *Caputzal v. Lindsay, 48 N.J. 69, 77-78, 222 A2d. 513(1966).* **Fourth,** the emotional distress suffered by the plaintiff must be "so severe that no reasonable man could be expected to endure it." Restatement, supra, Sec. 46J. W. Prosser & P. Keaton, Handbook on Torts, par. 12 at p.55 (5th ed. 1984)

The New Jersey Supreme Court has recognized the tort of negligent infliction of emotional distress in the non-matrimonial case of *Decker v. Princeton Packet, Inc., 116 N.J. 418, 429 (1989), 224 N.J. Super. 726, cert. gr. 546, 557, 111 N.J. 648 , aff. 561 A2d. 1122 which stated:* "The tort involving the negligent infliction of emotional distress can be understood as negligent conduct that is the proximate cause of emotional distress in a person to whom to the actor owes a legal duty to exercise reasonable care...Thus, to establish liability for such a tort, a plaintiff must prove that the defendant's conduct was negligent and proximately caused plaintiff's injuries. The negligence of defendant, however, depends on whether defendant owes a duty of care to the plaintiff, which is analyzed in terms of foreseeability. Liability should depend on the defendant's foreseeing fright or shock severe enough to cause substantial injury in a person normally constituted.' " Most of the cases which fall under this cause of action are not between family members but between a family member and a third party. *Portee v. Jaffee, 84 N.J. 88, 417 A2d. 521 (1980),* which is the type of case mentioned above, eliminated the need for a "physical manifestation" in order to recover for emotional distress and mental anguish as long as there was a close family relationship.

Defendants are liable to plaintiff for the tort of negligent intentional infliction of emotional distress in that (a) the acts of the Defendants and Plaintiff's emotional distress resulting therefrom were the result of intentional and/or reckless conduct on the part of Defendants; (b) the conduct was extreme and outrageous; (c) the conduct of Defendants was the proximate cause of the emotional injuries sustained by Plaintiff; and (d) the emotional distress sustained by Plaintiff was genuine and substantial and had a demonstrable negative effect on his life and work and has forced Plaintiff to seek medical and or psychological attention.

*In the Present case the Defendants as detailed in the pleading and more specifically Defendant Laura and her Paramour, Defendant have violated NJ 2C: 29-9 Parent Child Relationship and Multiple Court Orders allowing daily telephonic contact, have conspired with other Defendants to secret the Plaintiff's Children and block all access to the Plaintiff. Similarly, Defendant Siegfried and Defendant Patricia who are the Parents of Defendant Laura, willfully participated to secret the children, colluded with Defendant Laura to violate courts orders, blocking access to children and provided financial funding to support the illegal and bad behavior of their daughter Defendant Laura. Similarly, Defendant Mark, Defendant Stacy, Defendant Siegfried Jr, Defendant Barus, Defendant Crystal, Defendant Skye, Defendant David, Defendant Nicole who are the siblings and spouses of Defendant Laura actively colluded to violate court orders and conspired to block parent child relationship by secreting Plaintiff's children and also did provide financial support to combat the Plaintiff for his parental rights. Similarly, Defendant Slava, Defendant Nancy, Defendant Louis, Defendant Janice, Defendant Melissa, Defendant Kenneth , Defendant Christine, Defendant Jack, Defendant Nada, Defendant Bradley, being the friends of Defendant Laura also actively participated by giving advice to Defendant Laura on how to block Plaintiff's access to his children.*

*Defendants verbally and mentally abused Plaintiff and treated him in a demeaning and inferior manner, which no reasonable person could be expected to endure. As a direct and proximate result of these*

*malicious and conscious wrongful actions, Plaintiff has sustained severe emotional distress, resulting in bodily injury, and damages, including punitive damages, to be determined at trial. Defendants' breach of this duty directly and proximately caused Plaintiff to suffer genuine and substantial emotional distress. Plaintiff's emotional distress manifested itself in fear, humiliation, depression, heart palpitations, mania, insomnia, anxiety attacks, suicidal ideation, panic attacks, shortness of breath and headaches.*

*In addition to compensatory damages, Plaintiff Zia Shaikh hereby make a claim for punitive damages against all Defendants in an amount to be proven at trial for the willful and wanton acts, omissions, commissions of all Defendants, to include violation of Plaintiff's civil rights, as alleged in this Complaint.*

*The Negligent and Intentional acts and omissions of all Defendants in this case were so gross and culpable in nature that they constitute reckless indifference and wanton disregard for the law and for the lives and safety of others through malicious prosecution, false arrest/false imprisonment without probable cause that constitutes assault and kidnapping, including Plaintiff. All Defendants committed the acts and omissions alleged in this Complaint and subjected Plaintiff to outrageous improper treatment that caused Plaintiff to suffer financial and emotional distress so severe and outrageous that no person should be expected to endure it. All Defendants actions were outrageous and should be punished, and an example should be made so that these actions, commissions, and omissions are not repeated. The recovery of punitive damages is permitted under the federal civil rights statutes for reckless and callous indifference to the federally protected rights of others and is thus appropriate in this case. This instance of reckless and callous indifference to Plaintiff's safety and Constitutional rights should be punished through the imposition of punitive damages so as to make an example of conduct that must not be tolerated.*

*As a result of the Negligent and Intentional conduct of Defendants, jointly and severally, Plaintiff has suffered compensatory damages, including, but not limited to the loss of his employment, including back and front pay, social security, fringe benefits, medical benefits, future earnings, emotional pain and suffering, physical pain and suffering, attorney's fees, and such other actual damages as permitted for recovery by the laws of the State of New Jersey and the United States of America.*

*The Negligent and Intentional conduct of the Defendants, each of them, was willful and wanton. Therefore, Plaintiff demands judgment against the Defendants jointly and severely for compensatory and punitive damages, together with reasonable attorney's fees, costs of suit and such further relief as the Court may deem equitable and just.*

## XI. FEDERAL US CONSTITUTIONAL PROTECTION OF CHILD-PARENT RELATIONSHIPS:

The US Courts have repeatedly invoked the United States Constitution to protect the parent-child relationship. Although this protection has been extended to the full range of familial relationships, the jurisprudence generally does not address a variety of "nontraditional" [The term "traditional family" is extremely misleading. Generally, it has been applied to a family consisting of married parents with children born from the marriage. This definition assumes that families come in one dominant style and designates all other types "nontraditional."] relationships that exist in today's society. Thus, the case law provides guidance with respect to the "traditional" parent-child relationship but leaves many questions unanswered in the nontraditional realm.

More important, the jurisprudence is silent with respect to the children's interest in maintaining certain relationships. The Supreme Court initiated the constitutional protection of family relationships in *Meyer v. Nebraska [ 262 U.S. 390 (1923)]* and Pierce v. Society of Sisters, [268 U.S. 510 (1925).] placing the parent-child relationship within the private autonomy paradigm of the Constitution. *[See Meyer, 262 U.S. at 400; Pierce, 268 U.S. 534-35]* In both cases, the Court acknowledged that the liberty provision of the Fourteenth Amend-ment *[U.S. CONST. amend. XIV, § 1. In pertinent part, the Fourteenth Amendment provides:* All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.] limits a state's ability to interfere with parents' child-rearing and education decisions. [Meyer, 262 U.S. at 399.].

In these initial discussions, the Court did not clearly indicate that parents' right to control family decision-making was a fundamental liberty interest *[See Griswold v. Connecticut, 381 U.S. 479, 504 (1965)].* Subsequently, however, the Court clarified that the liberty interest in family relationships was indeed fundamental and granted the highest constitutional protection to the family decision-making process *[See Sandusky Kramer, 455 U.S. 745, 753 (1982)* (declaring parents' liberty interest in the "care, custody and management" of their children to be fundamental and requiring states to prove parental unfitness sufficient to terminate those rights by clear and convincing evidence)]. The Court affirmed the protection of the parent-child relationship in subsequent related cases.

In *West Virginia State Board of Education v. Barnette, [319 U.S. 624 (1943).]* the Court held that the state could not require school children to recite the Pledge of Allegiance against parental objection. Because the state could not demonstrate a compelling interest in such a requirement, the Court upheld the parents 'freedom to refuse-and to permit their children to refuse-to endorse official dogma under the Establishment Clause of the First Amendment [Prince v. Massachusetts, 321 U.S. 158 (1944)]. In Prince v. Massachusetts, however, the Court permitted the state to prohibit a parent from allowing her ward to proselytize their religion on the grounds that those activities violated the state child labor laws. Despite its prior holdings protecting parental discretion over a child's secular and religious training in Meyer, Pierce, and Barnette, the Court in Prince found that the state's compelling interest in the child's health outweighed Ms. Prince's constitutionally supported right to direct the upbringing of the child." Not with-standing this conclusion, the majority recognized that the parents have a constitutionally based right to raise their children.

In the case of *"In Wisconsin v. Yoder, [406 U.S. 205 (1972)]* the Court again acknowledged the existence of the parents' child-rearing authority and underscored the importance of protecting familial relationships against governmental intrusion. The Court declared a state policy requiring children to attend school until they were sixteen years old unconstitutional as applied to Amish children, because it violated both the parents' rights under the Free Exercise Clause of the First Amendment and their liberty interest under the Fourteenth Amendment. In the preceding cases, the parents' liberty interest in child-rearing served as a shield against governmental intrusion when there was no compelling state interest in the intrusive policy or action. The jurisprudence safeguarding family autonomy springs from the constitutional protection of individual decisions regarding intrafamily relationships." Interestingly, although it is often a factor in the Court's analysis, the Court has never required marriage as a prerequisite to the Constitutional protection of the parent-child relationship.

**Children's Federal Constitutional Rights:**

The recognition of children's liberty interests in familial relationships logically follows from existing jurisprudence protecting children's constitutional rights. The Supreme Court has recognized children's constitutional rights in several contexts and has announced that children are entitled to both procedural and substantive due process. Additionally, a number of Supreme Court cases have been interpreted as supporting children's liberty interests in areas other than family dispute litigation. In re Gault, the Supreme Court held for the first time that children are "persons" under the Constitution *[387 U.S. 1 (1967)].* As a result, the Gault Court recognized that children have a right to due process in juvenile proceedings. Subsequent cases have expanded procedural due process rights to apply in other proceedings involving juveniles *[New Jersey v. T.L.O., 469 U.S. 325, 341 (1985)]. The* Court also has found that children have constitutional rights to obtain abortions and contraceptives and to the freedom of expression. In applying the Constitution to children, courts have sought primarily to protect them from arbitrary state action, *[Island Trees, 457 U.S. at 873; Tinker, 393 U.S. at 513.]* insensitive government policies, [*Carey, 431 U.S. at 694;] and their own folly [Carey, 431 U.S. at 695-96].* While courts have afforded children's constitutional rights only limited protection in comparison to adults, they usually restricted children's rights to preserve the corresponding rights of the adults who take care of them or to promote the children's best interests.

The Plaintiff states that *In re Gault,* the Supreme Court held for the first time that children are "persons" under the *Constitution [387 U.S. 1 (1967)]* and the said judgment empowers the liberty provision of the Fourteenth Amendment across to all Children. *[U.S. CONST. amend. XIV, § 1.* In pertinent part, the Fourteenth Amendment provides: All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.]

*Defendants, Jackson School District and respective Principals of Jackson Liberty HS, Christa McAuliffe Middle school, Crawford Rodriguez elementary school, refused to provide access to Plaintiff's three children despite court orders, refused to accept the JURY VERDIT ORDER of Sep 06,2019 and challenged Plaintiff to sue them. All principals harassed Plaintiff when seeking report cards and seeking help for Plaintiff's children who all had POOR struggling grades; threatened to call police if Plaintiff attempted to attend kids' graduation ceremonies from these public institutions. Plaintiff's Four Previous Lawyers, Stephanie J. Brown, August J. Landi, Margie McMahon, David Schlendorf, never ever cited Plaintiff's constitutional rights or filed anything in the courts etc. to assert Plaintiff's INALIENABLE constitutionally protected parental rights and thus have committed the TORTS. Defendants, Jackson Twsp. Police chief Matthew Kunz and Jackson Township Police officer Christopher Parise deliberately interfered and refused to take in police reports on Plaintiff's complaints and harassed Plaintiff when he called in to request wellness checks on his children since the beginning starting in 2014.*

*By having Plaintiff arrested without any probable cause to do so, Defendants Coneeny, Laura Germadnig, Steven A. Zabarsky, Esq., the Law firm, Cowan & Gunteski, Melissa Reeves, Kenneth Reeves, Siegfried Germadnig, and Patricia Germadnig, Plaintiff's previous Lawyers Stephanie, August, Margie and David and Plaintiff's Children's School principals of Christa Mcaulifee Middle School, Jackson Liberty High School, Crawford Rodriguez Elementary School, including Jackson Township Police Chief Matthew Kunz and Police*

*Officer have all used the state court process for their own wrongful ends. As a result of his arrest, Plaintiff suffered damages and a special grievance. The domestic violence matter and underlying criminal matter were terminated favorably to Plaintiff.*

*The Plaintiff thus states in the present case, that all Defendant's named have failed to protect the Child's Constitutional rights by exploiting, harassing and abusing them and in spite of all the efforts of the Plaintiff to safeguard his children, Defendant Attorneys, Defendant Judges and Defendant Police Departments, Plaintiff's Children's Schools, Defendants CPA'S all failed to protect and safeguard the Constitutional Rights of the Children as guaranteed by the US Constitution. As a result of the above acts of the Defendants the Plaintiff suffered damages and a special grievance hence entitled for maximum Compensatory and Punitive Damages.*

## XII. FEDERAL PREJURY UNDER OATH OR ITS EQUIVALENT- 18 U.S.C. § 1623(a)- VIOLATIONS BY DEFENDANTS

*The Court or Grand Jury*: Constitutional Section 1623 reaches both false statements under oath and those offered "under penalty of perjury" by operation of 28 U.S.C. § 1746 [ 18 U.S.C. § 1623(a)]. The allegedly perjurious statement must be presented in a "proceeding before or ancillary to any court or grand jury of the United States." An interview in an attorney's office in preparation for a judicial hearing cannot be considered such an ancillary proceeding, [ Dunn v. United States, 442 U.S. 100, 111-12 (1979)] but the phrase "proceedings ancillary to" court or grand jury proceedings does cover proceedings to take depositions in connection with civil litigation, well as a variety of proceedings in criminal cases, hearings, venue hearings, including habeas proceedings, 91 supervised release revocation hearings, as bail and suppression hearings.

*False or Inconsistent:* The Supreme Court's observation that a statement that is misleading but literally true cannot support a conviction under *Section 1621* because it is not false perjury under *Section 1623*. *[ Bronston v. United States, 409 U.S. 352, 358-59 (1973)] applies with equal force to [United States v. Gorman, 613 F.3d 711, 716 (7th Cir. 2010); United States v. Thomas, 612 F.3d 1107, 1114-115 (9th Cir. 2010); United States v. Richardson, 421 F.3d 17, 32-3 (1st Cir. 2005); United States v. Shotts, 145 F.3d 1289, 1297 (11th Cir. 1998); United States v. Hairston, 46 F.3d 361, 375 (4th Cir. 1996)].*

Similarly, perjury cannot be the product of confusion, mistake, or faulty memory, but must be a statement that the defendant knows is false, *[ United States v. Fawley, 137 F.3d 458, 466 (7th Cir. 1998); United States v. Reveron Martinez, 836 F.2d 684, 689 (1st Cir. 1988); cf. United States v. Dunnigan, 507 U.S. 87, 94 (1993)]* although this requirement may be satisfied with evidence that the defendant was deliberately ignorant or willfully blind to the fact that the statement was false [ Fawley, 137 F.3d at 466-67]. On the other hand, "[a] question that is truly ambiguous or which affirmatively misleads the testifier can never provide a basis for a finding of perjury, as it could never be said that one intended to answer such a question untruthfully." *[ United States v. Richardson, 421 F.3d 17, 33 (1st Cir. 2005); see also United States v. Strohm, 671 F.3d 1173, 11791181 (10th Cir. 2011)].* Yet ambiguity will be of no avail if the defendant understands the question and answers falsely, nevertheless. Subsection 1623(c) permits a perjury conviction simply on the basis of two necessarily inconsistent material declarations rather than a showing that one of the two statements is false [

18 U.S.C. § 1623(c) ]Conviction does require a showing, however, that the two statements were made under oath; it is not enough to show that one was made under oath and the other was made in the form of an affidavit signed under penalty of perjury *[ United States v. Jaramillo, 69 F.3d 388, 390 (9th Cir. 1995). 102 United States v. McAfee, 8 F.3d 1010, 1014-15 (5th Cir. 1993) ]* Moreover, the statements must be so inherently contradictory that one of them of necessity must be false.

Few years ago, the Supreme Court declined to reverse an earlier ruling that "[t]he general rule in prosecutions for perjury is that the uncorroborated oath of one witness is not enough to establish the falsity of the testimony of the accused set forth in the indictment." Because the two-witness rule rests on the common law rather than on a constitutional foundation, it may be abrogated by statute without offending constitutional principles *[ United States v. Ruggiero, 472 F.2d 599, 606 (2d Cir. 1973); United States v. Diggs, 560 F.2d 266, 269 (7th Cir. 108 1977)* (citing cases in accord) ]. Subsection 1623(e) permits a perjury conviction without compliance with this traditional two-witness rule *[ 18 U.S.C. § 1623(e)* ("Proof beyond a reasonable doubt under this section is sufficient for conviction. It shall not be necessary that such proof be made by any particular number of witnesses or by documentary or other type of evidence"). See also United States v. Kemp, 500 F.3d 257, 294 (3d Cir. 2007); United States v. Hasan, 609 F.3d 1121, 1139 (10th Cir. 2010)]. Materiality is perhaps the most nettlesome of perjury's elements. It is usually said that a statement is material "if it has a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to whom it is addressed." *[ United States. v. Brugnara, 856 F.3d 1198, 1209 (9th Cir. 2017); United States v. Macedo-Flores, 788 F.3d 181, 189 (5th Cir. 2015); United States v. Strohm, 671 F.3d 1173, 1186 (10th Cir. 2011)].*

This definition is not easily applied when the precise nature of the underlying inquiry remains somewhat undefined such as in grand jury proceedings or in depositions at the discovery stage of a civil suit. On the civil side, the lower federal courts appear divided between the view (1) that a statement in a deposition is material if a "truthful answer might reasonably be calculated to lead to the discovery of evidence admissible at the trial of the underlying suit" and (2) that a statement is material "if the topic of the statement is discoverable and the false statement itself had a tendency to affect the outcome of the underlying civil suit for which the deposition was taken." *[ United States v. Wilkinson, 137 F.3d 214, 225 (4th Cir. 1998), comparing, United States v. Kross, 14 F.3d 751, 754 (2d Cir. 1994), and United States v. Holley, 942 F.2d 916, 924 (5th Cir. 1991)].* In the case of perjury before the grand jury, rather than articulate a single standard, the courts have described several circumstances under which false testimony may be considered material.

Materiality: In any event, a statement is no less material because it did not or could not divert the decisionmaker. The courts seem to have had less difficulty dealing with a materiality issue characterized as the "perjury trap" doctrine. The doctrine arises where a witness is called for the sole purpose of eliciting perjurious testimony from him. *[ Brown v. United States, 245 F.2d 549, 555 (8th Cir. 1957), quoting, United States v. Icardi, 140 F.Supp. 383, 38488 (D.D.C. 1956); but see United States v. Burke, 425 F.3d 400, 408 (7th Cir. 2005) ("We have not embraced this doctrine, however, and do not see any reason to adopt it now.") (internal citations omitted)].*

*Defendants, Slava Kleyman, Nancy Cavanaugh, Louis & Janice Elwell, Melissa Reeves, Kenneth Reeves, Christine Gilfillen, "Jack M", Nada Pityinger, Brett Pityinger (are friends of Plaintiff's Ex-wife Laura Germadnig)- All the said Defendants were in active participation by giving advice on HOW to block Plaintiff*

*access to the children, filing false police reports, giving false testimony, stealth of Plaintiff's US Passport, client files and online harassment via Facebook chat and YELP reviews as a collaborative effort to derail amicable resolution of Plaintiff's divorce.*

*Defendants, Cathleen Coneeny Esq and her husband – Laura's first divorce attorney who told her to file the Jan 18,2014 frivolous Domestic Violence report and based on the false claims that were defeated at the Jan 2014 trial were used to remove custody of my children. Defendant Cathleen made racially motivated comments "I know how to make Middle Eastern Men cry" and filed an egregiously false narrative in RESPONSE to the divorce complaint, encouraged separation of parent child relationship.*

*Defendants, Steven A. Zabarsky, Esq., Kimberly Zabarsky, Law firm of Citta, Holzapfel & Zabarsky, Legal Malpractice Insurance Carrier for Citta, Holzapfel & Zabarsky, John Does 1-10, Jane Does,1-10, XYZ Corporations- Submitted FALSE CIS, Fabricated financial statements. They told Laura Germadnig to NOT let Plaintiff see his kids for more child support as found in Lakewood police report. They also filed a Jackson police report to EXTORT attorney fees while he is a municipal prosecutor. He refused to recuse himself due to conflict with presiding judges as his best friends and former work colleagues and filed false rebuttals to disallow Plaintiff to remove HALF of household furnishings to establish Plaintiff's own apt. He also refused to timely respond to Plaintiff's four divorce attorneys or cooperate to resolve divorce.*

*Defendants, Joseph Gunteski CPA, COWAN GUNTESKI & CO forensic accountants, submitted unsubstantiated preliminary reports disguised as final Forensic accounting reports leading to erroneous FJOD orders, which were further shielded from investigation by John R. Wiley Jr. CPA, ABV, CGMA, manager of the ethics committee. Defendants, Seth Arkush MBA,MSW,LCSW, Integrated Care Concepts LLC also Submitted false personality report without ever meeting Plaintiff in violation of HIPPA rules and colluded to violate parent child relationship with co-defendants.*

*The Plaintiff states that in the present case, all the above Defendants and the Defendant's Attorneys willfully, knowing and intentionally committed Federal Perjury Offences by giving false statement and affidavits as aforementioned in this complaint, which qualifies the tests of ( Court or Grand Jury; False or Inconsistent & Materiality) and are to be tried under Federal laws for the said committed offences. As a result of the above acts of the Defendants the Plaintiff suffered damages and a special grievance hence entitled for maximum Compensatory and Punitive Damages.*

### XIII. JUDICIAL BIAS- A US CONSTITUTIONAL VIOLATION FOR EQUAL AND FAIR JUSTICE

The United States Supreme Court has held that "[a] fair trial in a fair tribunal is a basic requirement of due process *[1n re Murchison, 349 U.S. 133, 136 (1955) (the Constitution requires that hearings take place before an impartial tribunal)].* Fundamental to the notion of a fair trial and tribunal is the principle that a judge shall apply the law impartially and free from the influence of any personal biases *[West Virginia Judicial Inquiry Comm'n v. Dostert, 271 S.E.2d 427, 434 (W. Va.1980)].* And yet, judges deserve themselves and the system if they presume that bias and prejudice do not enter the decision-making process to some degree. As one judge observed, "to recognize the existence of such prejudices is the part of wisdom."

Judges are expected to be rigorous in excluding personal bias when making decisions; hence, there are few judges who would readily admit that they have biases which interfere with their impartiality. Indeed, judges are typically appalled if their impartiality is called into question. [Bemard L. Shientag, The Personality of the Judge, in HANDBOOK FORJUDGES 67(1961)] After all, most judges believe themselves to be consistently objective, impartial and fair. Judges generally believe that they have taken great strides to be equitable and that they have granted full latitude to each side in a controversy, allowing both sides the opportunity to fully present their case. Unquestionably, judges believe that they have decided cases in a manner that is in harmony with the facts and pertinent legal issues involved. Rarely do judges question whether they have conducted themselves with what Edmund Burke called the "cold neutrality of an impartial judge." But it is exactly through this blind faith in their impartiality that judges may gain a false sense of confidence in their decisions. They may fail to take into account the unavoidable influences we all experience as human beings and disregard the limits of human nature and the difficulty of bringing to the conscious level subjective motivations, beliefs and predilections.

 Lord MacMillan evinced a shrewd awareness of this weakness in human nature when he said:

*The judicial oath of office imposes on the judge a lofty duty of impartiality. But impartiality is not easy of attainment. For a judge does not shed the attributes of common humanity when he assumes the ermine. The ordinary human mind is a mass of prepossessions inherited and acquired, often none the less dangerous because unrecognized by the possessor. Few minds are as neutral as a sheet of plate glass, and indeed a mind of that quality may actually fail in judicial efficiency, for the warmer tints of imagination and sympathy are needed to temper the cold light of reason if human justice might be a mechanical product, but amidst the incalculable complexities of human relationship the administration of justice can never be of this character. To quote the ancient and impressive formula, the judge in pronouncing his decision must be rightly advised and have God and a good conscience before him ... he must purge his mind not only of partiality to persons, but of partiality to arguments, a much more subtle matter, for every legal mind is apt to have an innate susceptibility to particular classes of arguments. [ LORD MACMILLAN, LAW AND OTHER THINGS 217, 218 (1939).]*

The essential insight of Lord MacMillan's writing was that impartiality denotes a recognition of and a sensitivity to the contrasting positions of those involved in a controversy, but that judges, as human beings, naturally perceive these outlooks and positions and measure them against their own values, experiences, ideas, etc., which will influence how they decide their cases.

*Plaintiff has learned that Defendant Zabarsky has personal and professional relationships with Family Part Judge Madelin F. Einbinder.  Plaintiff had hired attorney August Landi, Esq., in August 2014, to represent Plaintiff.  Landi told Plaintiff directly that Defendant Zabarsky had mentored Judge Einbinder before she became a judge and helped her with her law practice.  Plaintiff was told directly that Zabarsky was a prime mover to get Judge Einbinder on the bench in  County.*

*Plaintiff's former attorney, August Landi, Esq., in his October 2014 motion filing brought this to the Family Court's attention about racial, religious, and nationality discrimination issues and Family Court Judge Madelin F. Einbinder ignored it.  Plaintiff has since tried to reapply for his passport twice but the applications were rejected due to Judge Einbinder's order precluding Plaintiff from obtaining a replacement passport since Plaintiff's passport was stolen by a friend of Defendant Laura Germadnig and given to Ms. Germadnig for use against Plaintiff in the divorce and child custody matter, These comments are indicative of the racial discrimination against Plaintiff in the family court matter and Judge Madelin F.*

*Einbinder, J.S.C with bias, unfairly and intentionally ignored it to favor the Defendants Zabarsky and the Law Firm.*

*Defendants Zabarsky and the Law firm were involved in mail fraud and wire fraud by sending threatening letters and faxes to Plaintiff and his counsel to extort monies out of Plaintiff he did not have because they were fabricated by Zabarsky and Defendant Law firm.  These threatening letters and faxes are putting Plaintiff under threat of contempt, arrest and incarceration.  This mail fraud and wire fraud included mailings and faxes of unjust, inequitable and unconstitutional orders against Plaintiff that were issued and filed by Judge Einbinder, as said orders were conducted ex parte.  Additionally, Plaintiff and his counsel were denied any defense or ability-to-pay hearings against the financial fabrications by Defendants Zabarsky, the Law firm, and Cowan and Gunteski, because Judge Einbinder was beholden to Defendant Zabarsky and Defendant Law firm.*

*Defendants, Steven A. Zabarsky, Esq., Kimberly Zabarsky, Law firm of Citta, Holzapfel & Zabarsky, Legal Malpractice Insurance Carrier for Citta, Holzapfel & Zabarsky, John Does 1-10, Jane Does,1-10, XYZ Corporations- Submitted FALSE CIS, Fabricated financial statements. They told Laura Germadnig to NOT let Plaintiff see his kids for more child support as found in Lakewood police report. They also filed a Jackson police report to EXTORT attorney fees while he is a municipal prosecutor. He refused to recuse himself due to conflict with presiding judges as his best friends and former work colleagues and filed false rebuttals to disallow Plaintiff to remove HALF of household furnishings to establish Plaintiff's own apt. He also refused to timely respond to Plaintiff's four divorce attorneys or cooperate to resolve divorce. Defendants, Joseph Gunteski CPA, COWAN GUNTESKI & CO forensic accountants, submitted preliminary reports as final Forensic accounting reports leading to erroneous FJOD. Defendants, Seth Arkush MBA,MSW,LCSW, Integrated Care Concepts LLC also Submitted false personality report without ever meeting Plaintiff in violation of HIPPA rules and colluded to violate parent child relationship with co-defendants.*

*The Plaintiff states that in in the present case, all the above Defendants and the Defendant's Attorneys, Defendants CPA's willfully, knowing and intentionally violated Equal and Fair Justice and contributed to the Judicial Bias by conspiring with the Judicial Officers in blatant violation of the due process of laws.  As a result of  the above acts of the Defendants the Plaintiff suffered damages and a special grievance hence entitled for maximum Compensatory and Punitive Damages.*

## XIV. RICO CLAIMS

In addition to the allegations regarding each Defendant above, all Defendants are each engaged in activities which constitute Enterprise operations under the *Racketeer Influenced Corrupt Organizations Act of 1970 (RICO),* and each Defendant are "persons" for purposes of RICO.

By virtue of their affiliations, associations, and collaboration as alleged herein, RICO Defendants function collectively as alter ego vehicles of one another facilitate and further commercial purposes of the Enterprises alleged herein. Specific to the RICO allegations are Defendants Zabarsky and the Law firm who have political sway and access to 19 municipal townships and court systems in which to ply their trade of filing and maintaining false allegations of domestic violence, in order to extort and extract monies from unsuspecting parties like Plaintiff through a divorce and child custody process designed to drain all assets and monies for profit and gain.

Specifically, in addition to the conspiracy allegations detailed above, each Defendant is liable as a principal *Pursuant to 18 U.S.C. §2 (a)-(b), and that each RICO person that is a RICO Defendant is liable as a co-conspirator pursuant to 18 U.S.C. §371.* Defendants, and each of them, while affiliated with one or more Enterprises, have operated, affiliated with, and participated directly and indirectly in the conduct of Enterprise affairs through a pattern of racketeering activity, in violation of *18 U.S.C. §1964(b), (c), and (d) as follows:*

**RICO ENTERPRISES**

Each of the following configurations, for purposes of RICO §1962(c) claims for relief, constitute an enterprise engaged in, or the activities of which affect, interstate or international commerce as those terms are defined pursuant to *Title 18 U.S.C. §1961(4) of the Racketeer Influenced and Corrupt Organizations Act of 1970 (RICO), and Boyle v. United States, 129 S.Ct. 227 (2009) (collectively "RICO ENTERPRISES").*

These entities and individuals, acting in concert with one another, are organized and maintained by and through a consensual hierarchy of agents, partners, managers, directors, officers, supervisors, deputies, and/or representatives that formulate and implement policies relative to business development coordination, education, social networking, professional networking, informational services to the public about various areas and practices of lawyers, including but not restricted to aspects of family law, child custody, child support, alimony, enforcement measures, and other domestic relations matters in the Ocean County, New Jersey area, and are known statewide.

All Defendants, acting in concert with each other, are engaged in a racketeering Enterprise of extortion, threats, kidnapping (false arrest/false imprisonment), harassment, fraud, mail fraud, wire fraud, assault (false arrest/false imprisonment) of litigants like Plaintiff who have been subjected to false domestic violence allegations by Defendants in order for said Defendants to obtain unfair advantage in civil litigation over Plaintiff, as well as to profiteer off of Plaintiff, wherein the government entities and officials obtain funding for domestic violence programs and the private individuals profiteer by draining Plaintiff's finances and assets, and causing him to placed in a situation of an inability to comply with onerous orders and obligations imposed through threat, duress and coercion by Defendants.

The Defendants, acting in concert, have a pecuniary interest in the outcome of such cases, because they profit in their salaries and pensions from the racketeering Enterprise of threat, duress, coercion, extortion, kidnapping, harassment, fraud, mail fraud, wire fraud, assault of litigants, that involves millions, if not billions of dollars of Federal funding through interstate commerce.

The Defendants, acting in concert, have a commercial purpose to generate as much revenue and income as possible for themselves and the State of New Jersey corporation, specifically for purposes of receiving Federal funding involving domestic violence programs, under the federal Violence Against Women Act ("VAWA") and federal child support enforcement reimbursement incentive statutes to the State. This funding is used to supplement the State of New Jersey corporation treasury to aid and assist in balancing the budget and balancing the state employee pension plans, and local municipalities, in which said Jackson Township Defendants are part of.  The commercial purposes to generate as much revenue and income as possible by expanding the Enterprise and the criminal activities of each officer therein, and others associated with it, by committing fraud on the United States. Funding for these entities and individuals is

obtained from the millions and billions of dollars in Federal Social Security Title IV-D and VAWA reimbursement incentive money to the State.

**GENERAL ENTERPRISE ALLEGATIONS**

With respect to each Enterprise:

**Commercial Purposes**

The constituent members comprising the/each Enterprise are engaged in a concerted campaign to extort, defraud, trick, deceive, corruptly persuade, victims that are primarily family court litigants like Plaintiff, to exercise proprietary control over, and extract maximum amounts of money from through unlawful seizure of a person's salary, physical assets, and/or their person in order to perform a "shake-down" of the person under threat, duress, and coercion of facing unlawful civil arrest and imprisonment for debt.

Further, in unfairly protecting their commercial purposes, the/each Enterprise harasses, threatens, assaults, abuses, kidnaps, denigrates, impugns, and/or otherwise harms, threatens, and attempts to harm those persons they seek to financially drain.

The/each Enterprise acts as a "cabal", a semi-private, sometimes secret, informal affiliation of entities with public presence (including law firms and individual lawyers, such as Defendants Coneeny, Esq., Zabarsky, Esq., and the Citta, Holzapfel & Zabarsky Law firm, who are in reality sworn officers of the Court). The Enterprises achieve their respective purposes by fraudulent collusion by representing their legitimacy through their illegal behavior of "that's how it is" or "take it or leave it" breach of one or more professional duties.

The fraudulent Enterprise known as the Township of Jackson, Jackson Township Police Department, the named Jackson Township police officers and officials, and Defendant Zabarsky (who is municipal prosecutor for Jackson Township and 18 other County municipalities) unlawfully uses police power to harass, abuse, threaten, intimidate, assault, and kidnap persons, like Plaintiff, through false arrest and false imprisonment, to obtain unfair advantage in a civil matter, namely a divorce, child custody and support dispute, in order to extract and extort through unlawful coercion as much as they can from Plaintiff, including presenting false and fraudulent testimony and evidence that Plaintiff and others similarly situated have more money than what is in reality, along with others similarly situated, no matter what their circumstances, financially or otherwise, may be.

**Interstate and International Commerce of the Enterprises:**

The activities of the Defendants heretofore mentioned affect interstate and international commerce as follows:

- The unallocated Pendente Lite support orders that Plaintiff Shaikh is obligated to pay, even though unconscionable, onerous, unjust, and inequitable, is authorized and enforceable under federal law and entitled to full faith and credit under the multiple state laws (Revised Uniform Reciprocal Enforcement of Support Act ["RURESA"], Uniform Interstate Family Support Act ["UIFSA"], 18 U.S.C. §228 ["Deadbeat Parents Punishment Act"]);

- Alimony and child support awards may be enforced in foreign countries through bilateral international treaties including by revoking passports of U.S. citizens;
- State alimony and child support awards are enforceable in all U.S. Military Courts;
- The affairs of families are a worldwide industry generating tens, if not hundreds, of billions of dollars through the child support/alimony enforcement Enterprises each year;

According to government statistics more and more alimony and child support arrearages are accruing each year nationwide, yet less payments are being made nationwide because alimony obligors cannot pay, are unemployed, underemployed, disabled, or dead. Yet, these accrued arrearages continue to be reported by the states and its municipalities, including State of New Jersey to fraudulently obtain larger amounts of 42 U.S.C. §658(a) Title IV-D reimbursement incentive funding from the Federal government.

Based on the commercial nature of the criminal enterprise, the private Defendants such as the Germadnig Defendants, Coneeny, Esq., Zabarsky, Esq., the Law firm and others, are profiteering through extortion, fraud, kidnapping, assault, terroristic threats, and other criminal racketeering acts.

**Longevity:** In conducting the affairs of the Enterprises, and in committing the predicate acts, omissions, misrepresentations, and breaches referred herein beginning prior to January 18, 2014 and continuing up through initiation of these proceedings, RICO Defendants engaged in a pattern of racketeering activity in contravention *to Title 18 United States Code §1962(c)* inasmuch as the Defendants, and each of them, were/was employed by , or associated with, one or more Enterprise engaged in activities that affect federal interstate and/or foreign commerce, and conducted such multiple criminal enterprise affairs by and through a pattern of racketeering activity.

**Enterprise Schemes and Artifices to Defraud**

Abuse of Process: Unconstitutional "civil" warrants, "civil" arrests & imprisonment for debt

The central tool used by the Defendants is the widespread illegal, unlawful exercise of the enormous equitable powers of the state family courts. New Jersey family courts exercise such powers putatively under a set of laws enacted to extend state police powers to "intervene" in personal family financial and custody matters involving domestic violence matters, child custody, child support, and alimony obligations. *These child custody, alimony and child support laws are found in the New Jersey Civil Code, Title 2A, specifically under N.J.S.A. 2A:34-23 et seq., and under Part 5, Chancery Division, Family Part of the New Jersey Court Rules, specifically Rules 5:3-7, 5:7-4, 5:7-5, 5:7-6, 5:8 et seq.*

These processes constitute the central foundation of the conspiracy to violate civil rights actionable under at least 18 U.S.C. §241, 242, and 42 U.S.C. §1983 et seq. By threatening, coercing, intimidating, falsely arresting and imprisoning Plaintiff (which constitutes the definitions of assault and kidnapping), and others similarly situated, the Defendants have perpetrated one or more frauds and swindles, abuse of process, or deprivations of Plaintiff's Constitutionally protected Rights, and Family Federal Rights.

**§1961(5) PATTERN OF RACKETEERING ACTIVITY**

ALLEGATIONS

18 U.S.C. §1961(5)

COMMISSION OF RICO 1961(1)(B) RACKETEERING ACTIVITY:

Plaintiff, Zia Shaikh, repeats and re-alleges all of the allegations in Paragraphs 1-151 as if the same were set forth herein at length.

All Defendants are RICO Defendants that engaged and continue to engage in the following "racketeering activity", as that term is defined pursuant to 18 U.S.C. §1961(5) ("RACKETEERING ACTIVITY").  All RICO Defendants' RACKETEERING ACTIVITY is committing, aiding and abetting, or conspiring to commit, tens of thousands of violations of the following laws with the past ten years (four years in instant case) including:

A.      *Fraud and False Statements:  18 U.S.C. §1001.*
B.      *Fraud and related activity in connection with identification documents, authentication features, and information:  18 U.S.C. §1028.*
C.      *Mail Fraud:        18 U.S.C. §1341.*
D.      *Wire Fraud:        18 U.S.C. §1343.*
E.      *Bank Fraud:        18 U.S.C. §1344.*
F.      *Intangible Personal Property Right Deprivation (interference with Plaintiff Shaikh's prospective economic advantage): Title 18 U.S.C. §1346.*
G.      *Obstruction of proceedings before departments, agencies, and committees: 18 U.S.C. §1505.*
H.      *Tampering with witness or victim: Title 18 U.S.C. §1513.*
I.      *Peonage; obstructing enforcement against  18 U.S.C. §1581.*
J.      *Forced Labor: 18 U.S.C. §1589.*
K.      *Trafficking with respect to peonage, slavery, involuntary servitude, or forced labor:  18 U.S.C. §1590.*
L.      *Unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor:  18 U.S.C. §1592.*
M.      *Benefitting financially from peonage, slavery, involuntary servitude, forced labor, and trafficking in persons: 18 U.S.C. §1593A.*
N.      *Conspiracy, attempt to commit acts of peonage, slavery, proscribed:  18 U.S.C. §1594.*
O.      *Interference with commerce by threats or violence:  18 U.S.C. §1951.*
P.      *Interstate and foreign travel or transportation in aid of racketeering enterprises:  18 U.S.C. §1952.*
Q.      *Extortion and threats:  18 U.S.C. §871.*
R.      *Principal and Aider and Abettor, Attempt, Conspiracy Liability:  Title 18 U.S.C. §2 (a) and (b).*

**Frauds and Swindles**: Beginning in 2014 and occurring every month thereafter through and including the present time, All Defendants threatened, used false and fraudulent court process, coerced, forced, intimidated Plaintiff Shaikh with financial ruin, loss of relationship with his children, and threats of arrest and imprisonment to obtain unfair advantage in the divorce process. As a result of these acts Defendants Coneeny, Esq., Zabarsky, Esq., the Law firm, Laura Germadnig, and others extracted and extorted significant monies out of Plaintiff through letters, court petitions and pleadings sent through the U.S. Mail, by fax or e-mail.  Threatening phone calls were also used.  Plaintiff has been forced into foreclosure and loss of equity of property, along with loss of his financial planning business. The end result is that it has forced Plaintiff through threats, duress and coercion to divest all of his assets and salary, to pay ludicrous overpriced legal and expert fees, and other fees, costs and expenses to Defendants Coneeny, Esq., Zabarsky, Esq., the Law firm, Cowan & Gunteski, Laura Germadnig, and others. All of these extortionate payouts in monies were done under fraudulent threat of unlawful arrest for a civil matter and

imprisonment for a civil debt, based on the false and fraudulent domestic violence claim brought on January 18, 2014, dismissed on January 30, 2014, and the underlying false criminal charge of harassment, *N.J.S.A. 2C:33-4(c)* dismissed on March 10, 2015.

**Kidnapping:** Each act of all of the Defendants, in concert, in falsely arresting and falsely imprisoning Plaintiff, or attempted kidnapping by defrauding him under false pretenses of purported "legal" process was committed in conducting, participating in, conspiracy with, or aiding and abetting in furtherance of the purposes of each Enterprise with which the Defendants are affiliated.

**Extortion:** Defendants in committing each act of extortion through threats by false arrest in a civil dispute, false imprisonment in a civil dispute, kidnapping, assault, threats, duress, coercion, terrorism, malicious prosecution, and malicious abuse of process resulting in forced labor, attempted, conspired, aided and abetted, and did obstruct, delay, and affect commerce or the movement of any article or commodity in commerce, namely money and valuable things, including the interference of Plaintiff 's business and economic advantage, consisting of, inter alia, payment of extortionate, excessive, onerous, unjust, oppressive, and inequitable unnecessary legal and expert fees, and onerous support and alimony obligation not based on reality or facts, but instead conduct intimidating hearings with threat of arrest and imprisonment hanging over Plaintiff's head at each hearing.

**Obstruction of Justice:** All Defendants, by Obstruction of Justice through the fraudulent court processes aforementioned, corruptly, by threats and force, by threatening letter or communication, endeavored to influence, intimidate, and impede Plaintiff's constitutional rights and his right to work/economic advantage. All Defendants, by Obstruction of Justice, used false arrest without probable cause and false imprisonment to obtain unfair advantage in a civil matter involving a divorce, support and child custody dispute, and used the false and fraudulent process for racial discrimination, peonage, slavery, involuntary servitude and forced labor against Plaintiff to deprive Plaintiff of his constitutional rights protected under the Constitution of the United States and New Jersey State Constitution.

**Aiding and Abetting:** All Defendants employed the U.S. Mails and/or federal interstate wires, as well as engaged in racketeering activity as alleged herein, to aid and abet the primary *RICO §1962(c)* contraventions committed by Defendants as alleged herein above. All Defendants substantially assisted in the commission of the primary RICO contraventions by said Defendants, thereby deriving a monetary benefit as a result thereof to the detriment of Plaintiff's Rights.

**Conspiracy:**   All Defendants aided and abetted a RICO Section 1962(d) conspiracy between said Defendants to contravene *RICO Section 1962(c)* to injure and/or damage Plaintiff's interest in his business and/or property, as well as his rights. Plaintiff Zia Shaikh alleges that all Defendants are conspiratorially liable under *Pinkerton v. U.S., 328 U.S. 640 (1946) and Salinas v. U.S., 522 U.S. 52 (1997)* for the substantive *RICO Section 1962(c)* contraventions committed by Defendants.


**CLAIMS OF RELIEF**


**CLAIM FOR RELIEF- TORT OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

Plaintiff Zia Shaikh incorporates by reference the allegations contained in the above paragraphs, as though fully set forth herein.

*WHEREFORE, Plaintiff Zia Shaikh, respectfully demands judgment against Defendants* Laura L. Germadnig, Siegfried & Patricia Germadnig, Melissa & Kenneth Reeves, Mark & Stacy GERMADNIG, Siegfried Jr & Barus Germadnig, Crystal Germadnig, Skye Germadnig, David & Nicole Tarnowski, Slava Kleyman,  Nancy Cavanaugh, Louis & Janice Elwell, Christine Gilfillen, Sandra Seaman, Jack M, Nada Pityinger, Brett Pityinger, Daniel & Kathleen SCHASTNY, Bradely & Rene Mckee, Robert & Carol Mckee, Stanley & Lori O' Brian, Candy Mckee, Steven A. Zabarsky, Esq., Kimberly Zabarsky, Law firm of Citta, Holzapfel & Zabarsky, Legal Malpractice Insurance Carrier for Citta, Holzapfel & Zabarsky, Cathleen Christie-Coneeny, Esq., Legal Malpractice Insurance Carrier for Cathleen Christie-Coneeny, Esq., Joseph Gunteski CPA, Cowan Gunteski & Co, John R. Wiley Jr. CPA, ABV, CGMA, manager of the ethics committee, Seth Arkush, Integrated Care Concepts LLC, Jackson School District, Principal of Jackson Liberty HS, Principal of Christa Mcaulifee Middle School, Principal of Crawford Rodriguez elementary School, Stephanie J. Brown Esq, August J. Landi Esq, Margie McMahon Esq, David Schlendorf Esq, Jackson Twsp. Police Chief Matthew Kunz, Jackson Township Police Officer Christopher Parise, Ocean Cty NJ Prosecutor Bradley Bilheimer, John Foti Jr, Madeline f. Einbinder j.s.c., Marlene l. Ford a.j.s.c, John s. Doran j.s.c., Deborah H. Schron j.s.c., John Does 1-10, John Does 1-10, XYZ Corporations, *individually for:*

A)  Damages in the amount of $50,000,000.00, and
B)  Punitive Damages in the amount of $100,000,000.00, and
C)  Awarding any counsel fees obtained by Plaintiff's counsel, and
D)  Awarding costs of suit, and
E)  Interest, and
F)  Damages for Pain and Suffering, and
G)  For such other relief as the Court may determine to be appropriate.

**CLAIM FOR RELIEF- TORT OF PARENTAL ALIENATION SYNDROME**

Plaintiff Zia Shaikh incorporates by reference the allegations contained in the above paragraphs, as though fully set forth herein.

*WHEREFORE, Plaintiff Zia Shaikh, respectfully demands judgment against Defendants* Laura L. Germadnig, Siegfried & Patricia Germadnig, Melissa & Kenneth Reeves, Mark & Stacy GERMADNIG, Siegfried Jr & Barus Germadnig, Crystal Germadnig, Skye Germadnig, David & Nicole Tarnowski, Slava Kleyman,  Nancy Cavanaugh, Louis & Janice Elwell, Christine Gilfillen, Sandra Seaman, Jack M, Nada Pityinger, Brett Pityinger, Daniel & Kathleen SCHASTNY, Bradely & Rene Mckee, Robert & Carol Mckee, Stanley & Lori O' Brian, Candy Mckee, Steven A. Zabarsky, Esq., Kimberly Zabarsky, Law firm of Citta, Holzapfel & Zabarsky, Legal Malpractice Insurance Carrier for Citta, Holzapfel & Zabarsky, Cathleen Christie-Coneeny, Esq., Legal Malpractice Insurance Carrier for Cathleen Christie-Coneeny, Esq., Joseph Gunteski CPA, Cowan Gunteski & Co, John R. Wiley Jr. CPA, ABV, CGMA, manager of the ethics committee, Seth Arkush, Integrated Care Concepts LLC, Jackson School District, Principal of Jackson Liberty HS, Principal of Christa Mcaulifee Middle School, Principal of Crawford Rodriguez elementary School, Stephanie J. Brown Esq, August J. Landi Esq, Margie McMahon Esq, David Schlendorf Esq, Jackson Twsp. Police Chief Matthew Kunz, Jackson Township Police Officer Christopher Parise, Ocean Cty NJ Prosecutor Bradley Bilheimer, John Foti Jr, Madeline F. Einbinder J.S.C., Marlene L. Ford A.J.S.C., John S. Doran J.S.C., Deborah H. Schron J.S.C.,  John Does 1-10, John Does 1-10, XYZ Corporations, *individually for:*

A) Damages in the amount of $50,000,000.00, and
B) Punitive Damages in the amount of $100,000,000.00, and
C) Awarding any counsel fees obtained by Plaintiff's counsel, and
D) Awarding costs of suit, and
E) Interest, and
F) Damages for Pain and Suffering, and
G) For such other relief as the Court may determine to be appropriate.


**CLAIM FOR RELIEF- TORT OF PARENTAL ALIENATION CAUSING INTERFERENCE WITH CUSTODY**

Plaintiff Zia Shaikh incorporates by reference the allegations contained in the above paragraphs, as though fully set forth herein.

*WHEREFORE, Plaintiff Zia Shaikh, respectfully demands judgment against Defendants* Laura L. Germadnig, Siegfried & Patricia Germadnig, Melissa & Kenneth Reeves, Mark & Stacy GERMADNIG, Siegfried Jr & Barus Germadnig, Crystal Germadnig, Skye Germadnig, David & Nicole Tarnowski, Slava Kleyman, Nancy Cavanaugh, Louis & Janice Elwell, Christine Gilfillen, Sandra Seaman, Jack M, Nada Pityinger, Brett Pityinger, Daniel & Kathleen SCHASTNY, Bradely & Rene Mckee, Robert & Carol Mckee, Stanley & Lori O' Brian, Candy Mckee, Steven A. Zabarsky, Esq., Kimberly Zabarsky, Law firm of Citta, Holzapfel & Zabarsky, Legal Malpractice Insurance Carrier for Citta, Holzapfel & Zabarsky, Cathleen Christie-Coneeny, Esq., Legal Malpractice Insurance Carrier for Cathleen Christie-Coneeny, Esq., Joseph Gunteski CPA, Cowan Gunteski & Co, John R. Wiley Jr. CPA, ABV, CGMA, manager of the ethics committee, Seth Arkush, Integrated Care Concepts LLC, Jackson School District, Principal of Jackson Liberty HS, Principal of Christa Mcaulifee Middle School, Principal of Crawford Rodriguez elementary School, Stephanie J. Brown Esq, August J. Landi Esq, Margie McMahon Esq, David Schlendorf Esq, Jackson Twsp. Police Chief Matthew Kunz, Jackson Township Police Officer Christopher Parise, Ocean Cty NJ Prosecutor Bradley Bilheimer, John Foti Jr Madeline F. Einbinder J.S.C., Marlene L. Ford A.J.S.C., John S. Doran J.S.C., Deborah H. Schron J.S.C., John Does 1-10, John Does 1-10, XYZ Corporations, i*ndividually for:*

A) Damages in the amount of $50,000,000.00, and
B) Punitive Damages in the amount of $100,000,000.00, and
C) Awarding any counsel fees obtained by Plaintiff's counsel, and
D) Awarding costs of suit, and
E) Interest, and
F) Damages for Pain and Suffering, and
G) For such other relief as the Court may determine to be appropriate.


**CLAIM FOR RELIEF- TORT OF PARENTAL ALIENATION CAUSING NON-PAYMENT OF CHILD SUPPORT**

Plaintiff Zia Shaikh incorporates by reference the allegations contained in the above paragraphs, as though fully set forth herein.

*WHEREFORE, Plaintiff Zia Shaikh, respectfully demands judgment against Defendants* Laura L. Germadnig, Steven A. Zabarsky, Esq., Kimberly Zabarsky, Law firm of Citta, Holzapfel & Zabarsky, Legal Malpractice Insurance Carrier for Citta, Holzapfel & Zabarsky, Cathleen Christie-Coneeny, Esq., Legal Malpractice

Insurance Carrier for Cathleen Christie-Coneeny, Esq., Joseph Gunteski CPA, Cowan Gunteski & Co, John R. Wiley Jr. CPA, ABV, CGMA, manager of the ethics committee, Seth Arkush, Integrated Care Concepts LLC, Jackson School District, Principal of Jackson Liberty HS, Principal of Christa Mcaulifee Middle School, Principal of Crawford Rodriguez elementary School, Stephanie J. Brown Esq, August J. Landi Esq, Margie McMahon Esq, David Schlendorf Esq, Jackson Twsp. Police Chief Matthew Kunz, Jackson Township Police Officer Christopher Parise, Ocean Cty NJ Prosecutor Bradley Bilheimer, John Foti Jr Madeline F. Einbinder J.S.C., Marlene L. Ford A.J.S.C., John S. Doran J.S.C., Deborah H. Schron J.S.C., John Does 1-10, John Does 1-10, XYZ Corporations, *individually for:*

A)   Damages in the amount of $50,000,000.00, and
B)   Punitive Damages in the amount of $100,000,000.00, and
C)   Awarding any counsel fees obtained by Plaintiff's counsel, and
D)   Awarding costs of suit, and
E)   Interest, and
F)   Damages for Pain and Suffering, and
G)   For such other relief as the Court may determine to be appropriate.


**CLAIM FOR RELIEF- TORT OF PARENTAL ALIENATION CAUSING NON-PAYMENT OF CHILD SUPPORT**

Plaintiff Zia Shaikh incorporates by reference the allegations contained in the above paragraphs, as though fully set forth herein.

*WHEREFORE, Plaintiff Zia Shaikh, respectfully demands judgment against Defendants* Laura L. Germadnig, Siegfried & Patricia Germadnig, Slava Kleyman, Nancy Cavanaugh, Steven A. Zabarsky, Esq., Kimberly Zabarsky, Law firm of Citta, Holzapfel & Zabarsky, Legal Malpractice Insurance Carrier for Citta, Holzapfel & Zabarsky, Cathleen Christie-Coneeny, Esq., Legal Malpractice Insurance Carrier for Cathleen Christie-Coneeny, Esq., Joseph Gunteski CPA, Cowan Gunteski & Co, John R. Wiley Jr. CPA, ABV, CGMA, manager of the ethics committee, Seth Arkush, Integrated Care Concepts LLC, Jackson School District, Principal of Jackson Liberty HS, Principal of Christa Mcaulifee Middle School, Principal of Crawford Rodriguez elementary School, Stephanie J. Brown Esq, August J. Landi Esq, Margie McMahon Esq, David Schlendorf Esq, Jackson Twsp. Police Chief Matthew Kunz, Jackson Township Police Officer Christopher Parise, Ocean Cty NJ Prosecutor Bradley Bilheimer, John Foti Jr, Madeline F. Einbinder J.S.C., Marlene L. Ford A.J.S.C., John S. Doran J.S.C., Deborah H. Schron J.S.C., John Does 1-10, John Does 1-10, XYZ Corporations, *individually for:*

A)   Damages in the amount of $50,000,000.00, and
B)   Punitive Damages in the amount of $100,000,000.00, and
C)   Awarding any counsel fees obtained by Plaintiff's counsel, and
D)   Awarding costs of suit, and
E)   Interest, and
F)   Damages for Pain and Suffering, and
G)   For such other relief as the Court may determine to be appropriate.

**CLAIM FOR RELIEF- TORT OF NEGLIGENT INJURY AND DISTRESS**

Plaintiff Zia Shaikh incorporates by reference the allegations contained in the above paragraphs, as though fully set forth herein.

*WHEREFORE, Plaintiff Zia Shaikh, respectfully demands judgment against Defendants* Laura L. Germadnig, Siegfried & Patricia Germadnig, Melissa & Kenneth Reeves, Mark & Stacy GERMADNIG, Siegfried Jr & Barus Germadnig, Crystal Germadnig, Skye Germadnig, David & Nicole Tarnowski, Slava Kleyman, Nancy Cavanaugh, Louis & Janice Elwell, Christine Gilfillen, Sandra Seaman, Jack M, Nada Pityinger, Brett Pityinger, Daniel & Kathleen SCHASTNY, Bradely & Rene Mckee, Robert & Carol Mckee, Stanley & Lori O' Brian, Candy Mckee, Steven A. Zabarsky, Esq., Kimberly Zabarsky, Law firm of Citta, Holzapfel & Zabarsky, Legal Malpractice Insurance Carrier for Citta, Holzapfel & Zabarsky, Cathleen Christie-Coneeny, Esq., Legal Malpractice Insurance Carrier for Cathleen Christie-Coneeny, Esq., Joseph Gunteski CPA, Cowan Gunteski & Co, John R. Wiley Jr. CPA, ABV, CGMA, manager of the ethics committee, Seth Arkush, Integrated Care Concepts LLC, Jackson School District, Principal of Jackson Liberty HS, Principal of Christa Mcaulifee Middle School, Principal of Crawford Rodriguez elementary School, Stephanie J. Brown Esq, August J. Landi Esq, Margie McMahon Esq, David Schlendorf Esq, Jackson Twsp. Police Chief Matthew Kunz, Jackson Township Police Officer Christopher Parise, Ocean Cty NJ Prosecutor Bradley Bilheimer, John Foti Jr, Madeline F. Einbinder J.S.C., Marlene L. Ford A.J.S.C., John S. Doran J.S.C., Deborah H. Schron J.S.C.,  John Does 1-10, John Does 1-10, XYZ Corporations, *individually, for:*

A)   Damages in the amount of $50,000,000.00, and
B)   Punitive Damages in the amount of $100,000,000.00, and
C)   Awarding any counsel fees obtained by Plaintiff's counsel, and
D)   Awarding costs of suit, and
E)   Interest, and
F)   Damages for Pain and Suffering, and
G)   For such other relief as the Court may determine to be appropriate.


**CLAIM FOR RELIEF- TORT OF INVASION OF PRIVACY**

Plaintiff Zia Shaikh incorporates by reference the allegations contained in the above paragraphs, as though fully set forth herein.

*WHEREFORE, Plaintiff Zia Shaikh, respectfully demands judgment against Defendants Steven A. Zabarsky, Kimberly Zabarsky, Law firm of Citta, Holzapfel & Zabarsky, Legal malpractice Insurance Carrier for Citta, Holzapfel & Zabarsky, Coneeny, Laura Germadnig,* Madeline F. Einbinder J.S.C., Marlene L. Ford A.J.S.C., John S. Doran J.S.C., Deborah H. Schron J.S.C., *Bradley Bilheimer, Defendant Laura and her Paramour, Defendant Siegfried and Defendant Patricia, Defendant Mark, Defendant Stacy, Defendant Siegfried Jr, Defendant Barus, Defendant Crystal, Defendant Skye, Defendant David, Defendant Nicole, Defendant Slava, Defendant Nancy, Defendant Louis, Defendant Janice, Defendant Melissa, Defendant Kenneth , Defendant Christine, Defendant Jack, Defendant Nada, Defendant Brett, Defendant August, Defendant Margie, Defendant David, Defendant Stephanie individually, for:*

A)   Damages in the amount of $50,000,000.00, and
B)   Punitive Damages in the amount of $100,000,000.00, and

C)   Awarding any counsel fees obtained by Plaintiff's counsel, and.
D)   Awarding costs of suit, and
E)   Interest, and
F)   Damages for Pain and Suffering, and
G)   For such other relief as the Court may determine to be appropriate.

**CLAIM FOR RELIEF- MALICIOUS PROSECUTION**

Plaintiff Zia Shaikh incorporates by reference the allegations contained in the above paragraphs, as though fully set forth herein.

*WHEREFORE, Plaintiff Zia Shaikh, respectfully demands judgment against Defendants Steven A. Zabarsky, Kimberly Zabarsky, Law firm of Citta, Holzapfel & Zabarsky, Legal malpractice Insurance Carrier for Citta, Holzapfel & Zabarsky, Coneeny, Laura Germadnig, Eluzzi,* Stephanie J. Brown Esq, August J. Landi Esq, Margie McMahon Esq, David Schlendorf Esq, Jackson Twsp. Police Chief Matthew Kunz, Jackson Township Police Officer Christopher Parise, Ocean Cty NJ Prosecutor Bradley Bilheimer, John Foti Jr, Madeline F. Einbinder J.S.C., Marlene L. Ford A.J.S.C., John S. Doran J.S.C., Deborah H. Schron J.S.C.,  John Does 1-10, John Does 1-10, XYZ Corporations, *individually, jointly and severally for:*

A)   Damages in the amount of $50,000,000.00, and
B)   Punitive Damages in the amount of $100,000,000.00, and
C)   Awarding any counsel fees obtained by Plaintiff's counsel, and
D)   Awarding costs of suit, and
E)   Interest, and
F)   Damages for Pain and Suffering, and
G)   For such other relief as the Court may determine to be appropriate.

**CLAIM FOR RELIEF- MALICIOUS ABUSE OF PROCESS**

Plaintiff Zia Shaikh incorporates by reference the allegations contained in the above paragraphs, as though fully set forth herein.

*WHEREFORE, Plaintiff Zia Shaikh, respectfully demands judgment against Defendants Coneeny, Laura Germadnig, Steven A. Zabarsky, Esq., the Law firm, Cowan & Gunteski, Melissa Reeves, Kenneth Reeves, Siegfried Germadnig, and Patricia Germadnig,* Stephanie J. Brown Esq, August J. Landi Esq, Margie McMahon Esq, David Schlendorf Esq, Jackson Twsp. Police Chief Matthew Kunz, Jackson Township Police Officer Christopher Parise, Ocean Cty NJ Prosecutor Bradley Bilheimer, John Foti Jr, Madeline F. Einbinder J.S.C., Marlene L. Ford A.J.S.C., John S. Doran J.S.C., Deborah H. Schron J.S.C.,  John Does 1-10, John Does 1-10, XYZ Corporations  *individually, jointly and severally for:*

A)   Damages in the amount of $50,000,000.00, and
B)   Punitive Damages in the amount of $100,000,000.00, and
C)   Awarding any counsel fees obtained by Plaintiff's counsel, and
D)   Awarding costs of suit, and
E)   Interest, and
F)   Damages for Pain and Suffering, and
G)   For such other relief as the Court may determine to be appropriate.

**CLAIM FOR RELIEF- FALSE ARREST**

Plaintiff Zia Shaikh incorporates by reference the allegations contained in the above paragraphs, as though fully set forth herein.

*WHEREFORE, Plaintiff  Zia Shaikh, respectfully demands judgment against Defendants Coneeny, Eluzzi, Laura Germadnig, Steven A. Zabarsky, Esq., the Law firm* Stephanie J. Brown Esq, August J. Landi Esq, Margie McMahon Esq, David Schlendorf Esq, Jackson Twsp. Police Chief Matthew Kunz, Jackson Township Police Officer Christopher Parise, Ocean Cty NJ Prosecutor Bradley Bilheimer, John Foti Jr, Madeline F. Einbinder J.S.C., Marlene L. Ford A.J.S.C., John S. Doran J.S.C., Deborah H. Schron J.S.C., John Does 1-10, John Does 1-10, XYZ Corporations*, individually, jointly and severally for:*

A)   Damages in the amount of $50,000,000.00, and
B)   Punitive Damages in the amount of $ 100,000,000.00, and
C)   Awarding any counsel fees obtained by Plaintiff's counsel, and
D)   Awarding costs of suit, and
E)   Interest, and
F)   Damages for Pain and Suffering, and
G)   For such other relief as the Court may determine to be appropriate.


**CLAIM FOR RELIEF-FALSE IMPRISONMENT**

Plaintiff Zia Shaikh incorporates by reference the allegations contained in the above paragraphs, as though fully set forth herein.

WHEREFORE, Plaintiff  Zia Shaikh, respectfully *demands judgment against Defendants Coneeny, Laura Germadnig, Steven A. Zabarsky, Esq., the Law firm,* Stephanie J. Brown Esq, August J. Landi Esq, Margie McMahon Esq, David Schlendorf Esq, Jackson Twsp. Police Chief Matthew Kunz, Jackson Township Police Officer Christopher Parise, Ocean Cty NJ Prosecutor Bradley Bilheimer, John Foti Jr, Madeline F. Einbinder J.S.C., Marlene L. Ford A.J.S.C., John S. Doran J.S.C., Deborah H. Schron J.S.C.,   John Does 1-10, John Does 1-10, XYZ Corporations,  *individually, jointly and severally* for:

A)   Damages in the amount of $50,000,000.00, and
B)   Punitive Damages in the amount of $100,000,000.00, and
C)   Awarding any counsel fees obtained by Plaintiff's counsel, and
D)   Awarding costs of suit, and
E)   Interest, and
F)   Damages for Pain and Suffering, and
G)   For such other relief as the Court may determine to be appropriate.


**DAMAGE CLAIMS AGAINST ALL DEFENDANTS- PUNITIVE DAMAGES**

Plaintiff Zia Shaikh incorporates by reference the allegations contained in the above paragraphs, as though fully set forth herein.

In addition to compensatory damages, Plaintiff Zia Shaikh hereby make a claim for punitive damages against all Defendants in an amount to be proven at trial for the willful and wanton acts, omissions, commissions of all Defendants, to include violation of Plaintiff's civil rights, common law tort as alleged in this Complaint.

The acts and omissions of all Defendants in this case were so gross and culpable in nature that they constitute reckless indifference and wanton disregard for the law and for the lives and safety of others through malicious prosecution, false arrest/false imprisonment without probable cause that constitutes assault and kidnapping, including Plaintiff. All Defendants committed the acts and omissions alleged in this Complaint and subjected Plaintiff to outrageous improper treatment that caused Plaintiff to suffer financial and emotional distress so severe and outrageous that no person should be expected to endure it. All Defendants actions were outrageous and should be punished, and an example should be made so that these actions, commissions, and omissions are not repeated.

The recovery of punitive damages is permitted under the federal civil rights statutes and for common law torts for reckless and callous indifference to the federally protected rights of others and is thus appropriate in this case. This instance of reckless and callous indifference to Plaintiff's safety and Constitutional rights should be punished through the imposition of punitive damages so as to make an example of conduct that must not be tolerated.

**CLAIM OF RICO- RECOVERY**

Plaintiff Zia Shaikh is entitled to recover, pursuant to *Title 18 United States Code §1964(c),* treble damages in the amount to be determined by offer of proofs at time of trial. Plaintiff is also entitled to recover attorney(s)' fees and costs of this litigation, as well as damages arising from lost profits and/or lost business opportunities attributable to the activities engaged in by all Defendants committed in furtherance of the Enterprises.

WHEREFORE, Plaintiff Zia Shaikh demands for judgment on RICO counts against All Defendants individually and jointly as follows:

An award of compensatory damages in the amount of $50,000,000.00 (Fifty Million Dollars) for the deprivation of his liberties, continual harassment and stress caused by Defendants, and for interference with Plaintiff's business/economic advantage causing him lost business and profits, as against all Defendants, individually, jointly and severally, according to proofs at trial;

An award of punitive damages in the amount of $100,000,000.00 ( One Hundred Million Dollars) for the deprivation of his liberties, continual harassment and stress caused by Defendants, and for interference with Plaintiff's business/economic advantage causing him lost business and profits, as against all Defendants, individually, jointly and severally, according to proofs at trial; Exemplary damages according to proofs at trial; Treble damages pursuant to RICO damages; Enhanced damages according to proofs at trial; Interest; An award of reasonable costs and expenses incurred in this action, including counsel fees, if any, and expert fees, if any, as allowable under *Title 18, 28, and 42 sections asserted of the United States Code*;

**CLAIM FOR RELIEF –**VIOLATION OF 42 U.S.C. §1981 AGAINST ALL DEFENDANTS

Plaintiff Zia Shaikh incorporates by reference the allegations contained in the above paragraphs, as though fully set forth herein.

**WHEREFORE**, Plaintiff  Zia Shaikh, respectfully demands judgment against All Defendants individually, jointly and severally for:

A)   Damages in the amount of $10,000,000.00, and
B)   Punitive Damages in the amount of $50,000,000.00, and
C)   Awarding any counsel fees obtained by Plaintiff's counsel, and
D)   Awarding costs of suit, and
E)   Interest, and
F)   Damages for Pain and Suffering, and
G)   For such other relief as the Court may determine to be appropriate.


**CLAIM FOR RELIEF–** VIOLATION OF 42 U.S.C. §1983 AGAINST ALL DEFENDANTS

Plaintiff Zia Shaikh incorporates by reference the allegations contained in the above paragraphs, as though fully set forth herein.

**WHEREFORE**, Plaintiff  Zia Shaikh, respectfully demands judgment against All Defendants individually, jointly and severally for:

A)   Damages in the amount of $10,000,000.00, and
B)   Punitive Damages in the amount of $50,000,000.00, and
C)   Awarding any counsel fees obtained by Plaintiff's counsel, and
D)   Awarding costs of suit, and
E)   Interest, and
F)   Damages for Pain and Suffering, and
G)   For such other relief as the Court may determine to be appropriate.


**JURY DEMAND**

        Plaintiff Zia Shaikh demands that this matter be tried by a jury of twelve in the District Court of the United States for the District of New Jersey.


Dated: March 26, 2022                    _____
                                                      Zia Shaikh – Pro Se Plaintiff